Exhibit H

**Leslie Murphy**

| | |
|---|---|
| **From:** | Wall, Travis R. [twall@barwol.com] |
| **Sent:** | Thursday, August 07, 2008 11:25 AM |
| **To:** | Marcia L. Augsburger |
| **Cc:** | Leslie Murphy; Kiel, Linda |

**Subject:** RE: Alta Bates

Marcia:

I conferred with my client, and defendants cannot stipulate to a change in the scheduling order. Among other objections, we believe that the motion for leave to amend is untimely and that the delay is prejudicial. Defendants would be undercutting this position by agreeing to a stipulation to allow plaintiff to file such a motion at this late date.

Travis

> **From:** Marcia L. Augsburger [mailto:maugsburger@mhalaw.com]
> **Sent:** Thursday, August 07, 2008 9:32 AM
> **To:** Wall, Travis R.
> **Subject:** RE: Alta Bates
>
> We intend to claim fraud as well. In any event, would you stipulate to an order changing the scheduling order such that we can file our motion to amend to be heard on 10-10?
>
> *Marcia L. Augsburger, Esq.*
> McDonough Holland & Allen PC
> 555 Capitol Mall
> Sacramento, CA 95814
> Phone: 916-325-4589
> Fax: 916-444-8989
>
> **Confidentiality Notice: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication. If you have received this communication in error, please contact our IT Department by email at helpdesk@mhalaw.com, or by telephone at (916) 444-3900. Thank you.**
>
>
> **From:** Wall, Travis R. [mailto:twall@barwol.com]
> **Sent:** Thursday, August 07, 2008 9:29 AM
> **To:** Marcia L. Augsburger
> **Subject:** RE: Alta Bates
>
> Marcia:
>
> We cannot agree to your proposal. There is also no reason for your motion to be heard first. We are moving on the breach of contract claims. If we prevail, your client will have no basis to seek any type of relief under any theory.

8/7/2008

Travis

---

**From:** Marcia L. Augsburger [mailto:maugsburger@mhalaw.com]
**Sent:** Thursday, August 07, 2008 9:28 AM
**To:** Wall, Travis R.
**Subject:** RE: Alta Bates
**Importance:** High

With regard to the hearing dates, it seems to me to be a more efficient schedule to have the motion to amend heard first and then the motion for summary judgment. Would you stipulate to an order changing time so that the motion to amend can be heard on 9-19 and the summary judgment motion on 10-10, which is the next available date?

*Marcia L. Augsburger, Esq.*
McDonough Holland & Allen PC
555 Capitol Mall
Sacramento, CA 95814
Phone: 916-325-4589
Fax: 916-444-8989

**Confidentiality Notice: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication. If you have received this communication in error, please contact our IT Department by email at helpdesk@mhalaw.com, or by telephone at (916) 444-3900. Thank you.**

---

**From:** Wall, Travis R. [mailto:twall@barwol.com]
**Sent:** Thursday, August 07, 2008 9:11 AM
**To:** Marcia L. Augsburger
**Cc:** Leslie Murphy
**Subject:** RE: Alta Bates

Marcia:

We have no obligation to provide a declaration for items 2 or 4. We will provide a supplemental response as required by the Federal Rules of Civil Procedure.

Travis

---

**From:** Marcia L. Augsburger [mailto:maugsburger@mhalaw.com]
**Sent:** Thursday, August 07, 2008 7:00 AM
**To:** Wall, Travis R.
**Cc:** Leslie Murphy
**Subject:** RE: Alta Bates

1. I never refused to explain the relevance - you have refused to accept my explanations, and to acknowledge that it is sufficient if the documents are reasonably calculated to lead to the discovery of admissible evidence. The topics of the manual reflect that they are

reasonably likely to have evidence bearing on issues of materiality of the disclosure, whether UOO/MOO followed its internal practices, procedures, and policies, how it interpreted the SRQ and Policy, and its agency relationship with its TPAs. If you are willing to discuss this further, or to produce the manual forthwith, please contact me or Leslie today. I have meetings until 11, then a noon meeting until 3:00, and another meeting at 5:00.

2. & 4. We will continue working on the motion to compel with regard to these until we see the supplemental responses and a declaration that a diligent search has been conducted of all records. It seems to us you could run a report of all claims paid and denied for 2005 and 2006, check them against the final disclosures, of which there would only be 1 for each insured group in California, then for those patients who do not appear on the final disclosures, check to see when they were first diagnosed. You should then produce the files for the cases where diagnosis preceded the policy commencement date.

3. With regard to the exception log, are there any portions you are willing to produce? We need to better understand the circumstances under which UOO/MOO makes exceptions.

*Marcia L. Augsburger, Esq.*
McDonough Holland & Allen PC
555 Capitol Mall
Sacramento, CA 95814
Phone: 916-325-4589
Fax: 916-444-8989

**Confidentiality Notice: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication. If you have received this communication in error, please contact our IT Department by email at helpdesk@mhalaw.com, or by telephone at (916) 444-3900. Thank you.**

**From:** Wall, Travis R. [mailto:twall@barwol.com]
**Sent:** Wednesday, August 06, 2008 10:49 PM
**To:** Marcia L. Augsburger
**Cc:** Leslie Murphy
**Subject:** RE: Alta Bates

Marcia:

I did not have time to respond to your points earlier since I have been working on other matters all day.

1. You have failed to explain why the entire claims manaul is relevant to this dispute. We have offered to have you identify specific sections and state the potential relevance, but you refused.

2. Request No. 62 seeks documents related to United's review of ABSMC stop loss claims related to medical conditions that were not disclosed during renewals. The only potentially responsive documents to this request are those for CC and RM, which have already been produced. I will prepare a supplemental response tomorrow.

3. My client will not agree to produce the exception log since it is not relevant or reasonably calculated to lead to the discovery of admissible evidence.

4. We have already affirmed that all SRQ's are the same. You object to the fact that we used the term "will affirm." Although we take issue with this objection, we will agree to revise the response to affirm that all SRQ's are the same and to specify that MOO does not issue stop loss policies.

5. My client continues to maintain that these files are irrelevant.

As for the timing of your motion to amend, as stated in previous e-mails, Alta Bates cannot notice its motion for September 19. Although the court issued an order establishing a placeholder on that date for dispositive motions, the judge's website makes clear that the earliest available date for other motions is October 3. Please do not imply to the court that we agreed that Alta Bates could notice its motion for September 19. I would also prefer that the motion be heard later, since a September 19 date would make the briefing for the opposition coincide with my vacation and the motion would be mooted if the court grants our motion for summary judgment.

Travis

---

**From:** Marcia L. Augsburger [mailto:maugsburger@mhalaw.com]
**Sent:** Tuesday, August 05, 2008 3:34 PM
**To:** Wall, Travis R.
**Cc:** Leslie Murphy
**Subject:** RE: Alta Bates

With regard to the pending Order of Magistrate LaPorte relating to requests 17, 51, and 52, we will be submitting the enclosed letter to the Court unless you have changed your position on any of the issues discussed therein. We will hold the letter until the end of the day today in case we hear from you, but I believe you have made your position very clear in all the correspondence we have exchanged and during our conversations.

With regard to the remaining outstanding requests, we will file a motion this Thursday, the last day, and request that it be heard on September 16, 2008. The motion will address the following:

1. Claims Manual (Request no. 67) . The Table of Contents makes it absolutely clear that we need the entire manual. Each chapter appears to contain information on matters that have been raised by one party or the other at various times in this matter. We will maintain the confidentiality of the document.

2. Documents regarding UOO's and MOO's review of ABSMC claims related to medical conditions not disclosed during renewal (Request no. 62). When we talked, you said you would tell me whether you have produced everything. I assume this is what you are referring to in the last paragraph below, and that in fact, your client confirmed it did not produce everything but will not produce any additional documents. I believe this would include documents relating to ███████ and ██████. Please advise asap. If I do not hear from you by close of business, I will assume we need to include it in our

motion to compel.

3. Exception log (Request no. 63). Your client continues to refuse to produce the exception logs for the reasons we have discussed with respect to request number 17 to UOO (please see enclosed letter to Court). If this is inaccurate, please advise asap. Otherwise, we will include this in our motion to compel, based on our position that the exception log is reasonably calculated to lead to evidence that bears on UOO's interpretation of the SRQ and policy.

4. SRQs for 2005 -2006 (Request no. 65). You were going to revise UOO's and MOO's responses to state that all SRQs UOO used were identical, and that MOO did not issue SRQs.

5. UOO's Case Management Files for ABSMC (Request no. 24 to UOO). I understand you will not produce these, so they will be the subject of the motion to compel.

With regard to our motion to amend the complaint, we will file the motion to be heard on the same day as your motion for summary judgment. I believe this is what you suggested.

Marcia L. Augsburger, Esq.
McDonough Holland & Allen PC
555 Capitol Mall
Sacramento, CA 95814
Phone: 916-325-4589
Fax: 916-444-8989

Confidentiality Notice: This communication and any accompanying document(s) are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon the communication is strictly prohibited. Moreover, any such inadvertent disclosure shall not compromise or waive the attorney-client privilege as to this communication. If you have received this communication in error, please contact our IT Department by email at helpdesk@mhalaw.com, or by telephone at (916) 444-3900. Thank you.

-----Original Message-----
From: Wall, Travis R. [mailto:twall@barwol.com]
Sent: Monday, August 04, 2008 3:54 PM
To: Marcia L. Augsburger; Leslie Murphy
Cc: Kiel, Linda
Subject: Alta Bates

Marcia and Leslie:

Attached is the table of contents for United's claim manual. We have already produced the sections related to claims processing and appeals.
If your client believes another section is potentially relevant, please identify the section. We are not agreeing to produce all sections you might identify, but we are willing to discuss them further. I have designated these documents as confidential under the protective order in this case.

With respect to the SLIIC, please be advised that Mutual and United did not draft any manuals related to SLIIC. Rather the manuals were created by an outside consultant who designed the system for Untied. They simply describe how to use the computer software and are not company procedures manuals. The SLIIC manuals have no potential relevance to this case. There is no SLIIC table of contents that I can send you since the manuals do not have a table of contents.

I spoke with my client about the third-party claims files, and United continues to believe that they are totally irrelevant to this case. My clients will not agree to produce those documents.

Travis

Travis R. Wall
BARGER & WOLEN LLP
650 California Street, 9th Floor
San Francisco, California 94108-2713
Tel. (415) 743-3738 (direct)
Tel. (415) 434-2800 (main operator)
Fax. (415) 434-2533
email:  twall@barwol.com

The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above.  Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient.  If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal.  Thank you.

Exhibit I

**Leslie Murphy**

| | |
|---|---|
| **From:** | Wall, Travis R. [twall@barwol.com] |
| **Sent:** | Thursday, August 07, 2008 2:03 PM |
| **To:** | Marcia L. Augsburger; Leslie Murphy |
| **Cc:** | Kiel, Linda |
| **Subject:** | Alta Bates |

**Attachments:** 20080807140005160.pdf; 20080807140014397.pdf

  

20080807140005160.pdf (239 KB)...    20080807140014397.pdf (230 KB)...

Marcia and Leslie:

Please see the attached supplemental responses.  The originals will follow by mail.

Travis

Travis R. Wall
BARGER & WOLEN LLP
650 California Street, 9th Floor
San Francisco, California 94108-2713
Tel. (415) 743-3738 (direct)
Tel. (415) 434-2800 (main operator)
Fax. (415) 434-2533
email: twall@barwol.com

The information in this transmittal (including attachments, if any) is privileged and confidential and is intended only for the recipient(s) listed above.  Any review, use, disclosure, distribution or copying of this transmittal is prohibited except by or on behalf of the intended recipient.  If you have received this transmittal in error, please notify me immediately by reply email and destroy all copies of the transmittal.  Thank you.

Exhibit J

1            IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
2

3    ALTA BATES SUMMIT MEDICAL   )
     CENTER,                     )
4                                )
           Plaintiff,            )
5                                )
                        -vs-     )Case#C07-4224 JSW
6                                )
     UNITED OF OMAHA LIFE        )
7    INSURANCE COMPANY, et al.,  )
                                 )      DEPOSITION
8        Defendants.             )
     _____)
9

10

11            *** CONFIDENTIAL ***

12

13            DEPOSITION OF TOM GAGE

14

15            Deposition of TOM GAGE, taken on

16   behalf of the Plaintiff, at Erickson &

17   Sederstrom, 10330 Regency Parkway Drive,

18   Suite 100, Omaha, Nebraska, beginning at

19   8:26 a.m., Thursday, June 26, 2008, before

20   Bobbi M. Randall, RPR, CSR, a General Notary

21   Public within and for the State of Nebraska,

22   pursuant to Notice.

23
              BOBBI M. RANDALL, RPR, CSR
24       MATHESON-TAULBORG-DENNEY-SCHLEIFE
             7602 Pacific Street, LL101
25              Omaha, NE  68114
                (402) 397-9669   ORIGINAL

2

1                    <u>APPEARANCES</u>

2       For the Plaintiff:

3       MARCIA L. AUGSBURGER
        LESLIE C. MURPHY
4       Attorneys at Law
        Ninth Floor
5       555 Capitol Mall
        Sacramento, CA  95814
6
        For the Defendants:
7
        TRAVIS WALL
8       Attorney at Law
        Ninth Floor
9       650 California Street
        San Francisco, CA  94108
10
        DAVID A. BARRON
11      Attorney at Law
        Mutual of Omaha Plaza
12      Omaha, NE  68175

13                      <u>INDEX</u>

14      <u>TOM GAGE</u>

15                                              <u>Page</u>

        Direct Examination by Ms. Augsburger      4
16
        Certificate                             221
17
        <u>EXHIBITS</u>:                         <u>Marked</u>
18      44 - January 29, 2003, email from
             J. Mueller
19                                              124

        89 - Report of Evaluation of Benefit &
20           Risk Management Services (Tantara)  117

21      90 - February 8, 2001, letter to S. Reid 117

22      91 - March 2004 email string            126

23      92 - June 2004 email string             133

24      93 - August 17, 2005, email from J. Moore 135

25      94 - August 2005 email string           158

        95 - Handwritten notes                  167

1        A    Actually, special risk is another area

2   under the umbrella of special markets of which

3   stoploss is also part of that.  We had some

4   changes back in 2004 that necessitated my also

5   assuming the responsibilities of stoploss -- or

6   special risk.

7        Q    What kind of changes were those?

8        A    Terminations, people moving on, blending

9   of departments.

10       Q    When was United of Omaha created?

11       A    I don't know.

12       Q    Was it there when you arrived at MoO?

13       A    Yes.

14       Q    Do you also work for United?

15       A    My paycheck comes from Mutual of Omaha.

16       Q    Do you know whether United has any

17  employees?

18       A    I don't know.

19       Q    In your role as vice president of sales

20  and marketing, do you travel around and meet with

21  TPAs?

22       A    Yes.

23       Q    Are you sort of a -- well, what kinds of

24  things do you do when you meet with TPAs?

25       A    We meet with TPAs on a prospective

1   basis.  If we are -- if we are looking for

2   opportunities to write stoploss business, we will

3   typically contact third party administrators who

4   administer claims for a number of self-funded

5   customers.  They are, in essence, brokers.  They

6   broker the business, and then they will contact

7   carriers like a Mutual of Omaha to underwrite the

8   business.  We're one of many carriers in this

9   business that provide services to self-funded

10  employer groups.

11      Q    Okay.  So do you market primarily to

12  TPAs as opposed to --

13      A    Yes.

14      Q    -- for example, employers?

15      A    Yes.

16      Q    So then your relationships or Mutual of

17  Omaha's relationships with TPAs would be very

18  important to its business; right?

19      A    Yes.

20      Q    Beyond the advantage of being able --

21  well, let me say it this way:  A TPA may represent

22  multiple employers or others who are interested in

23  purchasing stoploss insurance; right?

24      A    Correct.

25      Q    So you sort of -- by going to a TPA, you

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL    11

1    sort of get a lot of bang for your buck, as it

2    were?

3        A    Correct.

4        Q    So that's one advantage of having a good

5    relationship with a TPA.  What are some other

6    advantages that MoO gets from having good

7    relationships with a TPA?

8        A    Our advantage would be we get

9    opportunities to underwrite business from third

10   party administrators.  That's the advantage.

11       Q    Okay.

12       A    We -- you know, we receive, hopefully,

13   numerous opportunities to underwrite business

14   that's brokered by these third party

15   administrators.

16       Q    Okay.  In addition, third party

17   administrators provide a lot of administrative

18   services --

19       A    Right.

20       Q    -- for employers, for example; right?

21       A    Yes.

22       Q    And if the TPAs weren't providing

23   administrative services, then Mutual of Omaha

24   would either have to provide them or hire someone

25   else to do so; right?

1        A      Correct.

2        Q      So, for example, if a TPA has access to

3    claims information, and for purposes of stoploss,

4    MoO wants to have information about, for example,

5    high dollar claims, then MoO -- if the TPA were to

6    just dump all of the claims onto MoO and say,

7    Here, go ahead and search for the high-dollar

8    claims, you would have to have personnel, for

9    example, to address that; right?

10       A      To review it.

11       Q      But by having a TPA who Mutual requires

12   go through the claims and find -- or advise of the

13   high dollar ones, that's an advantage that Mutual

14   has because they don't have to hire personnel to

15   handle that; right?

16       A      I would say it's -- yes.  Yeah.

17       Q      Okay.  Another advantage might be at

18   least some TPAs handle case management; right?

19       A      Yes.

20       Q      And if an employer, for example, is

21   self-insured and has hired a TPA to handle claims,

22   then the TPA is going to have some interest or

23   motivation in keeping -- in containing the health

24   care costs; right?

25       A      For the employer, yes.

1    Q    Yes.  And that's also an advantage to

2    Mutual, right, ultimately?

3    A    It can be.

4    Q    As we have talked about some of these

5    advantages, have any others come to mind right

6    now?

7    A    No.

8    Q    Okay.  Can you tell me approximately --

9    and just a real general ballpark is fine, you're

10   not expected to know precisely numbers and all of

11   that as I ask you questions.

12   A    Sure.

13   Q    Approximately how many stoploss policies

14   did Mutual issue in California in, say, 2003?

15   A    In the state of California?

16   Q    Yes.

17   A    I don't know.

18   Q    Okay.  Do you know how many stoploss

19   policies Mutual issued throughout the United

20   States?

21   A    In 2003?

22   Q    Yes.

23        THE WITNESS:  Would you like me to make

24   a good guess?

25        MR. WALL:  Well, you shouldn't be

1    Q    Now, you're aware that BRMS, for

2    example, represents Alta Bates -- or is a third

3    party administrator for Alta Bates in connection

4    with Alta Bates's self-insured plan for its

5    employees; correct?

6    A    Yes.

7    Q    And can you give me sort of some sense

8    of how many of the TPAs that you deal with are

9    representing employers in connection with their

10   own self-insured plans, a percentage, general

11   percentage?

12   A    I'm not sure I understand the question.

13   Q    Okay.  A third party administrator in

14   connection with the stoploss policies that United

15   or Mutual issues will administer -- or

16   administrate claims for groups who are -- who have

17   basically their own self-insured health plans;

18   right?

19   A    Yes.

20   Q    And is that the case with all of the

21   TPAs you deal with or just a portion of them?

22   A    All of the TPAs we deal with.

23   Q    Okay.  And you're aware that the TPAs

24   are the ones who gather the information about

25   employee claims and pull that together for

1    submission to United or Mutual; correct?

2        A    Yes.

3        Q    And are you also aware that the

4    employers in many cases are really not privy to

5    the information, to the medical information, about

6    their employees?

7        A    I believe that to be the case.

8        Q    All right.  In fact, employers really

9    are well advised not to have information about the

10   medical conditions of their employees; right?

11       A    I would say in a specific sense with

12   specific employees, yes.  In a general sense,

13   employers may have information regarding the

14   entire population.

15       Q    Sure.  What percent of their population

16   has had more than 10,000 in claims, that sort of

17   thing; right?

18       A    Yes.

19       Q    So in fact, one of the reasons that

20   employers hire third party administrators is to

21   sort of shield themselves from having specific

22   information about individual claims; correct?

23       A    That could be one of the reasons, yes.

24       Q    So you understand that for that reason,

25   TPAs prepare the SRQs for submission to United or

1    Mutual; right?

2       A    They may prepare them, yes.

3       Q    All right.  And the information that is

4    disclosed comes from or is generated by the TPA;

5    right?

6       A    I would say the information coming from

7    the TPA or the broker, if there's an outside

8    broker involved, or in some cases it may be from

9    the employer, if the employer tracks that

10   information.

11      Q    Right.  Are you also aware that United

12   or Mutual required that even though the

13   employer -- in situations where the employer is

14   not the one who compiles the disclosure

15   information, that they are nonetheless required to

16   sign the disclosure, the application forms that

17   are submitted to United or Mutual?

18      A    I believe the employer is required to

19   sign, yes.

20      Q    And, in fact, you're aware that in the

21   industry, TPAs are generally unwilling to sign

22   applications or disclosure forms of that type;

23   right?

24      A    Yes.

25      Q    Do you recall discussions in the

1    that it could be reasonably anticipated that it

2    would take a TPA some time to get systems into

3    place in order to go back and pull ICD-9

4    information if they didn't already have those

5    systems in place at the end of 2004?

6         A    Well, it's my general sense that TPAs

7    that process claim information online have the

8    information at their fingertips.  It may be a

9    situation whereby the system isn't programmed to

10   develop a particular report.  Now, programming can

11   be a very simple task based upon -- I believe

12   based upon your system, or it can be an extensive

13   task.  I don't -- I really can't answer that

14   question with any certainty.

15        Q    Okay.  Do you have any -- well, what do

16   you know about BRMS's ability to pull ICD-9 codes

17   in 2005?

18        A    It's my understanding that that was

19   something that they could not -- they could not do

20   or weren't doing.

21        Q    Where did you gain that information?

22        A    I believe in our discussions with BRMS I

23   alluded to earlier, they mentioned that's

24   something that they had not done before.

25        Q    Okay.  Did that surprise you?

1      A    Yes.

2      Q    Okay.  Why did it surprise you?

3      A    Because it's -- in our industry it's

4  very -- it seems to be a very simple process.

5  Like I mentioned before, the information, if

6  you're processing claims online, if your system is

7  programmed to do that, it's a matter of being able

8  to extract that information.  At that time, I

9  believe there were many carriers, MGUs, asking for

10 very specific ICD-9 information.  I don't know for

11 sure, but it certainly was not, in my opinion, an

12 uncommon request.

13     Q    All right.  Did you express that to

14 BRMS?

15     A    Yes.

16     Q    What was their response?

17     A    The response was we can program our

18 system to be able to provide that information to

19 you.

20     Q    Okay.  Did they tell you by when?

21     A    No.

22     Q    Do you remember when you had this

23 conversation with them?

24     A    I don't recall the exact time.

25     Q    Just generally?

```
 1          A      I would believe it to be, like I said

 2     earlier, in '05 or '06.  I just -- I don't recall

 3     the exact time.

 4          Q      Okay.  And do you recall whether or not

 5     United or Mutual agreed to go ahead and continue

 6     using BRMS as a TPA just by the fact that they

 7     didn't yet have an automated system to pull ICD-9

 8     codes?

 9          A      Can you repeat that?

10                 (The requested portion was read.)

11          A      Yes, I believe we -- I believe we

12     continued to work with BRMS, yes.

13          Q      (By Ms. Augsburger)  Okay.

14          A      Yes.

15          Q      And to put that question a little bit

16     differently, BRMS had informed you that it didn't

17     have really any processes in place to -- or it

18     really didn't intend to provide all of the ICD-9

19     codes while it was attempting to gain that

20     capability, and United or Mutual, nonetheless,

21     kept them on as a TPA; right?

22          A      That I don't know.  I don't recall

23     anything in the discussions about that.

24          Q      Is Mutual or United still under contract

25     with BRMS as a TPA?
```

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL    65

1        A      I don't believe so.

2        Q      Okay.  Do you recall when they were no

3   longer a TPA for United or Mutual?

4        A      No.  Can you explain under contract?

5        Q      Well, remember toward the beginning of

6   the deposition when I asked you a question and

7   your counsel objected and you said, Do you mean

8   under contract?  You have a sense of what that is,

9   don't you?  You know there's a contract between

10  Mutual and BRMS; right?

11       A      Yes, a TPA agreement.

12       Q      Right.  And that's a contract; right?

13       A      I would answer that I think contract can

14  be a broad term.  Maybe not in your industry.

15       Q      What did you mean?

16       A      Do we continue to do business,

17  underwrite business for BRMS?  And the answer is

18  no.  I do not know if our TPA agreement has been

19  terminated.  I don't know that.

20       Q      Okay.  Let me go back to my prior

21  question, then.  BRMS, you met with BRMS, as I

22  have it, and you said in 2005 or 2006, and they

23  told you that they really didn't have any systems

24  in place to be able to identify ICD-9 codes.  Do I

25  have that right so far?

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL     66

1        A    That is my recollection, yes.

2        Q    Okay.  And do you also recall that

3   thereafter, you continued to market products to

4   BRMS?

5        A    Based upon -- yes, based upon my

6   recollection of that, yes.

7        Q    Okay.  And was it -- when the

8   disclosures were received that BRMS had

9   participated in creating, was there a decision

10  made to provide some flexibility, because you're

11  aware that BRMS didn't have the capability of

12  pulling ICD-9 codes?

13       A    I really believe that we felt BRMS would

14  be able to develop the documentation or the system

15  capability to extract that information or provide

16  us that information, however they wanted to do it.

17  And yes, that was -- I would say that was -- could

18  have been a reason why we continued to quote

19  business with them, yes.  We were -- we were led

20  to believe that BRMS understood our position and

21  was going to do anything they possibly could to

22  get us the information we requested.

23       Q    Okay.  You didn't reject the select risk

24  questionnaires?

25       A    I don't know.

1   audits being conducted of BRMS?

2       A    Audits are a standard practice of

3   Mutual.  I don't know what the schedule is, but

4   we -- we typically audit all of our TPAs

5   regardless of their performance.

6       Q    Okay.  On a regular basis?

7       A    Yes, regular could mean once every

8   couple of years, depending upon the number of TPAs

9   that we have to audit.

10      Q    Okay.  And so to your knowledge, were

11  the audits of BRMS performed as part of the

12  regular audit process?

13      A    I don't know.

14      Q    Okay.  What concerns did you hear Mutual

15  express or did you hear expressed within Mutual

16  about BRMS's performance as a TPA?

17      A    The concern that I heard was we were not

18  receiving claim -- claim and medical management

19  information that is typically received by our

20  medical management department from other TPAs.

21      Q    Okay.  Did you undertake to do any

22  investigation as to why that was happening?

23      A    Personally, no.  The investigation would

24  have occurred between our medical management staff

25  and BRMS.

1      Q      All right.  Did you have any

2      conversations with Scott Reid about those

3      concerns?

4      A      I believe so.

5      Q      And I think you mentioned earlier that

6      one response, at least, that you got from someone

7      at BRMS is that they didn't have the capability of

8      pulling these --

9      A      Yes --

10     Q      -- claims; right?

11     A      -- that actually led to our visit.

12     Q      Okay.  Were there any other -- did you

13     gain any other information from anyone at BRMS

14     regarding Mutual or United's concerns that it was

15     not receiving -- I'm sorry, let me try that

16     again -- regarding United or Mutual's concerns,

17     that claims information was not being received on

18     a timely basis or at all?

19     A      I believe the individuals that I spoke

20     with were Scott Reid and Matt.

21     Q      And other than expressing that they

22     didn't have the ability technologically to pull

23     this information, did they say anything else about

24     that?

25     A      Not that I'm aware of.

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL      88

1       Q    Okay.

2       A    But the conversations -- you know, I may

3  not have been privy to all of the conversations

4  regarding the day-to-day or the details of all of

5  that.  That would have taken place between our

6  medical management staff and BRMS.

7       Q    Sure.  I'm just asking about your

8  knowledge, your conversations with BRMS.

9       A    Not that I recall.

10      Q    Okay.  And so nothing other than what

11  you've already told me with regard to medical

12  management?

13      A    Not that I recall, no.

14      Q    Okay.  Do you recall when you first

15  heard about United or Mutual's concerns about

16  BRMS?

17      A    I don't remember exactly when.

18      Q    Just approximately.

19      A    I would say approximately 2005.

20      Q    Okay.  And the concern expressed, was it

21  more about the fact that United or Mutual wasn't

22  receiving claims on a timely basis or was it that

23  they weren't receiving disclosures at all, or some

24  combination?

25      A    I believe the -- it was more of a --

1   rather than receiving disclosures, it was

2   receiving just the basic information concerning

3   large claims that we would standardly be receiving

4   from other administrators.  And that is

5   typically -- what triggers that is when you start

6   receiving claims, specific claims, and our medical

7   management staff had no prior knowledge of that

8   particular claim.  So that's what -- typically

9   what will trigger a response from our medical

10  management folks.

11          Q     Would you look at Exhibit 41, please?

12          A     Okay.

13          Q     This is the agreement that we looked at

14  earlier today that bears your signature between

15  BRMS and, at least initially in 2003, Mutual of

16  Omaha; correct?

17          A     Yes.

18          Q     And this was entered in 2003; correct?

19                MR. WALL:  Are you talking about the

20  original?

21                MS. AUGSBURGER:  Yes.

22                MR. WALL:  I think he answered the

23  question.

24          Q     (By Ms. Augsburger)  Did you answer the

25  question?

1  A  Yes.

2    COURT REPORTER:  What was the answer?

3    THE WITNESS:  Yes.

4  Q  (By Ms. Augsburger)  All right.  So then

5 the amendment to -- there was an amendment that

6 was entered which begins on page 0049, signed by

7 you in November of 2005; correct?

8  A  Yes.

9  Q  All right.  Do you think you had heard

10 about United or Mutual's concerns with regard to

11 receiving basic information about large claims

12 from BRMS at the time that you executed this

13 amendment with BRMS?

14  A  It's possible, yes.

15  Q  Okay.  Do you recall having any

16 conversations about whether it was a good idea to

17 amend the -- this TPA agreement and continue the

18 relationship with BRMS in late 2005?

19  A  Can you repeat that, please?

20    (The requested portion was read.)

21  A  No.

22  Q  (By Ms. Augsburger)  And then on the

23 last page, this is another amendment to the same

24 agreement; correct?

25  A  Yes.

 1    recollection, generally a standard form agreement

 2    within United or Mutual?

 3         A    Generally, yes.

 4         Q    All right.  And I take it you've looked

 5    at some --

 6         A    Yes.

 7         Q    -- of those agreements; right?

 8         A    Yes.

 9         Q    So let's look at Section 2.1.  That

10    section addresses premium collection activities.

11    Do you see that?

12         A    Yes.

13         Q    And so do I have it correct that third

14    party administrators generally collect premiums on

15    behalf of United or Mutual?

16         A    Yes.

17         Q    And third party administrators also

18    deposit those funds into a fiduciary account;

19    right?

20         A    Yes.

21         Q    Do you have any reason to believe that

22    BRMS's services deviated from this provision?

23         A    No reason to believe that.

24         Q    Let's look at the next page, which is

25    marked 38.

1        A    (Witness obliged.)

2        Q    The first provision at the top of 38

3    starts at the bottom of page 37.  It says, In

4    addition to the terms and conditions set forth

5    above, contractors shall perform the following

6    premium collection functions for company, and A

7    says, Follow the guidelines and proceeds set forth

8    in the TPA guide or other applicable procedural

9    manual of company.  Do you see that?

10       A    Yes.

11       Q    Okay.  And then F says, Provide company

12   with evidence of applicant insurability in

13   accordance with applicable policy provisions.  Do

14   you see that?

15       A    Yes.

16       Q    Does that have to do with premium

17   collection activities?

18       A    I don't believe so.

19       Q    Okay.

20       A    I believe -- applicant insurability.  In

21   the context of premium remittance, which I

22   understand this section implies, applicant

23   insurability could possibly mean ability to pay

24   premium in a timely fashion, but I'm not clear on

25   that.  I don't know.

1    Q    Okay.  Well, I'm just --

2    A    Yeah.

3    Q    -- I'm just trying to figure it out,

4    because you're right, I notice too, it's under

5    Section 2.1, Premium Collection Activities, and

6    yet I'm just trying to figure out whether there is

7    a way that that really comes under premium

8    collection.

9         Okay.  Well, in any event, under Section

10   2.2, it says, Contractor shall distribute

11   commissions to appointed agents and brokers with

12   in force policies in accordance with procedures

13   described in the TPA guide.  Do you see that?

14   A    Yes.

15   Q    Are you familiar with the TPA guide?

16   A    Somewhat, yes.

17   Q    And you expect the TPAs to comply with

18   that guide; right?

19   A    Yes.

20   Q    So can you just describe to me what is

21   meant by the term, appoint agents and brokers,

22   either with regard to this contract and your

23   understanding or based on your experience in the

24   industry?

25        MR. WALL:  Calls for speculation, lacks

1          foundation.  He didn't draft this agreement.

2          A    Mutual of Omaha requires agents and

3     brokers to be appointed with them, and I -- I

4     don't know if it's -- well, I'll leave it at that.

5     We require that they be appointed with Mutual of

6     Omaha.

7          Q    (By Ms. Augsburger)  Okay.  And what

8     does it mean for an agent, let's say, for example,

9     to be appointed?

10         A    To the best of my knowledge, Mutual of

11    Omaha runs a background check, and I'm not clear

12    beyond that what they -- what information they're

13    looking at, but there is a department that will

14    appoint an agent or a broker or not.

15         Q    Okay.  So there's an approval process --

16         A    Yes.

17         Q    -- essentially?

18         A    Yes.

19         Q    Okay.  And are you aware that there are

20    some state laws that address appointments of

21    agents by insurance companies?

22         A    I'm aware there are a number of

23    different state laws.  I don't know what they are,

24    and I -- I wouldn't want to speculate.

25         Q    Just having -- I'm just saying, just

1    other words, written agreements regarding the

2    appointment with the agents?

3        A    Repeat that, please.

4            (The requested portion was read.)

5        A    Yes.

6        Q    (By Ms. Augsburger)  But you don't know

7    with whom, at least in California?

8        A    Correct.

9        Q    Okay.  So then under 2.2B, that provides

10   that the TPA is to distribute 1099 forms to agents

11   and brokers receiving company commissions; right?

12       A    Yes.

13       Q    So do you understand that United or

14   Mutual provides TPAs with information about who

15   those agents and brokers are?

16       A    Yes.  Yes.

17       Q    Okay.  And that is -- it's helpful to

18   United to have the TPA complete and distribute

19   these forms to the agents and brokers because then

20   United or Mutual won't have to do that; right?

21       A    Correct.

22       Q    Then 2.3 provides that --

23       A    Let me clarify that, if I can.

24       Q    Okay.

25       A    I believe Mutual is required by law to

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL      99

1    provide Schedule A information to --

2         Q    Yes.

3         A    Yeah, that is a requirement, so we do

4    provide that to our third party administrators

5    that we work with.

6         Q    Right.  But the United or Mutual

7    personnel don't also complete and distribute the

8    1099s; right?

9         A    Right.

10        Q    Then under 2.3A, the TPA is required to

11   provide the policyholders with the enrollment and

12   eligibility materials, booklets, identification

13   cards, and other materials that United or Mutual

14   supplies; correct?

15        A    Correct, that's what this says.

16        Q    Okay.  And the TPAs also report and

17   process policyholder requests to add, terminate,

18   or change coverage under the policy in accordance

19   with the procedures set forth in the TPA guide;

20   that's 2.3B?

21        A    Yeah, I'm just reading it.

22        Q    Sorry.

23        A    Correct.

24        Q    Then C on the top of the next page

25   marked 39 --

1      A     Yes.

2      Q     -- this says, The TPAs are required to

3   enforce policy eligibility requirements and

4   collect data to support enrollment activities;

5   right?

6      A     Yes.

7      Q     And United and Mutual don't have a

8   department or personnel that fulfill that

9   function; right?

10     A     They do not have a department dedicated

11  to this, no.

12     Q     Do they have personnel who are dedicated

13  to that activity?

14     A     Yes.

15     Q     Okay.

16     A     Not on a daily basis.  It would be in

17  the claim -- on a claim by claim basis.  We would

18  verify eligibility, yes.

19     Q     Okay.  So then what does the TPA do?

20     A     Well, typically that's done -- it's a

21  simultaneous situation.  The TPA will, in their

22  verification of eligibility -- in many cases, they

23  will submit a copy of the enrollment card

24  supporting the fact that this is an eligible

25  individual under the plan --

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL    101

1    Q    Okay.

2    A    -- and that would come in directly to

3    our claim examiner.

4    Q    Okay.  But you're not suggesting there's

5    a duplication of efforts with regard --

6    A    No.

7    Q    -- with regard to --

8    A    No.

9    Q    I have to finish the question.

10    A    I'm sorry.

11    Q    You're not suggesting there's a

12    duplication of efforts with regard to enforcing

13    policy eligibility requirements and collecting

14    data to support enrollment activities; right?

15    A    I would say there's not a simultaneous

16    duplication of efforts.  If there's any question

17    at all on our behalf, we'll inquire.

18    Q    Sure.

19    A    Yeah.

20    Q    Okay.  Then the TPAs are also expected

21    to retain eligibility records; right?

22    A    Yes.

23    Q    And to field and answer inquiries from

24    persons regarding policy eligibility issues;

25    right?

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL   102

1    A    Yes.

2    Q    And then the TPA, reading further in

3    Section E here, it says, And refer all issues

4    involving questionable or disputed eligibility

5    determinations to company; right?

6    A    Yes.

7    Q    And so you would expect a reasonable TPA

8    to make a decision about whether there is an issue

9    involving a questionable or disputed eligibility

10   determination, and if so, to refer that to United

11   or Mutual; right?

12   A    Yes.

13   Q    So there's some judgment there that the

14   TPA needs to exercise as to whether or not they

15   contact the company?

16   A    Yes.

17   Q    Now, under Section 3.2, that relates to

18   the TPAs having an adequate business premises;

19   right?

20   A    Yes.

21   Q    And the TPA is required to provide

22   advanced written notice to United or Mutual of all

23   of its business locations; right?

24   A    Yes.

25   Q    Do you know whether that's something

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL   104

1    and the TPA guide?

2         A    I don't know.

3         Q    You haven't heard that discussed?

4         A    No.

5         Q    Then it says, In the event that the TPA

6    fails to meet a performance standard, then its

7    compensation will be reduced.  Do you see that?

8         A    What point was that?

9         Q    This is the last sentence of Section

10   3.5.

11        A    Okay.

12        Q    Do you see that?

13        A    Yes.

14        Q    And it says, Shall be reduced in the

15   manner and by the amount of the credits described

16   in the service addendum or TPA guide.  What are

17   credits?

18        A    I don't know.

19        Q    Okay.  Would you look at the next page.

20   It's marked United 0040.  And 4.3 says something

21   about a service addendum.  I just thought maybe

22   you would read that and see if it helps you

23   interpret that term for me, because I'm just

24   trying to figure out what that is.

25             MR. WALL:  Excuse me, what section?

1          (The requested portion was read.)

2      A     No, I'm not familiar with that.

3      Q     (By Ms. Augsburger)   Okay.   And when you

4   were considering entering into a relationship with

5   BRMS, it was not -- did you consider it not

6   important to find out about their clients, or was

7   that just not your role?

8      A     During the initial discussions -- it's

9   probably more important for us to understand them

10  and how they do business, and also, like I said,

11  it is nice to know their mix of business.  Do they

12  tend to write in any one particular industry?   Is

13  it broad based?   I can't say we're not interested.

14  I just don't know if that question came up.

15     Q     Okay.   Why is it more important to

16  understand them and how they do business, or why

17  is that important?

18     A     It's important for us because we need to

19  know what to expect from them in all of the

20  various departments, whether it's underwriting,

21  claims, eligibility.   We need to know -- and

22  that's one of the reasons we do continual audits.

23     Q     You need to make sure that they're going

24  to do a good job?

25     A     Right.

1      Q      Do you think it's important that United

2   or Mutual satisfy itself that the TPA is capable

3   of meeting the expectations that United and Mutual

4   have?

5      A      Yes.

6      Q      And do you think it's important that

7   United and Mutual satisfy itself that the TPA has

8   the required technological capabilities?

9      A      I think it's important, yes.

10      Q      Do you think it's important that United

11   and Mutual satisfy itself that the TPA understands

12   what United and Mutual need in terms of

13   information?

14      A      Yes.

15      Q      And do you think it's important that the

16   TPA express a willingness to serve the interests

17   of United and Mutual in performing the TPA

18   agreement?

19      A      With respect to the TPA agreement, yes.

20      Q      Would you find Exhibit 42 again, please.

21   Would you turn to page 0060.

22      A      (Witness obliged.)

23      Q      This is the first page of chapter 3 of

24   the third party administration guide; correct?

25      A      Yes.

1    A    Yes.

2    Q    And this was also for BRMS; correct?

3    A    Correct.

4    (Exhibit No. 98 was marked for

5    identification.)

6    Q    (By Ms. Augsburger)  This is another

7    specific reimbursement request form relating to

8    Debra Jones; correct?

9    A    Yes.

10    Q    And this is, like the last one, this

11    request relates to the policy period of January

12    of '06 through December of '06; right?

13    A    Correct.

14    Q    And this was also submitted by BRMS;

15    correct?

16    A    Yes.

17    Q    And this was for $33,066?

18    A    Yes.

19    (Exhibit No. 99 was marked for

20    identification.)

21    Q    (By Ms. Augsburger)  Do you recognize

22    the Mutual of Omaha symbol up there at the top?

23    A    Yes.

24    Q    Have you ever seen any stationery that

25    just has United of Omaha Life Insurance Company on

DIRECT - T. GAGE (Augsburger) - CONFIDENTIAL    176

1   it as opposed to what you see on this document in

2   the top left-hand corner, where it has Mutual and

3   United?

4       A    I don't recall.  I don't recall seeing

5   United of Omaha letterhead.

6       Q    This is addressed to Ralph Herrera at

7   BRMS, and it says, I have completed my review of

8   your submission dated 7/21/06 for the

9   above-referenced individual totaling 331,371.80.

10  The following determination has been made.  And

11  then there are some quotations, and if you go to

12  the second page, the second paragraph says, Review

13  of the claim documentation submitted indicates

14  that the claimant incurred services on May 24th,

15  2005, and so on and so on, and ultimately in the

16  last sentence, it says, Based on this

17  documentation, we are applying provision misstated

18  data and denying reimbursement for the stoploss

19  claim submitted; right?

20      A    Yes.

21          (Exhibit No. 100 was marked for

22      identification.)

23      Q    (By Ms. Augsburger)  Exhibit 100 is a

24  denial of the $33,066 claim that we looked at

25  earlier; right?

1    STATE OF NEBRASKA                    )
                                          )    ss
2    COUNTY OF DOUGLAS                    )

3        I, Bobbi M. Randall, RPR, CSR a General

4    Notary Public in and for the State of Nebraska, do

5    hereby certify:

6        That prior to being examined, the

7    witness named in the foregoing deposition, TOM

8    GAGE, was by me duly sworn to testify the truth,

9    the whole truth, and nothing but the truth;

10       That said deposition was taken before me

11   at the time and place set forth and was taken down

12   by me in shorthand and thereafter reduced to

13   computerized transcription under my direction and

14   supervision, and I hereby certify the foregoing

15   deposition is a full, true, and correct transcript

16   of my shorthand notes so taken.

17       I further certify that I am neither

18   counsel for nor related to any party to said

19   action nor in any way interested in the outcome

20   thereof.

21       IN WITNESS WHEREOF, I have hereunto

22   subscribed my name this July 14th, 2008.

23

24

25   _____
     Bobbi M. Randall, RPR, CSR
     General Notary

GENERAL NOTARY-State of Nebraska
BOBBI M. RANDALL
My Comm. Exp. April 12, 2012