Exhibit K

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
 2

 3     ALTA BATES SUMMIT MEDICAL   )
       CENTER,                     )
 4                                 )
            Plaintiff,             )
 5                                 )
                      -vs-         )Case#C07-4224 JSW
 6                                 )
       UNITED OF OMAHA LIFE        )
 7     INSURANCE COMPANY, et al.,  )
                                   )        DEPOSITION
 8          Defendants.            )
                                   )
 9     _____)

10

11              *** CONFIDENTIAL ***

12

13        DEPOSITION OF CAROL TARKOWSKI

14

15              Deposition of CAROL TARKOWSKI,

16     taken on behalf of the Plaintiff, at

17     Erickson & Sederstrom, 10330 Regency Parkway

18     Drive, Suite 100, Omaha, Nebraska, beginning

19     at 8:30 a.m., Friday, June 27, 2008, before

20     Bobbi M. Randall, RPR, CSR, a General Notary

21     Public within and for the State of Nebraska,

22     pursuant to Notice.

23
              BOBBI M. RANDALL, RPR, CSR
24      MATHESON-TAULBORG-DENNEY-SCHLEIFE
             7602 Pacific Street, LL101
25              Omaha, NE  68114
                (402) 397-9669
```

ORIGINAL

2

1                            APPEARANCES

2          For the Plaintiff:

3          MARCIA L. AUGSBURGER
           LESLIE C. MURPHY
4          Attorneys at Law
           Ninth Floor
5          555 Capitol Mall
           Sacramento, CA  95814
6
           For the Defendants:
7
           TRAVIS WALL
8          Attorney at Law
           Ninth Floor
9          650 California Street
           San Francisco, CA  94108
10
           DAVID A. BARRON
11         Attorney at Law
           Mutual of Omaha Plaza
12         Omaha, NE  68175

13                              INDEX

14

15         CAROL TARKOWSKI                          Page

           Direct Examination by Ms. Murphy            3
16
           Certificate                               144
17

18         EXHIBITS:                               Marked

19         116- 1500 Form                            123

20         117- Stop Loss Contract & Plan Document
                 Information                          123
21
           118- Appeals                              123
22

23

24

25

1    or talk to your counsel, just let me know and

2    that's fine.  In addition, if you have any -- if

3    you are not understanding my questions, just feel

4    free to tell me what you're not understanding, and

5    I'll try to rephrase so we're both on the same

6    page.  Is there any reason why you can't give your

7    full and complete testimony today?

8         A    No.

9         Q    Did you review any documents in

10   preparation for the depo today?

11        A    Yes.

12        Q    What did you review?

13        A    I reviewed the claims training manual.

14   I reviewed some information in the claim file, my

15   denial letter, and the letter of appeal that had

16   come in at that time.

17        Q    And when you said the claims training

18   manual, is that the manual for the stoploss

19   department at Mutual of Omaha?

20        A    Yes, it is.

21        Q    What is your job title?

22        A    It's manager of stoploss claims.

23        Q    For what company?

24        A    Mutual of Omaha.

25        Q    Are you employed by United of Omaha?

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    5

1    A    I'm employed by Mutual of Omaha.  United

2    is part of Mutual of Omaha.

3    Q    How many direct reports do you have?

4    A    There are eight claim analysts.  There's

5    a lead analyst.  There are two senior claim

6    auditors and a contract premium of three people.

7    Q    The three people are the --

8    A    One is premium and then two contract --

9    contracts, compliance.

10    Q    Aside from the people who directly

11    report to you, how many people are in your claims

12    department?

13    A    In the claims department there are the

14    eight analysts, myself, and the lead analyst.

15    Q    In addition to the eight claim analysts,

16    there's an additional analyst -- that's the senior

17    analyst?

18    A    The lead analyst, yes.

19    Q    And then there are two claims auditors

20    in your department as well?

21    A    They're the TPA auditors, but they're

22    part -- I control -- I have control of that area.

23    Q    Okay.  Do you consider yourself the

24    person most knowledgeable about United of Omaha's

25    policies and practices with respect to rejecting

1    it should be denied, that would be referred on,

2    and it would be -- where it's up to the next

3    level, so there's a question on whether it should

4    be denied.

5         There are some that are very simple to

6    deny.  They sent in the claim.  There's $150,000

7    spec.  They only sent in 100,000 in charges.  We

8    know it doesn't reach the spec level so we deny

9    it, as we're not reimbursing this because you did

10   not meet the spec level.

11        So in those cases they would easily deny

12   that claim without any additional referral.  If

13   there is some question in their mind regarding the

14   denial, then there would be an additional question

15   to someone -- another level, probably to me.

16        Q    Do the claims analysts have the

17   authority to deny a request for reimbursement

18   based on a failure to disclose without any

19   involvement from anybody else?

20        A    No.

21        Q    Do you have any policies, written

22   policies and procedures, that the claims analysts

23   use?

24        A    Yes.

25        Q    What is the name of those -- what are

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    15

1    have in the review and paying of stoploss claims?

2        A    If we are very busy, there are times

3    when Mark or Claudia will actually handle some

4    claims.  If they're in the office, especially

5    during the winter, they may handle some of our

6    claims if our volumes are very high.  They also

7    review claims.  We have reviews at a certain

8    level, dollar level, and Mark and Claudia, if I'm

9    busy, will help with those reviews of the

10   high-dollar claims.

11       Q    Do either of the senior claims auditors

12   have the authority to deny specific requests for

13   reimbursement for failure to disclose during the

14   underwriting process without approval from anybody

15   else?

16       A    During the underwriting process or the

17   claims process?

18       Q    Either.

19       A    A claim doesn't come in during the

20   underwriting process.  It would be afterwards.

21       Q    Oh, it was a bad question.  Let me try

22   it again.  Do they have the authority to deny a

23   stoploss claim based on the failure to disclose?

24       A    They have the authority to -- as the

25   others, they have the authority to deny the claim,

1    but there are -- everyone has additional steps

2    they go through, so the authority would be granted

3    at some point.

4        Q    Do the three people that you discussed

5    that handle premiums and contracts, do they have

6    any involvement with the paying or denying of

7    stoploss claims?

8        A    No.

9        Q    So we went through the claims analysts,

10   the lead claims analysts, and the senior claims

11   auditors, and none of them have the authority to

12   deny requests for reimbursement or stoploss claims

13   based on failure to disclose without some

14   additional authority from somebody else; correct?

15       A    Correct.

16       Q    Can you explain to me what would have to

17   be done or who has the authority to deny or reject

18   a stoploss claim for failure to disclose?

19       A    I would have the authority.  Any of the

20   upper management team would have the authority.

21   The normal review is that it goes up to the next

22   level.  Or what happens is they look at the

23   disclosure information.  That's the first step, so

24   the analyst or Mark, whoever is reviewing it,

25   Kris, Claudia, myself, anyone reviewing the claim

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    19

1      A    What do you mean by involvement?

2      Q    Do you participate when renewals are

3  being reviewed?  Are you involved occasionally

4  with the underwriting process?

5      A    No.

6      Q    What about audits?  Are you involved

7  with audits of TPAs?

8      A    Yes.

9      Q    How are you involved?

10     A    I have gone out with Claudia on some

11 audits to help her.  If it was a large TPA, I

12 would help her with the auditing of the claims

13 while she was out there.

14     Q    Have you ever participated in an audit

15 at BRMS?

16     A    No.

17     Q    When we talked about the process to deny

18 stoploss claims for lack of disclosure, are there

19 any written policies at United or Mutual of Omaha

20 that describe the chain of command or the order of

21 people that you have to go through before you deny

22 a claim for that reason?

23     A    Yes.

24     Q    What is the name of the policy?

25     A    It's in the stoploss manual, claims

1    manual, and it's under disclosure.  I don't know

2    specifically what it's called.

3        Q    Is there any other written document?

4        A    Not that I'm aware of.

5        Q    If I could have you look at -- these are

6    a group of exhibits that have been previously

7    marked, and I actually want you to look at the top

8    one, which has been marked as Exhibit 2.  Are you

9    familiar with this document?

10       A    Yes.

11       Q    What is it?

12       A    It's the contract for Alta Bates.

13       Q    Is this something that you have on file

14   in the claims department?

15       A    It's in our contract department.

16       Q    Do the contract analysts have access to

17   this?

18       A    Yes.

19       Q    If you could flip to the page down at

20   the bottom marked United 0011.

21       A    (Witness obliged.)

22       Q    And up at the top it says, Misstated

23   Data; do you see that?

24       A    Yes.

25       Q    Are you familiar with this provision?

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    36

1    everything up.  So you have done your due

2    diligence, you've looked at disclosure, you find

3    there might be an issue, you don't think this

4    person was disclosed, now you need to put together

5    information so that we can begin the process of

6    discussing this.

7        Q    At this point would you expect your

8    claims analysts to notify you?

9        A    Usually, yes.

10       Q    Are you notified about all of the claims

11   that have disclosure issues?

12       A    Normally.  I don't know that I was

13   notified of all.

14       Q    Can you give me a general sense, for

15   example, in 2005, how many claims had disclosure

16   issues?

17       A    I don't recall.

18       Q    Do you think it was over a thousand?

19       A    No.  It would be a small number.

20       Q    Over 50?

21       A    No.

22       Q    Less than ten?

23       A    Yes.

24       Q    Okay.  The next paragraph says, Once all

25   of this information is gathered, the claims

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    38

1    Q    Okay.

2    A    And, yes, they would come to me.

3    Q    Do you recall ever paying a claim that

4    was not disclosed during the underwriting process?

5    A    Yes.

6    Q    Can you tell me about that?

7    A    What do you mean?

8    Q    Can you tell me what the circumstance

9    was of one of those claims that were paid?

10    A    I know that there have been claims that

11    have been paid that were not disclosed.  I don't

12    know that I remember specifics.  I know that there

13    had been discussions, and in some cases there were

14    a couple of claims that I recall that we made an

15    exception, and we -- we reimbursed the claim and

16    then a certain amount of that was taken out of the

17    TPA comp.

18    Q    And that process was essentially in the

19    process that we just kind of went over, where all

20    of the different groups at Mutual underwriting,

21    the case managers and the claims department and

22    the claims supervisor sat down and kind of

23    reviewed the information that you had on that

24    particular patient?

25    A    The information or additional

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    39

1    information from the TPA.  Usually that is a part

2    of it as well, that they're going to explain why

3    this was not disclosed.

4        Q    In the couple of instances that you

5    generally recall, do you recall why -- what

6    information that you had received that resulted in

7    an exception being made?

8        A    I can't recall their specifics of it, to

9    tell you the truth.

10       Q    Okay.  Do you recall generally what time

11   frame that was?

12       A    What do you mean?

13       Q    The claims that there was an exception

14   made, was that something that happened this year?

15   Last year?

16       A    I know there were a couple in 2005 and

17   2006.  There was one this year.

18       Q    Aside from the process that we just

19   walked through on these two pages there, is this

20   the general guideline that you expect your claims

21   analysts to follow when reviewing a stoploss

22   claim?

23       A    Yes.

24       Q    Okay.  On the next page it says,

25   Disclosure and Laser Issues with Underwriting.

1      A      Mark Brewer.

2      Q      And do you know why?

3      A      Mark was helping us at that time.  He

4   was in the office.  We had increased flow, and

5   Mark handled this particular claim.

6      Q      Do you recall when Mr. Brewer brought

7   this claim to your attention?

8      A      He did not bring this claim to my

9   attention.

10     Q      How did you find out about D███ J████'s

11  claim?

12     A      I found out about D███ J████'s claim

13  when there was an appeal and I handled the appeal.

14     Q      Okay.  So is it accurate that when

15  Ms. J███'s claim was submitted, the 7/21/06 claim

16  was submitted, you were not involved with the

17  review and processing of that stoploss claim?

18     A      Correct.

19     Q      Are you aware that this particular 7/21

20  submission was denied?

21     A      Yes.

22     Q      For failure to disclose?

23     A      Yes.

24     Q      Do you know who approved that denial?

25     A      Julie Moore and John Lenagh.

1    was involved with the initial denial of D████

2    J████'s claim?

3         A    I don't know.

4         Q    We talked earlier about you said that

5    you recalled a couple of times where exceptions

6    were made to -- where claims were paid when they

7    were not disclosed.  Do you remember that?

8         A    Yes.

9         Q    Do you recall the amount of the claims

10   that were paid and the exception to the rule that

11   they must be disclosed?

12        A    I don't remember the specific amounts.

13        Q    Do you remember generally?  Was it a

14   million dollar claim?

15        A    Less than a million.

16        Q    Did the amount of the claim submitted

17   have any bearing on the decision to make an

18   exception?

19        A    No.

20        Q    You also indicated, when we talked about

21   claims that were denied for lack of disclosure,

22   you said that you thought there were probably

23   about less than ten.  Do you remember that?

24        A    Yes.

25        Q    I want to make sure I understood that.

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    63

1    Were there less than ten claims that were

2    submitted that had disclosure issues, or were they

3    denied for nondisclosure?

4        A    By disclosure issues, we would have to

5    define disclosure issues.

6        Q    How would you define it?

7        A    We look at disclosure on every claim,

8    and when an analyst may wonder if it's disclosure,

9    that's why they go to the nurse.  And they may go

10   to the nurse, and the nurse will say, We have had

11   instances where it was right at the beginning of

12   when the disclosure was signed, maybe a day

13   before.  Technically that was before the

14   disclosure was signed, but it is right on that

15   cusp of -- so generally in those instances, we may

16   review and say, It would be very difficult for

17   them to disclose that one, continue through

18   processing.

19       Q    So the typical case that there's a

20   disclosure issue is when there is a claim that

21   arises around the time of the disclosure period,

22   for example, late in the calendar year, early in

23   the following year?

24       A    Most disclosure issues are those that we

25   see that are much before the effective date.

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    64

1    There can be those that are, yes, a cusp one, and

2    then is it or is it not.

3        Q    Can you give me an example of one of

4    those that would be well before the disclosure

5    date?

6        A    D█████ J█████ is one that they had

7    received precertifications.  She was diagnosed in

8    June or in that time frame, June and August.

9    There was treatment several months before the

10    effective date of the contract.

11        Q    And in those circumstances where you

12    described that the disclosure issue was much

13    before -- I think those were your words -- of

14    those ones, are those typically denied for

15    nondisclosure?

16        A    It would be reviewed for possible

17    denial.  One of the things we would look at is,

18    yes, if it's not disclosed, it can be denied for

19    misstated data.  It's excluded under the contract

20    if it's not on that select risk questionnaire and

21    it should have been.  So yes, it can be denied.

22        Q    So it's not automatic?

23        A    We go through our normal review process.

24        Q    And that's the process we walked through

25    earlier where you go back to the files, you

1    discuss it with the nurse case manager, the

2    underwriter, the managers, and yourself?

3        A    Yes.

4        Q    Can you look at Exhibit 111?

5        A    (Witness obliged.)

6        Q    And if you could turn to the last page

7    there, marked 4006.  This is an email from Julie

8    Moore to you and other -- some other people, and

9    it says, Ed indicated yesterday that we have

10    received a claim for one of the ████ twins.

11    That's a little surprising given Care Assist

12    hasn't completed their hospital review yet.  Do

13    you see that part?

14        A    Yes.

15        Q    Do you know why Ms. Moore was surprised?

16        A    She was surprised because the bills --

17    the TPA sent the bills to Care Assist for the

18    review, and at the same time, they sent in the

19    reimbursement request for the bills without that

20    review having been completed.

21        Q    But was the Care Assist review a

22    suggestion?

23        A    Yes.

24        Q    So what if Care Assist never gave you

25    their audit review of those claims?  What would

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    67

```
 1              MS. MURPHY:  Then I do want to look at

 2         88, thank you.

 3         Q    (By Ms. Murphy)  Okay.  This is an email

 4    dated 8/2/2006 from John Lenagh to Mark Brewer,

 5    who was the claims examiner, correct, for

 6    Ms. Jones --

 7         A    For this claim.

 8         Q    -- and Betty Coyle, who was the

 9    underwriter, Julie Moore, and yourself.  Do you

10    see that?

11         A    Yes.

12         Q    Does this refresh your recollection that

13    you received some information about Ms. J████'s

14    claim prior to the denial?

15         A    Yes.

16         Q    Does it refresh your recollection that

17    you participated in the denial -- the initial

18    denial of Ms. J████'s claim?

19         A    No, I did not.

20         Q    This email -- well, I'll just read it:

21    Mark, we agreed that a denial is appropriate.  We

22    do plan on having some meetings soon to discuss

23    the whole BRMS situation.  This new claim will be

24    added to the other recent issues.  Do you see that

25    part?
```

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    84

1        Q    Did you assign him the D█████ J█████ case?

2        A    I either assigned it to him or -- I'll

3  look at the inventory and usually say, What

4  analyst needs help?  So it's a matter of he goes

5  to that analyst and then takes the next old -- the

6  oldest work from that individual.

7        Q    Do you know whether or not Mr. Brewer

8  was involved in audits of BRMS?

9        A    I'm not certain.  I know Claudia was.

10       Q    How long has he been a senior claim

11  auditor?

12       A    Since before I started at Mutual in

13  2003.

14       Q    When you are reviewing stoploss claims

15  that have a disclosure issue, do you have any

16  policy or procedure that requires a team meeting

17  or a meeting of certain people before making a

18  final decision on that claim?

19       A    We don't have a process or a procedure

20  that says certain people have to review a

21  disclosure issue.

22       Q    Would you agree that it's done on a

23  case-by-case basis, that it depends on the facts

24  of the case at issue?

25       A    Yes.

1    just looked at in Exhibit 49?

2        A    Yes.

3        Q    What else did you review?

4        A    I reviewed Mark's previous denial, and I

5    reviewed any information in the file pertaining to

6    the overall -- what was determined from the case.

7        Q    Were there notes from Mark Brewer?

8        A    The email of his discussions with both

9    the nurses, Betty Coyle, and then the overall

10    decision to deny the claim.

11        Q    Those were in notes?

12        A    Email.

13        Q    Did we look at that email already?

14        A    Yes.

15        Q    Was that the one where it had Mark's

16    comments in bold?

17        A    No.

18        Q    Oh.

19            MR. WALL:    Exhibit 88.

20        Q    (By Ms. Murphy)    Okay.    Why did the

21    subsequent denial go back to Ed Kilgore from Mark

22    Brewer?

23        A    Subsequent denial?

24        Q    Yes.    Mr.    --

25            MR. WALL:    Subsequent to the first

1    denial.

2        Q    (By Ms. Murphy)  The first denial.  The

3    first denial by Mr. Brewer was sent out, and then

4    the next one was from Mr. Kilgore.  Do you know

5    why?

6        A    Ed would have received -- what he would

7    have received was a reimbursement request from the

8    TPA, so he gets a reimbursement request.  They're

9    requesting some additional dollars.  No additional

10   appeal, but they're requesting some additional

11   dollars.  Ed would review the claim, see it was

12   denied for disclosure, and continue with the

13   denial.

14       Q    So that's the reason why Mr. Brewer

15   didn't continue on with the D█████ J█████ claim?

16       A    Right, it was Ed Kilgore's TPA.

17       Q    The precertification forms that you

18   referenced in your denial letter that you received

19   from the TPA, did you research whether or not

20   those claims were paid?

21           MR. WALL:  Specify paid by, the provider

22       was paid?

23       Q    (By Ms. Murphy)  Do you know whether or

24   not the provider was paid for those claims?

25       A    I don't know.

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    98

1    case may be?

2        Q    Exactly.

3        A    In this particular case, I denied it

4    based on trigger diagnosis, so it's based on the

5    fact that she was treated for this diagnosis prior

6    to the effective date.  My main information that

7    I'm looking at, did she treat for this diagnosis

8    and do I see this diagnosis -- that they knew

9    about this diagnosis prior to the effective date.

10   So my main review is this diagnosis.

11       Q    When you were reviewing the appeal sent

12   in by BRMS, did you ever discuss the option of

13   adjusting the specific deductible for D███ J███?

14       A    No.

15       Q    Why not?

16       A    The claim had already been denied, so

17   then I reviewed the information received from

18   BRMS.  There was no information in there for me to

19   consider anything but denying the claim.

20       Q    Do you know if it was considered in the

21   initial denial?

22       A    I don't know.

23       Q    Did you discuss the option of revising

24   the terms or conditions of the policy?

25       A    No.

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    99

1      Q     Did you discuss the option -- when

2    reviewing the appeal, did you discuss the option

3    of adjusting the premium rates?

4      A     No.

5      Q     Did you consider it?

6      A     No.

7      Q     Was there ever a discussion when

8    reviewing the appeal for Ms. ▆▆▆ about

9    rescinding the stoploss insurance policy?

10     A     No.

11     Q     Do you recall any discussions you had

12   with the case manager about D▆▆▆ J▆▆▆?

13     A     No.

14     Q     Did you discuss Ms. J▆▆▆'s case with

15   the case manager?

16     A     I don't recall discussing it.

17     Q     Do you know whether or not Mark Brewer

18   had a discussion with her?

19     A     Yes.

20     Q     Did Mr. Brewer tell you about that

21   discussion?

22     A     No.

23     Q     Was there any information requested from

24   BRMS prior to you upholding the denial?

25     A     No.

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL  100

```
1        Q    Do you know whether or not any
2   additional information was requested from BRMS
3   prior to the initial denial?
4        A    I'm not certain.
5        Q    If Mr. Brewer or Mr. Kilgore had
6   requested information from BRMS prior to denying
7   the claims, do you think that it would be
8   documented in the file?
9        A    Yes.
10       Q    So do you think it's reasonable that
11  they did not -- or let me rephrase that.
12            Do you have any reason to believe that
13  either Mr. Brewer or Mr. Kilgore contacted BRMS
14  for additional information prior to denying the
15  claim?
16       A    No.
17       Q    Did you have any formal meetings
18  about -- did you have any in-person meetings with
19  Julie Moore or Tom Gage about Ms. J█████'s claim?
20       A    No.
21       Q    Can you look at Exhibit 105?
22       A    (Witness obliged.)
23       Q    This is a letter dated April 25th, 2005,
24  to you from Matt Schafer.
25       A    Yes.
```

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL   119

1   to see on a disclosure statement.  So we review

2   disclosure on every case.

3       Q    Okay.  But what about if the -- if the

4   case was you reviewed the group plan document and

5   the policy document, now, the only thing that you

6   found that was not disclosed was the trigger

7   diagnosis, just assume that.

8       A    Then it's a disclosure issue.

9       Q    Right.  And then you go back to all of

10  the policy manual that we went through, you go and

11  talk to the case manager, you look at the file and

12  all of that stuff.  When you do all of that,

13  you're still only looking for whether or not that

14  particular trigger diagnosis was in existence

15  prior to the disclosure; correct?

16      A    Yes.

17      Q    Based on the policies and practices in

18  place at United and Mutual, what factors do you

19  consider in deciding whether or not to make an

20  exception to the rule that you deny claims that

21  are not disclosed?

22      A    That's on a case-by-case basis.  There

23  aren't any set factors.  You have to review the

24  case on hand.

25      Q    So we looked at the stoploss or a

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL  130

1  stoploss manual we were looking at?

2      A    Yes, it is.

3      Q    And is this the portion of the manual

4  that you were referencing when we discussed that

5  earlier?

6      A    Yes.

7      Q    First paragraph is the first level of

8  appeals.  It says, When a first appeal is received

9  by MoO and was correctly submitted by the TPA, the

10 original claims analyst who processes the

11 submission will acknowledge receipt of the appeal

12 to the TPA within five working days, then that

13 same analyst must review the appeal within ten

14 working days and determine if the claim should now

15 be paid.  Do you see that part?

16     A    Yes.

17     Q    Did that happen in D██████ J██████'s case?

18     A    No.

19     Q    The original claims analyst was Mark

20 Brewer?

21     A    Yes.

22     Q    Did a claims analyst review the appeal?

23     A    No.

24     Q    The next sentence says, If the claims

25 analyst decides to pay the claim, they may issue a

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL   134

1    completion of that form?

2         A    Probably Mark or Ed.

3         Q    But you don't know for sure?

4         A    I'm not certain.

5         Q    Okay.  On the next page there, it says

6    Exceptions.  The next -- it says, The exceptions

7    log will deal with exceptions we make on claims.

8    This does not include items under the TPA special

9    handling section.  What is the exceptions log?

10        A    The exceptions log is a log we have that

11   if we make an exception, we could have denied the

12   claim.  We make an exception to allow a claim, we

13   log that in our log.  So we went outside either --

14   it could be out of our contract we make the

15   exception or they didn't pay correctly according

16   to the group plan document, but we made the

17   exception to reimburse it under the specific

18   reimbursement.

19        Q    Can you give me an example of a claim

20   that you recall that was paid as an exception?

21        A    There's a claim that the PPO repriced

22   the claim, and they repriced the claim according

23   to their contract, and at some point they realized

24   they made a mistake.  It was no longer within our

25   loss claim basis.  Maybe the claim just for Alta

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL  135

1    Bates 11/06 up to 11/07, they didn't pay the claim

2    until 11/08 but it was a claim we originally

3    reimbursed.  Now they owe some additional and it's

4    not covered under the new stoploss contract, so

5    they come to us and say, Will you make an

6    exception and pay under that old contract because

7    it was your original claim.  And that's one we

8    have made an exception on.

9         Q    Are there any written policies about

10   what claims or types of claims that exceptions are

11   acceptable for?

12        A    No, it's case-by-case.

13        Q    Where it says the TPA special handling

14   section.  What is that referring to?

15        A    We have some special handling for each

16   of our TPAs.  One example, one of our TPAs may

17   indicate that although the plan doc generally says

18   they investigate all accidents before reimbursing

19   the claim, they actually pay the first $500 and

20   then hold anything beyond that for investigation,

21   because if it's a real small accident claim, they

22   don't want to hold them up.  So we agree, although

23   the group plan document says you're going to

24   investigate all of them before you pay them, we'll

25   agree, to say, Okay, if we see up to $500

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL    136

1    reimbursed in a claim that comes in with other

2    portions of that claim, we will reimburse up to

3    that $500, too.

4         Q    Okay.  Do you know how Mutual of Omaha

5    or United of Omaha comes to the agreement with the

6    TPA on the special handling?

7         A    The TPA would generally contact me or

8    someone within the organization, and you know,

9    say, Hey, you know, there's this going on or this

10   is causing a lot of rework or whatever the case

11   may be.  They will contact someone in management,

12   underwriting, and talk about that specific part of

13   the --

14        Q    The next sentence says, The log will

15   generally track when we are paying claims we

16   normally would not pay.  Do you know why you track

17   those claims?

18        A    This was a requirement from our internal

19   audit, that we have a log that not only shows any

20   exceptions, but also appeals, because internal

21   audit wanted us to have that information.

22        Q    Do you have any idea about the dollar

23   amount that United or Mutual of Omaha paid on

24   claims they would not normally pay in, for

25   example, 2006?

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL   137

1        A    I can't recall specific dollar amounts.

2        Q    Do you have a general idea of a dollar

3    amount?

4        A    No.

5        Q    The next sentence says, Perhaps the TPA

6    did not disclose an individual, we deny the claim,

7    and then management makes a decision to allow the

8    claim as an exception -- or we pay 50 percent of

9    the claim.  The portion of the sentence here where

10   it says management makes the decision, what does

11   that refer to?

12       A    As we discussed, when we get to the

13   disclosure and we find it's still not a disclosure

14   after the analyst has reviewed it, the nurse has

15   reviewed it, the underwriter has reviewed it, then

16   upper management will usually look at the case.

17       Q    Where it says, or we pay 50 percent of

18   the claim, what is that referencing?

19       A    There have been a couple of claims where

20   we have reimbursed it and then 50 percent of the

21   comp is taken out of TPA's -- 50 percent of the

22   claim is taken out of the TPA comp.  So that is

23   just one example.

24       Q    So in that one example, how much money

25   was taken out of that particular TPA's comp?

DIRECT - C. TARKOWSKI (Murphy) - CONFIDENTIAL   138

1       A    I don't recall, to tell you the truth.

2       Q    In the D██████ J██████ case, did you

3   consider whether or not to pay 50 percent of the

4   claim?

5       A    I don't know.  I didn't in my denial.  I

6   just upheld the denial.  In the original denial, I

7   don't know the discussion.

8       Q    So you did not consider the possibility

9   of paying 50 percent of the claim for Ms. Jones?

10      A    I would review it on a case-by-case

11  basis.  Had they provided some documentation --

12  the documentation they provided showed that they

13  knew this was disclosure -- yes, it was

14  disclosure.  I didn't have any reason to want to

15  do 50 percent of the claim.  It was a disclosure

16  issue.

17      Q    So is the answer, no, you did not

18  consider paying 50 percent of the claim for

19  Ms. Jones?

20      A    That is true.

21      Q    Okay.  Did you write this portion of the

22  stoploss manual?

23      A    Yes, I did.

24      Q    Did you get any input from anybody else

25  in writing this portion?

```
 1      STATE OF NEBRASKA         )
                                  )    ss
 2      COUNTY OF DOUGLAS         )

 3              I, Bobbi M. Randall, RPR, CSR a General

 4      Notary Public in and for the State of Nebraska, do

 5      hereby certify:

 6              That prior to being examined, the

 7      witness named in the foregoing deposition, CAROL

 8      TARKOWSKI, was by me duly sworn to testify the

 9      truth, the whole truth, and nothing but the truth;

10              That said deposition was taken before me

11      at the time and place set forth and was taken down

12      by me in shorthand and thereafter reduced to

13      computerized transcription under my direction and

14      supervision, and I hereby certify the foregoing

15      deposition is a full, true, and correct transcript

16      of my shorthand notes so taken.

17              I further certify that I am neither

18      counsel for nor related to any party to said

19      action nor in any way interested in the outcome

20      thereof.

21              IN WITNESS WHEREOF, I have hereunto

22      subscribed my name this July 14th, 2008.

23

24

25              Bobbi M. Randall, RPR, CSR
                General Notary Public
```

GENERAL NOTARY-State of Nebraska
BOBBI M. RANDALL
My Comm. Exp. April 12, 2012