Exhibit L

1        IN THE UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3  ALTA BATES SUMMIT MEDICAL  )
    CENTER,                 )

4                      )
       Plaintiff,       )

5                      )
          -vs-      )Case#C07-4224 JSW

6                      )
    UNITED OF OMAHA LIFE     )

7    INSURANCE COMPANY, et al., )
                      )     DEPOSITION

8      Defendants.      )
    _____)

9

10

11          \*\*\* CONFIDENTIAL \*\*\*

12

13     DEPOSITION OF BETTY COYLE ROBERTS

14

15        Deposition of BETTY COYLE ROBERTS,

16  taken on behalf of the Plaintiff, at

17  Erickson & Sederstrom, 10330 Regency Parkway

18  Drive, Suite 100, Omaha, Nebraska, beginning

19  at 2:55 p.m., Friday, June 27, 2008, before

20  Bobbi M. Randall, RPR, CSR, a General Notary

21  Public within and for the State of Nebraska,

22  pursuant to Notice.

23         BOBBI M. RANDALL, RPR, CSR

24    MATHESON-TAULBORG-DENNEY-SCHLEIFE
       7602 Pacific Street, LL101

25        Omaha, NE  68114
       (402) 397-9669   *ORIGINAL*

2

<u>APPEARANCES</u>

For the Plaintiff:

MARCIA L. AUGSBURGER
LESLIE C. MURPHY
Attorneys at Law
Ninth Floor
555 Capitol Mall
Sacramento, CA  95814

For the Defendants:

TRAVIS WALL
Attorney at Law
Ninth Floor
650 California Street
San Francisco, CA  94108

DAVID A. BARRON
Attorney at Law
Mutual of Omaha Plaza
Omaha, NE  68175

<u>INDEX</u>

<u>BETTY COYLE ROBERTS</u>                    <u>Page</u>

Direct Examination by Ms. Augsburger         3

Certificate                                100


<u>EXHIBITS</u>:                                <u>Marked</u>

45 - October 15, 2003, email from S. Danker 3

50 - Table of Contents                      91

119- Policy No. UP-90X4                      3

(All exhibits are bound separately.)

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL5

1   best conclusion that you can based on your memory.

2   You understand the difference?

3       A    Yes.

4       Q    Are you an employee of Mutual of Omaha?

5       A    Yes.

6       Q    Are you also employed by United of

7   Omaha?

8       A    I know that they're one and the same

9   company.

10      Q    Okay.  Do they occupy the same building?

11      A    Well, let me back up.  I honestly don't

12  know the difference.  It's Mutual of Omaha and I

13  know some of the policies are Mutual of Omaha and

14  some of the policies are United of Omaha, so I

15  don't really think it's -- there's not really a

16  difference.

17      Q    Okay.  Do they occupy the same building,

18  or do you know?  Let me ask it this way:  Is there

19  a building that is set aside solely for United of

20  Omaha?

21      A    Not that I'm aware of.

22      Q    Do you have an underwriting file at

23  Mutual of Omaha?

24      A    What type of an underwriting file?

25      Q    Well, do you maintain files in your

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL13

1    stoploss coverage unless and until his medical

2    expenses total more than 350,000; right?

3        A    Yes.

4        Q    And so where this says Mutual of Omaha

5    does not mandate lasering at renewal, is lasering

6    something that employers consider a good thing

7    or an advantage or not?

8        A    It depends on the employer.

9        Q    Okay.  Do you think that United or

10    Mutual gain a financial advantage or some other

11    advantage from having the practice of lasering or

12    offering lasering?

13        A    It's just another way of looking at the

14    risk so that we write profitable business.  I

15    mean, instead of a laser, we could increase the

16    rates.

17        Q    Okay.  So you're -- it's sort of risk

18    shifting from one form to another?

19        A    Yes.

20        Q    Okay.  What other kinds of things might

21    you do with a quote in order to distribute the

22    risk or shift the risk?

23        A    We might do an aggregating specific

24    deductible.

25        Q    What is that?

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL14

1      A    It's where you can -- in your example

2   where you had 250,000 specific deductible, we

3   could add another 250,000 aggregating specific

4   deductible, which would apply to the whole entire

5   group.

6           So an individual would first have to

7   meet the 250,000, and then a collection or one

8   individual could meet the additional 250.  So if

9   you had one individual that had a claim for

10  550,000, then that additional 250,000 would

11  already be met.  But if you had several claims

12  that made up that additional 300,000, those would

13  all apply to the aggregating specific deductible,

14  and then once they meet that, then the stoploss

15  comes into play.

16     Q    Okay.  Does anything else come to mind

17  that could be done to shift the risk?

18     A    We could do the aggregating specific

19  deductible on --

20     Q    I'm sorry, other than the aggregating

21  kinds of deductibles?

22          MR. WALL:  She's clarifying about how

23      the aggregating specific deductible can be

24      used.  It's different from what she just

25      testified to.

1        A    Yes.

2        Q    Do you agree that the underwriting

3   department -- or at least particularly yours, you

4   apply the highest ethical standards to renewal

5   underwriting practices; right?

6        A    Yes.

7        Q    And do you agree that Mutual or United

8   do not cancel policies due to adverse experience?

9        A    We do not cancel the policy.  The

10  employer may choose not to renew with us.

11       Q    Okay.  And then it says, Nor will we

12  decline any individual at renewal due to ongoing

13  claims.  Do you agree with that?

14       A    Yes.

15       Q    Then under process, step 2 --

16       A    Yes.

17       Q    -- this says, The TPA gathers the

18  requested information -- oh, let's back up to

19  number 1.  I'm sorry.

20            It says, Approximately 75 to 90 days

21  prior to the renewal date, we will send a letter

22  to the TPA (list of groups, if more than one)

23  requesting detailed information on the groups.

24  And then in bold it says, A select risk

25  questionnaire is required.  And then number 2

 1     A    It's considered an aggregated specific

 2   deductible.  Those are not lasers.

 3     Q    I'm sorry.  Thank you.  Yeah.  Okay.  So

 4   is there anyone who is lasered under this policy?

 5     A    No.

 6     Q    And how do you know that?

 7     A    Because there's no one listed under the

 8   special underwriting terms like they were in the

 9   previous year.

10     Q    Okay.  And so if someone were lasered

11   under the '06 policy, it would say -- essentially,

12   it would say, The following special underwriting

13   terms apply, and it would have a patient's name

14   like Charlene Mosley and state that the specific

15   deductible for ▬▬▬ ▬▬▬ is 350,000; right?

16     A    It would say the same thing as the

17   previous one.

18     Q    Can you very briefly describe what the

19   aggregated specific deductible means with respect

20   to the four individuals who are listed here?

21     A    It's like I explained, the aggregating

22   specific deductible, it's an additional deductible

23   that the group has to meet before the stoploss

24   would be covered.  But in this situation, that

25   additional amount only applies to these four

1    claimants.  So any one or all four of them could

2    have claims that exceed the specific deductible,

3    and then they have to satisfy the additional

4    250,000 before the stoploss will take place.

5         Q    Okay.  So just to make sure that I

6    understand this -- I'm sorry, it's kind of

7    confusing to me, but each of them have to have

8    claims totaling at least 250,000; right?

9         A    Yes.

10        Q    And then one or more of them need to

11   have an additional 250 in claims; right?

12        A    Yes, 250,000.

13        Q    Yes.  How did you first become

14   acquainted with BRMS?

15        A    When they became an approved TPA.

16        Q    And do you recall whether you met with

17   anyone personally with BRMS?

18        A    Yeah, but I don't remember when.

19        Q    Did you travel to Sacramento to meet

20   with them at any time?

21        A    Yes.

22        Q    When was that?  Do you remember?

23        A    I don't remember the dates.  I can look

24   at my expense reports from prior years.

25        Q    That's okay.  Do you remember how many

1      A    Right.

2      Q    And the reports that are attached

3  contain a lot of information, not just the things

4  that are listed here?

5      A    Yes.

6      Q    Okay.  At the bottom of this form, this

7  says, As an authorized representative of

8  applicant, I hereby warrant and represent that the

9  information included on Attachment A or reports

10  supplied is a complete and accurate -- I'm

11  sorry -- is complete and accurate and that nothing

12  has been knowingly or intentionally omitted.  I

13  also acknowledge that failure to disclose complete

14  information or providing inaccurate information

15  may result in the exclusion of stoploss insurance

16  for losses related to -- and there's a

17  parenthetical that I'll come back to -- certain

18  individuals; right?  And that's what that says;

19  right?

20      A    Yes.

21      Q    Then in the parenthetical it says, Or

22  the adjustment of specific deductibles for.  Do

23  you see that?

24      A    Yes.

25      Q    Are you involved in the denial of the

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL73

1 claim relating to D███ J███?

2  A I was informed that the claim was going

3 to be denied.

4  Q Okay.  Were you consulted about whether

5 or not you felt that was appropriate or the right

6 course of action?

7  A We discussed whether it had been

8 disclosed, and I agreed with the claim examiner --

9 and I don't remember who I had talked with, that I

10 agreed it had not been disclosed.

11  Q Okay.  At any time did you have or

12 review -- did you ever have any conversations

13 about the possibility of adjusting the deductible

14 for that -- for the D███ J███ claims rather than

15 denying coverage entirely?

16  A I believe the claim was sent to the

17 nurse, and she reviewed it and said, had she known

18 this information prior to -- or as a part of the

19 disclosure, she would have recommended a higher

20 spec deductible.

21  Q All right.  Are you aware of any

22 conversations where anyone within the company

23 considered applying that deductible when the

24 claims came in and rejected that, or any

25 conversation about that?

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL74

1    A    It's usually a combination of several

2    things, and every situation is different.  We

3    will -- I mean, we do -- I mean, we can do any of

4    these things, and so it's --

5    Q    I'm just asking --

6    A    -- usually a collective decision, or we

7    consulted and the claim examiner makes the

8    decision -- the claims supervisor makes the

9    decision.

10    Q    What I'm asking is whether in this

11    situation you remember any collaborative effort to

12    make that decision.

13    A    I remember meetings about it.  I don't

14    know that I was in all of the meetings.

15    Q    Okay.  Do you remember discussions about

16    whether or not United or Mutual should adjust the

17    specific deductible?

18    A    I remember Trish saying that her

19    recommendation would be for a higher one.  I don't

20    remember us considering that.

21    Q    Do you remember Trish suggesting that it

22    would be better to apply a higher deductible than

23    it would be to deny payment outright?

24        MR. WALL:  Are you asking about --

25    A    That's not --

1              MR. WALL:  Go ahead.

2        A     That's not her place.  She just makes a

3    projection.

4        Q     (By Ms. Augsburger)  So she didn't say

5    that?

6        A     No.

7        Q     Okay.  I'm just trying to get your

8    testimony straight.  So you remember her saying,

9    That's what I would have done, but you don't

10   remember a single person within United or Mutual

11   who ever seriously considered that option,

12   correct, or at least who expressed that they were

13   seriously considering that option?

14       A     I don't remember anybody seriously

15   considering that option.

16       Q     Okay.  Thank you.  Number 2 says,

17   Revision of the terms or conditions of any issued

18   stoploss insurance policy.  Do you remember anyone

19   at United or Mutual ever expressing that they gave

20   that particular option any consideration --

21       A     No.

22       Q     -- with respect to D███ J███?

23       A     No.

24       Q     Would you locate Exhibit 68, please, in

25   this group of documents.  And you might want to

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL76

1   leave Exhibit 2 out because I might come back to

2   that.

3           Before we move on to the next exhibit, I

4   would like you to go back to Exhibit 2 for just a

5   minute and turn to page 011.  In the top section

6   it relates to misstated data; correct?

7       A    Yes.

8       Q    And this says -- and I'm going to

9   paraphrase because it's really long -- that

10  basically if there is misstated data, Mutual or

11  United may -- and now I'm going to look at B. --

12  revise the terms or conditions of the policy,

13  including, without limitation, the premium rates.

14  Do you see that?

15      A    Yes.

16      Q    At any time have you been asked to

17  analyze the -- or to look at changing premium

18  rates in a situation where a policy has been

19  issued and there was a nondisclosure?

20      A    Have I -- I'm sorry, can you repeat it?

21      Q    Yeah, has anyone at United or Mutual

22  ever asked you to assist with analyzing how

23  premium rates might be changed as a result of a

24  nondisclosure instead of just denying the --

25           MS. AUGSBURGER:  Can we go off the

1      record for just a moment?

2               (An off-the-record discussion was held.)

3          Q     (By Ms. Augsburger)  Has anyone at

4    United or Mutual ever asked you to assist with

5    analyzing how premiums might be changed as a

6    result of a nondisclosure instead of just denying

7    a claim outright?

8          A     I have not been asked to do that.

9               (An off-the-record discussion was held.)

10         Q     (By Ms. Augsburger)  Would you locate

11   Exhibit 68, or do you have that?  You might have

12   it right there.  Do you see that?

13         A     Yes.

14         Q     The top is an email from you to Joyce

15   Mumm dated 8/22/2005; right?

16         A     Yes.

17         Q     What is the STR case management report?

18         A     I'm assuming that's a report that we

19   received from BRMS.  It's not one of our reports.

20         Q     Okay.  You don't recall?

21         A     I don't recall that specific report, no.

22         Q     Okay.  I'm sorry, why don't you flip to

23   the next page.

24         A     Oh, here it is.

25         Q     Okay.  And I take it you don't recall

DIRECT - B. COYLE ROBERTS (Augsburger) CONFIDENTIAL88

1    final proposal was the one that showed all of the

2    individuals that we listed with aggregating specs

3    or if it was an email that was agreed to but --

4         Q    Oh, okay.

5         A    -- we would have an agreement.

6         Q    That would be in the policy?

7         A    Well, the policy would show -- I mean,

8    we looked at the policy, and the policy had the

9    four claimants listed on there under the

10   aggregating spec deductible.

11        Q    So presumably, then, you used the

12   information that you learned that's reflected in

13   this email to ultimately adjust the amount of the

14   premiums; right?

15        A    Yes.  Well, not the premiums because I

16   think I left the premiums the same.  I adjusted

17   the spec deductibles on certain individuals.

18        Q    Right.  I'm sorry.  Yeah.  That's me

19   again getting in too much of a hurry.  The

20   premiums stayed the same and you accounted for

21   this information as we talked about in the policy?

22        A    Yes.

23        Q    All right.  Exhibit 80, please.  If you

24   go to the email at the bottom, this is an email

25   from Patricia Swank to Mark L.  Do you know who

1     that is?

2          A    Mark Lucas.

3          Q    Okay.  And it says, Okay, I emailed you

4     too soon.  On D█████ J█████, do you know where she

5     is going for dialysis and how much the discount

6     is?  That sort of thing, and then the top email is

7     from Patricia Swank to you dated February 15 of

8     2006, and it says, Betty, I believe you wanted to

9     see this one as well.  Do you see that?

10         A    Yes.

11         Q    Do you recall you wanted to see this?

12         A    No.

13         Q    Can you locate Exhibit 118, please.

14    Would you turn to the second page, please.  Do you

15    see under Exceptions, about the middle of that

16    paragraph, it says, Perhaps the TPA did not

17    disclose an individual, we deny the claim, and

18    then management makes a decision to allow the

19    claim as an exception, or we pay 50 percent of the

20    claim.  Do you see that?

21         A    I just found it.

22         Q    I'm sorry.

23         A    That's okay.

24              MR. WALL:  Can you explain to her what

25         this document is?

1    STATE OF NEBRASKA      )
                   )   ss
2    COUNTY OF DOUGLAS    )

3       I, Bobbi M. Randall, RPR, CSR a General

4  Notary Public in and for the State of Nebraska, do

5  hereby certify:

6       That prior to being examined, the

7  witness named in the foregoing deposition, BETTY

8  COYLE ROBERTS, was by me duly sworn to testify the

9  truth, the whole truth, and nothing but the truth;

10      That said deposition was taken before me

11  at the time and place set forth and was taken down

12  by me in shorthand and thereafter reduced to

13  computerized transcription under my direction and

14  supervision, and I hereby certify the foregoing

15  deposition is a full, true, and correct transcript

16  of my shorthand notes so taken.

17      I further certify that I am neither

18  counsel for nor related to any party to said

19  action nor in any way interested in the outcome

20  thereof.

21      IN WITNESS WHEREOF, I have hereunto

22  subscribed my name this July 14th, 2008.

23

24

25    Bobbi M. Randall
      General

GENERAL NOTARY-State of Nebraska
BOBBI M. RANDALL
My Comm. Exp. April 12, 2012

```
1              IN THE UNITED STATES DISTRICT COURT
                   NORTHER DISTRICT OF CALIFORNIA
2

3  ALTA BATES SUMMIT MEDICAL CENTER,)   CASE NO. C07-4224-JSW
                                     )
4              Plaintiff,            )
                                     )
5         vs.                        )   DEPOSITION OF
                                     )   BETTY COYLE ROBERTS
6  UNITED OF OMAHA LIFE INSURANCE    )
   COMPANY, et al.,                  )
7                                    )   TAKEN ON BEHALF OF
              Defendants.            )   PLAINTIFF
8  - - - - - - - - - - - - - - - - -
```

# ORIGINAL

```
9

10        DEPOSITION OF BETTY COYLE ROBERTS, taken

11  before Michelle A. Brezinski, Court Reporter and General

12  Notary Public within and for the State of Nebraska,

13  beginning at 10:58 a.m., on the 24th day of July, 2008,

14  at Mutual of Omaha, Mutual of Omaha Plaza, Omaha, Nebraska.

15

16                   ***CONFIDENTIAL***

17

18

19

20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFF:
      Ms. Marcia L. Augsburger
 3    Ms. Leslie C. Murphy
      Ninth Floor
 4    555 Capitol Mall
      Sacramento, CA    95815
 5    (916) 444-3900

 6    FOR THE DEFENDANT:
      Mr. Travis Wall
 7    Attorney at Law
      Ninth Floor
 8    650 California Street
      San Fransisco, CA  94108
 9    (415) 434-2800

10    Mr. David A. Barron
      Attorney at Law
11    Mutual of Omaha Plaza
      Omaha, NE   68175
12

13

14                    Also present:

15    Kelly Elder
      Amanda Westindorf
16

17

18

19

20

21

22

23

24

25
```

COYLE ROBERTS - Direct (By Ms. Augsburger)

1              What does UW stand for?

2       A.    Underwriting.

3       Q.    Okay.  So can you explain for me how this portion

4    of the process works?

5       A.    At the final disclosure, usually about 30 days

6    prior to the effect -- or prior to the renewal date, the

7    TPA will send in updated reports on behalf of the client

8    and our nurse will make her final review.  And if that

9    review has changed since the initial one, then I would go

10   back to the TPA and say we need to adjust our rates or

11   laser or do an aggregating spec or even occasionally we

12   might be able to reduce the rate if a person is no longer

13   at risk.

14      Q.    Okay.  Well, where this says, If the nurse's

15   final review has changed and UW feels there is an increased

16   risk of large claims, that sort of sounds to me like it's

17   anticipated that the underwriter will make a decision about

18   whether there's an increased risk of large claims; is that

19   not your experience?

20      A.    Based on the nurse's final review.

21      Q.    All right.  So is there -- do you base your

22   decision or your feeling on whether there's an increased

23   risk of large claims solely on what the nurse tells you?

24      A.    I take that into consideration.  I can't say that

25   it would be solely because --

COYLE ROBERTS - Direct (By Ms. Augsburger)

1    Q.    Okay.

2    A.    -- because I may discuss it with another

3    underwriter and see what they would do in that situation,

4    but primarily I am going to use the nurse's review.

5    Q.    What other things do you consider?

6    A.    If the rates that I have set would be enough to

7    cover the difference in what the nurse is projecting, then

8    I wouldn't need to increase the rates.

9    Q.    Okay.

10   A.    Or if the nurse is saying -- you know, worst case

11   scenario, if they have a transplant, I may say, you know,

12   we need to do a transplant specific laser.  It could be --

13   it could be several things.

14   Q.    Okay.  There's two, what else?

15   A.    Well, those two are the ones that come to mind.

16   I can't think of anything else right now.

17   Q.    Okay.  So this -- back to the sentence it says,

18   If the nurse's final review has changed and the underwriter

19   feels there's an increased risk of large claims.

20         Now, that sounds to me like the underwriter is

21   expected to draw a conclusion about whether there is a risk

22   that there will be more large claims.  And the reason I say

23   that is because there is an increased risk of large claims,

24   but I haven't -- it doesn't sound like you make a

25   determination about that; is that accurate?

COYLE ROBERTS - Direct (By Ms. Augsburger)

1    1 through 12 is information of a type that -- in the

2    industry that -- in the underwriting industry you would be

3    interested in.  In your case you just didn't need all of

4    this because you had it, but the question was this was the

5    type that would be -- type of information that would be of

6    interest?

7         A.   Yes.

8         Q.   All right.  That's all I want to know.  Let's

9    look at Exhibit 124, do you have it?

10        A.   Yes.

11        Q.   Okay.  The e-mail at the bottom is from

12   Lisa Simpson to you and Matt Schafer and it says, Betty,

13   Matt wanted you to have this info prior to your conference

14   call this morning, and then attached to it is -- it says

15   STR case management; do you see that?

16        A.   Yes.

17        Q.   Do you have any recollection about a conference

18   call in around August of 2005 with Matt?

19        A.   I remember a conference call, I don't know if it

20   was at this date, but --

21        Q.   You think it might have been -- was it -- did it

22   relate to the list of patients or cases that you see on

23   United 4479, the conference call, do you recall?

24        A.   Well, it must have been about that if he's asking

25   me to just send information prior to the conference call.

COYLE ROBERTS - Direct (By Ms. Augsburger)

1       Q.    Right, well, that's a conclusion I could

2  certainly draw from this document, that you said you didn't

3  remember, so now I want to take you away from the e-mail.

4       A.    Okay.

5       Q.    Do you remember -- the conference call that you

6  were thinking that you remember with Matt, did it have to

7  do with this list of patients on United 4479?

8       A.    I don't remember discussing that list of cases

9  with Matt.

10      Q.    All right.  Now, would you look again at

11  Exhibit -- the same exhibit, 124, Page 4479?

12      A.    Yes.

13      Q.    Do you know whose handwriting that is?

14      A.    No.

15      Q.    Do you recall reviewing a list of patients in

16  2005 where the notation in each case indicated whether the

17  patient was in active case management -- or not in each

18  case, but in a majority of cases?

19      A.    Do I remember seeing a list like this with notes?

20      Q.    Correct.

21      A.    With notes beside it saying they were in case

22  management?

23      Q.    Well, let's look at No. 2.

24      A.    Okay.

25      Q.    Linda Lam.  And then it talks about Cassidy and

COYLE ROBERTS - Direct (By Ms. Augsburger)

1  Chase are still being followed and are in case management;

2  do you see that?

3      A.  Yes.

4      Q.  No. 3, Henry Moss, last four words, in active

5  case management; do you see that?

6      A.  Yes.

7      Q.  No. 4, last four words are in active case

8  management; do you see that?

9      A.  Yes.

10     Q.  The same is true with regards to No. 5, 6, 7, 8,

11  9, 10, 11.  No. 12 says Herbert Oubre is not currently

12  being managed; do you see that?

13     A.  Yes.

14     Q.  Next one is No. 13, that person is in active case

15  management, 14 the same, 15 the same, 16 the same, 17 the

16  same, 18 the same, 19 the same, 20 the same.  21 says place

17  on transplant list and then there's some handwriting.

18         So would you agree with me that the majority of

19  the patients listed on this piece of paper are, according

20  to the notes, in active case management?

21     A.  Yes.

22     Q.  All right.  Now, do you recall reviewing pieces

23  of paper like this where it was noted that the patients

24  were in active case management?

25     A.  Did I receive this same list; is that what you're

COYLE ROBERTS - Direct (By Ms. Augsburger)

1    asking me?

2        Q.   I don't think I asked you if you received the

3    list.

4        A.   No, I --

5            MS. AUGSBURGER:  Can you read -- let's have the

6        question read back.

7                    (Whereupon, the pending question was

8                    repeated by the court reporter.)

9            THE WITNESS:  I remember receiving a report like

10       this.

11   BY MS. AUGSBURGER:

12       Q.   Thank you.  Now, do you know of any significance

13   that in active case management or the inclusion of the note

14   that the patients were in active case management; is there

15   a significance that attaches to that with respect to

16   Mutual?

17           MR. WALL:  Calls for speculation.

18           THE WITNESS:  Usually when I see the term "in

19       case management," there would be case management notes

20       attached to the report.

21   BY MS. AUGSBURGER:

22       Q.   All right.  And so that would be significant to

23   you so -- because that would tell you that you have --

24   there's some information out there that may be relevant to

25   underwriting, right?

```
 1              C E R T I F I C A T E

 2   STATE OF NEBRASKA     )
                           :ss
 3   COUNTY OF DOUGLAS     )

 4          I, Michelle Brezinski, Court Reporter, General

 5   Notary Public within and for the State of Nebraska, do

 6   hereby certify that the foregoing testimony of Betty Coyle

 7   Roberts, was taken by me in shorthand and thereafter

 8   reduced to typewriting by use of Computer-Aided

 9   transcription, and the foregoing (176) pages contain a

10   full, true and correct transcription of all the testimony

11   of said witness, to the best of my ability;

12          That I am not a kin or in any way associated with

13   any of the parties to said cause of action, or their

14   counsel, and that I am not interested in the event thereof.

15          IN WITNESS WHEREOF, I hereunto affix my signature

16   and seal this 3rd day of August, 2008.

17

18

19                          _____
                            MICHELLE A. BREZINSKI
20                          GENERAL NOTARY PUBLIC

21

22

23                                MICHELLE A. BREZINSKI
                                  MY COMMISSION EXPIRES
                                     August 17, 2010
24

25   My commission expires:
```

Exhibit M

# Specific Reimbursement Request Form

Mutual of Omaha Insurance Company
United of Omaha Life Insurance Company



Mail To:  Mutual of Omaha
          S3-Stop Loss Claims Unit
          Mutual of Omaha Plaza
          Omaha, NE 68175

## Stop Loss Policy Information     Initial Submission ☒   Subsequent Submission ☐   Advance Funding ☒

Policyholder/Group: *ALTA BATES SUMMIT MED CENTER*

Policy No.: *UL-90X4*          Policy Period: *1/1/06 - 12/31/06*
                                             (Accumulation period)

## Employee and Eligibility Information

Employee (Last/First): ▓▓▓▓▓          Birth Date: ▓▓▓▓   Soc. Sec. No.: ▓▓▓▓

Employee Status: Active (Y/N) *Y*   Retired: (Y/N) *N*   Hire Date: *9/12/72*  Health Benefit Effective Date: *1/1/05*

Date Last Worked: ___/___/___   Return to Work Date: ___/___/___   FMLA effective: ___/___/___  until ___/___/___

COBRA effective: ___/___/___ until ___/___/___   Extension of Benefits effective: ___/___/___  until ___/___/___

Continuation of Benefits effective: ___/___/___ until ___/___/___   Accident Date: ___/___/___ (if applicable)

Pre-Existing Condition Exclusion applicable (Y/N) *N*   Prior Creditable Coverage applicable (Y/N) *N*

## Claim Information

Claimant: ▓▓▓▓          Birth Date: ▓▓▓▓   Gender: *F*   Relation to Employee: *SELF*

Diagnosis: *585.6 END STAGE RENAL DISEASE*   Prognosis: _____

Plan Benefits Paid during this Policy Period $ *581,371.80*   Est. Future Liability $ _____

Case Management involved in claim (Y/N) *Y*          Specific Amount Requested $ *331,371.80*

Items that must be submitted with the initial claim:
  • Copies of all pertinent eligibility documentation (e.g., enrollment card, screen prints of history, COBRA payments, documentation supporting how
    coverage was maintained to meet the definition of "actively at work" status (FMLA dates, vacation or sick time utilized) documentation and verification of
    creditable coverage, etc.)
  • Results of Other Insurance, Medicare and Subrogation investigation
  • Signed Subrogation form (if applicable)
  • Copies of Care Certifications (Preauthorizations, Hospital Precertifications, etc.)
  • Copies of Case Management Progress Notes
  • Copies of all provider bills (refunds, benefit exceptions, overpayments)
  • Copies of EOB's
  • Claim History Report

Items that must be submitted with any subsequent claim submissions:
  • Claim History Report
  • Copies of Care Certifications (preauthorizations, hospital precertifications, etc.)
  • Copies of Case Management Progress Notes
  • Copies of all provider bills (refunds, exception payments, overpayments)
  • Copies of EOB's

DEPOSITION
EXHIBIT
97
Gese

Administrator: *BENEFIT & RISK*          Address: *10860 GOLD CENTER DR., #300*   Phone Number:
               *MANAGEMENT SERVICES*             *RANCHO CORDOVA CA 95670*       *(800) 959-4767*

Authorized By: *Ralph Hansen*            Date: *7-21-06*                 Fax Number:
                                                                        *(916) 858-3955*

Z747

Exhibit N

### THIRD PARTY ADMINISTRATOR AGREEMENT

This THIRD PARTY ADMINISTRATOR AGREEMENT (this "Agreement") is made this January 22, 2003, effective January 1, 2003 by and between Benefit and Risk Management Services, a California corporation, having its principal place of business at 10860 Gold Center Dr. S-100 Rancho Cordova, CA 95741 ("Contractor"), and Mutual of Omaha Insurance Company, a Nebraska corporation ("Company").

A.    Company has issued or will issue certain stop loss and group insurance policies to employers and/or other entities (singularly "Policyholder" and collectively "Policyholders") that have an arrangement with Contractor to submit premium on behalf of the Policyholder to the Company.    The term "Policy" or "Policies" shall include each inforce stop loss or group insurance policy with a corresponding Service Addendum attached to this Agreement;

B.    Company desires to engage Contractor to perform certain administrative services in connection with the Policies; and

C.    Contractor desires to accept such engagement pursuant to the terms and conditions of this Agreement.

In consideration of the terms, conditions and other agreements set forth herein, Contractor and Company hereby agree as follows:

### SECTION 1: APPOINTMENT

1.1    **Engagement of Contractor.**  Company hereby engages Contractor to provide the administrative services specified herein with respect to the Policies.

1.2    **Acceptance of Engagement.**  Contractor hereby accepts engagement by Company to perform the administrative services specified herein with respect to the Policies with the skill, diligence and expertise commonly expected from experienced and qualified personnel performing such duties.  Contractor shall perform such services in accordance with all relevant federal and state laws, rules and regulations and in accordance with the Mutual of Omaha Insurance Company TPA Guide, as such TPA Guide may be amended and revised from time to time.  Company shall provide Contractor with a copy of the TPA Guide upon execution of this Agreement or within a reasonable time thereafter.  Company may revise and amend the TPA Guide by providing written notice thereof to Contractor of at least 30 days.

1.3    **Notification of Policyholders.**  To the extent required by law or by Company, Contractor shall provide written notice, in a form approved by Company, to insured persons, Policyholders and all necessary others, disclosing the identity of, and relationship among, Contractor, Company, Policyholders and insured persons.

1.4    **Insurance.**  Contractor shall have and maintain at its own expense errors and omissions insurance covering itself and its employees and agents issued by an insurance carrier acceptable to Company until such time as all duties of Contractor hereunder are fully discharged.  Such insurance shall be written on a per occurrence basis in an amount not less than $1 million per occurrence and shall have an annual aggregate of $1 million or other amounts as specifically required by law, if such amounts are greater than $1 million/$1 million.  Each policy shall name Company as an additional insured, and such policy shall provide prior notification of Company in the event of termination, modification or cancellation of said policy.  Contractor shall annually provide evidence of said coverage to Company.  Company shall have the right to require Contractor to increase the amount of insurance provided hereunder upon written notice to Contractor.

1.5    **Fidelity Bond.**  Contractor shall have and maintain at its own expense a fidelity bond with a surety acceptable to Company, covering losses caused by dishonesty of itself and its employees and agents, as well as loss or destruction of monies or other property belonging to others and held by Contractor, until such time as all duties of Contractor hereunder are fully discharged.  In no event shall such bond be in an amount less than $500,000. Contractor shall annually provide evidence of such bond to Company.



DEPOSITION
EXHIBIT
41

Wells    6-25-08

PENGAD 800-631-6989

UNITED-0036

Contractor will immediately inform Company of any intent to change sureties or cancel the bond or if the bond is canceled for any reason. Company shall have the right to require Contractor to increase the amount of the bond upon written notice to Contractor.

1.6     **Trademarks, Tradenames, Etc..** Contractor shall not use or reproduce, by any means, any logo, trademark, service mark or name of Company or any of its affiliates in any advertising, publicity releases, customer lists or otherwise, without the prior written consent of Company.

1.7     Compliance.

    (a)     Contractor shall obtain and maintain all necessary licenses, certificates, registrations and regulatory approvals in all states which so require and otherwise shall comply with all other licensing laws and regulations applicable to Contractor and its employees and agents, and all other laws and regulations with respect to Contractor's duties hereunder. Contractor will not provide services under this Agreement unless the proper licenses, certificates, registrations and regulatory approvals have been obtained. Contractor will immediately notify Company of any change in the status of such licenses, certificates, registrations and regulatory approvals. On or before the Effective Date, and annually thereafter, Contractor will provide to Company a copy of all licenses certificates, registrations and regulatory approvals.

    (b)     Contractor shall act in an ethical, professional manner in connection with this Agreement. Contractor shall immediately notify Company in the event that Contractor or any employee, officer or director of Contractor is convicted of a felony involving dishonesty, breach of trust or violation of 18 U.S.C. 1033 after the Effective Date.

    (c)     Contractor shall comply with this Agreement, each Service Addendum and all written policies, rules, practices, procedures and processes of Company related to this Agreement, including, without limitation, the TPA Guide and the statement of values of Company included in the TPA Guide.

## SECTION 2: CONTRACTOR'S SERVICES

Unless otherwise indicated in a Service Addendum, Contractor agrees to, the following terms and shall perform the following services:

2.1     **Premium Collection Activities.** Contractor agrees that all charges and premiums collected by Contractor on behalf of or for Company, including the return of premiums received by Contractor from Company, shall be held by Contractor in a fiduciary capacity. Such funds shall be immediately remitted to the person or persons to whom such funds are owed or shall be deposited promptly in a federally insured or state-insured financial institution. Contractor agrees that payment to the Contractor of any premiums or charges for insurance by or on behalf of a Policyholder or insured person shall be deemed to have been received by Company, and the payment of return premiums forwarded by Company to Contractor or processed by Contractor shall not be deemed to have been paid to the Policyholder or insured person until such payments are received by the Policyholder or insured person. Nothing in this section limits any rights of Company against Contractor resulting from Contractor's failure to make full and timely payments to Company, Policyholders or insured persons.

Monies deposited into the fiduciary account shall not be combined with funds allocable to claims under any circumstances. Contractor shall have no authority to extend the time for payment of premium by any Policyholder, establish premium rates, guarantee rate credits, or bind Company in any way unless expressly authorized by Company in writing to do so.

In addition to the terms and conditions set forth above, Contractor shall perform the following premium collection functions for Company:

2

UNITED-0037

(a) Follow the guidelines and procedures set forth in the TPA Guide (receipt of which Contractor hereby acknowledges) or other applicable procedural manual of Company;

(b) Collect and deposit Policyholder's insurance premiums in the fiduciary account;

(c) Distribute monthly premium statements to Policyholders on a timely basis;

(d) Maintain current premium records for each Policyholder;

(e) Inform Policyholders of premium delinquencies, Policy lapses and Policy terminations, and collect premium due;

(f) Provide Company with evidence of applicant insurability, in accordance with applicable Policy provisions;

(g) Make withdrawals from the fiduciary account only to effect the following transactions:

    (i) remit premiums to Company;

    (ii) deposit premiums in an account maintained in the name of the Company;

    (iii) pay to Contractor its commissions, fees, or charges, as mutually agreed to by the parties hereto; and

    (iv) remit return premiums to any individual or entity entitled to such premiums;

(h) Remit to Company all of the Policy premiums due to Company, less Contractor's applicable insurance commissions (if Contractor is entitled to commissions pursuant to a producer agreement between Company and Contractor) within fifteen (15) days after receipt of such premiums by Contractor, but in no event later than the fifteenth (15th) day of the month following the end of the then-applicable grace period;

(i) contact Company when cash or a cash equivalent (e.g., traveler check, money order, cashier check) of $10,000 or greater is received for Company.

2.2 **Commissions.** Contractor shall:

(a) distribute commissions to appointed agents and brokers with in-force Policies in accordance with procedures described in the TPA Guide;

(b) complete and distribute Forms 1099 by January 31 of each year to agents and brokers receiving Company commissions on Policies during the previous year.

2.3 **Enrollment and Eligibility Activities.** Contractor shall perform the following services with respect to Policy enrollment and eligibility activities, based on product type as described in the applicable Service Addendum:

(a) Provide Policyholders with Company-prepared enrollment and eligibility materials, booklets, identification cards and other materials.

(b) Report and process Policyholder requests to add, terminate or change coverage under the Policy in accordance with the procedures set forth in the TPA Guide.

UNITED-0038

(c)     Enforce Policy eligibility requirements and collect data to support enrollment activities (e.g., information regarding other coverage, incapacitated children, full-time students, qualified child medical support orders).

(d)     Retain eligibility records (e.g., copies of signed enrollment forms, change requests, termination notices) in a manner acceptable to Company.

(e)     Field and answer inquires from persons regarding Policy eligibility issues, and refer all issues involving questionable or disputed eligibility determinations to Company.

### SECTION 3: OTHER DUTIES AND RESPONSIBILITIES OF CONTRACTOR

3.1     **Authority.** Nothing in this Agreement authorizes Contractor to exercise any discretion in determining benefits under a Policy, to change benefits under a Policy, or to determine or change premium rates, underwriting criteria or Company's claims payment procedures.

3.2     **Adequate Business Premises.** Contractor will maintain at its own expense adequate business premises, sufficient qualified and experienced personnel, and sufficient equipment to perform the services required by this Agreement. Contractor shall provide advance written notice to Company of all business locations at which services required by this Agreement will be performed.

3.3     **Delivery.** Contractor shall deliver any termination notices or other written communications delivered by Company to Contractor for delivery to Policyholders promptly upon receipt of instructions from Company to deliver such materials.

3.4     **Notice of Litigation or Regulatory Proceeding.** Contractor shall immediately notify Company upon receiving notice of potential, threatened, or actual litigation or any regulatory inquiry or complaint with respect to this Agreement or any Policy. Company shall have final decision-making authority to assume the administration and defense of any such action. Company has the option of requiring Contractor to assume its own defense regarding any litigation relating to this Agreement or any Policy. A copy of the correspondence or document received shall accompany each notice. Contractor shall furnish Company all records and all other documents relating to a lawsuit as requested by Company. Contractor further agrees it will fully cooperate with Company in the defense of any lawsuit arising out of a claim against Company or arising out of this Agreement, unless related to a dispute between Company and Contractor, including, without limitation, the providing of records, files and witnesses.

3.5     **Compliance with Performance Standards.** Contractor shall perform its services hereunder in accordance with the Performance Standards described in each Service Addendum and the TPA Guide. In the event Contractor fails to meet a Performance Standard, then Contractor's compensation under this Agreement shall be reduced in the manner and by the amount of the credits described in the Service Addendum or TPA Guide.

3.6     **Reports.** Within 15 days after the end of each month, unless otherwise stated, Contractor shall provide to Company the reports set forth in the Service Addenda and TPA Guide. Notwithstanding the foregoing, upon request of Company, Contractor shall provide to Company interim reports disclosing the information included in any of the reports described in the preceding sentence within five days after receipt of Company's request.

3.7     **Contractor's Representation of Authority.** Contractor represents that it has a written agreement with each Policyholder whereby Contractor is authorized to collect Policy premium and remit this to Company on behalf of the Policyholder. Contractor further agrees to immediately advise Company in writing if Contractor's authority is withdrawn, terminated or otherwise limited.

3.8     **Confidentiality Agreement.** On or before the effective date of any stop loss insurance policy which Company has agreed to issue to an employer and/or other organization that has an agreement with

4

Contractor to submit to Company stop loss insurance premium on behalf of the employer and/or other organization, Contractor shall furnish such employer and/or other organization with two copies of Company's Confidentiality Agreement for execution by the employer and/or other organization. Company shall provide Contractor with a copy of such agreement, and any replacements or substitutions of such agreement which have been prepared by Company, which may be reproduced by Contractor solely for the purpose of complying with this Section 3.8. Contractor shall remit both executed copies to Company on or before the effective date of the stop loss insurance policy. Contractor shall not agree to, nor bind Company in any way to, any changes, revisions or modifications to a Confidentiality Agreement without Company's prior written approval. Contractor shall immediately advise Company in the event the employer and/or other organization refuses to execute a Confidentiality Agreement or proposes any changes, revisions or modifications to a Confidentiality Agreement.

### SECTION 4: COMPANY'S DUTIES AND RESPONSIBILITIES

4.1    **Company's Obligations.** Company shall:

(a)    Notify Policyholder(s) of Policy termination if Company does not receive premium within 20 business days following expiration of the Policy grace period.

(b)    Review and accept or decline Policyholder(s)' requests to retroactively add/terminate/change coverage beyond the terms outlined in the Policy.

(c)    Review and accept or decline policy reinstatement requests by Contractor/Employer.

(d)    Provide Contractor with a TPA Guide outlining detailed premium and, if applicable, eligibility, processing, communication, remittance and reporting requirements, and other requirements. Company shall provide Contractor with any updates to the TPA Guide that may be made from time to time.

(e)    Notify any department or division of insurance or any other governmental authority, when required by law or regulation, in writing of any change, termination or cancellation of this Agreement within the time period required by law.

4.2    **Penalties and Sanctions.** Company may adopt, from time to time, penalties and sanctions applicable to breach of this Agreement or violation of law by Contractor or an employee or agent of Contractor. Adoption of these guidelines and any failure to observe them shall neither grant any rights to Contractor or its employee or agent, nor impose any duties upon Company, and shall not be deemed to limit Company's rights as set forth in this Agreement.

4.3    **Service Addendum.** Company may revise, add, remove or delete a Service Addendum by providing written notice thereof to Contractor. In the event a Service Addendum is removed or deleted or the premium submission arrangement between Contractor and a Policyholder is ended, such policy shall no longer fall within the definition of "Policy" under this Agreement.

### SECTION 5: LIMITATIONS

5.1    **Limitations.** Contractor, either personally or through its employees or agents, shall not:

(a)    **Expense or Liability.** Except as specifically provided in this Agreement, incur any expense or liability on account of, or otherwise bind, Company without specific prior written approval from an Authorized Representative. For purposes of this Agreement, an "Authorized Representative" means the President of Company or an individual authorized in writing by the President.

(b)    **Money Collected.** Spend, cash or deposit any premium checks or drafts for any Policy, except as allowed under this Agreement.

5

UNITED-0040

(c)  **Alteration of Contracts.** Make, alter, or discharge any contracts or insurance policies on behalf of Company; make, alter, or discharge any proposal or offer of insurance coverage on behalf of the Company; or modify, waive, extend or discharge any terms or conditions of any Policy or other evidence of insurance, application, or any provision thereof.

(d)  **Premium and Contracts.** Extend the time for payment of any premium or waive any premium, or bind Company to reinstate any terminated contract, or accept payment in any form other than a customer check or money order.

(e)  **Legal Response.** Institute or file a response to any legal or regulatory proceeding on behalf of Company.

(f)  **Discontinue Premium Payment.** Directly or indirectly induce any customer to relinquish any Policy or discontinue any premium payment.

(g)  **Misrepresentation.** Misrepresent, or induce any person to misrepresent, any provision, benefit, or premium of any Policy.

(h)  **Representations.** Represent to any person or organization that Contractor in any way represents Company for any purpose not specifically covered by the terms of this Agreement.

(i)  **Syndicates.** Commit Company to participate in insurance or reinsurance syndicates or enter into any reinsurance arrangements relating to the Policies.

(j)  **Employment.** Recruit, employ or compensate in any manner any individual employed by Company during the term of this Agreement.

(k)  **Premium Rates.** Quote premium rates other than as specified by Company.

(l)  **Business Operating Expenses.** Use any funds held in a fiduciary account for payment of any business operating expenses of Contractor.

## SECTION 6: COMPENSATION

6.1   **Service Fees and Payment.** In consideration of the services and duties to be performed by Contractor under this Agreement, and of the other terms and provisions therein, the parties agree that Contractor shall be entitled to and will receive payment of the fees for services rendered hereunder directly from the Policyholder unless otherwise indicated in a Service Addendum. Contractor shall look solely to Policyholders for payment for services described herein unless Company is required to pay Contractor pursuant to a Service Addendum. Contractor shall have no recourse against Company if any Policyholder fails to pay Contractor for the services described herein.

6.2   **Fees and Expenses.** Contractor shall be responsible for and shall pay, with its own funds, all fines, penalties, assessments, interest, costs, liabilities, expenses, fees and taxes incurred by Contractor in the performance of this Agreement or relating to the improper performance or nonperformance of any services required to be performed hereunder by Contractholder, whether imposed on Company or Contractor or any employee or agent of Contractor.

6.3   **Interest.** Any premiums collected by Contractor or other payments payable to Company by Contractor under this Agreement that are not paid to Company by Contractor as required in this Agreement shall accrue interest on a daily basis. Interest shall be computed on the basis of a 365-day year. The annual interest rate shall be a floating rate equal to the prime rate as reported in the *Wall Street Journal* as of the first day of each month, plus 2%. Any interest that remains due at the end of each calendar year shall be added to the outstanding amount of premiums or other payments due and unpaid at such date. Company's

6

levying and collection of such charges for accrued interest shall not serve as a waiver of any of Company's rights as stated elsewhere in this Agreement.

6.4     **Compensation to Employees and Agents.**  Contractor shall have full responsibility to compensate, from Contractor's own funds, any employee, agent or other individual or organization providing services to Contractor relating to this Agreement or to Contractor's duties or services hereunder.

6.5     **Obligations of Employees and Agents.**  Contractor shall be liable for any obligation of Contractor's employees and agents that relate to this Agreement, specifically including any indebtedness of such parties to Company. Contractor agrees that upon receipt of notifications from Company detailing the failure of such parties to properly perform, Contractor will promptly perform such obligations or will compensate Company for the failed performance.

### SECTION 7:  BOOKS AND RECORDS

7.1     Records and Inspection.

(a)     Contractor shall maintain at its principal administrative office for the duration of this Agreement and six years thereafter, or such longer period as may be required by applicable law or regulation ("Records Retention Obligation"), adequate books and records related to its services and obligations under this Agreement and adequate books and records concerning all transactions between it, Company, insured persons, claimants, and Policyholders including, without limitation, a copy of this Agreement, Policy premium payment records, and fiduciary bank account records. The books and records shall be maintained as required in the preceding sentence unless the records are delivered to Company or a succeeding administrator in accordance with this Agreement. The books and records shall be maintained in accordance with prudent standards of insurance recordkeeping, shall be separately maintained from the records of other business conducted by Contractor and shall comply with the requirements of applicable law or regulation. Contractor shall maintain the confidentiality of all books and records hereunder in accordance with Section 9. Upon completion of its Records Retention Obligation, Contractor shall return or destroy all books and records in accordance with Section 9.

(b)     Inspection and Audit.  During the term of this Agreement and six years thereafter, Company or its representative shall have the right to inspect and audit Contractor's books and records, as well as any books and records which are maintained by Contractor's employees or agents, during normal business hours, upon at least 48 hours advance written notice. Such inspection and audit may take place at any location or office of Contractor or any employee or agent of Contractor at which any of the books and records are maintained. Company or its representative shall also have the right to inspect and audit any Policyholder's books and records relating to transactions between Policyholders and Contractor or its employees or agents. If Company's or its representative's right to inspect and audit Contractor's books and records, or the books and records of a Policyholder or Contractor's employees or agents, is impeded, restricted, limited or denied by Contractor or its employees or agents, in addition to all other remedies available at law or under this Agreement, Company is entitled to (i) seek and obtain equitable relief, including injunctive relief, and (ii) reimbursement of all attorney fees and court costs therefor.

(c)     Copies of Books and Records.  Upon request of Company, Contractor shall promptly furnish Company with a copy of any books and records described in this Section 7.

(d)     Access by Governmental Authorities.  A governmental authority, including, without limitation, a commissioner of insurance, having appropriate jurisdiction, shall have access to books and records maintained by Contractor for the purpose of examination, audit and inspection. Information contained in such books and records, including the identity and addresses of Policyholders, shall be treated as confidential information in accordance with and as allowed by applicable law or regulation. However, a governmental authority may use the information in any proceeding instituted against Contractor. Additionally, in the event Company requests information

7

from Contractor in order to allow Company to respond to inquiries from governmental authorities. Contractor shall immediately provide the requested information to Company. Additionally, in the event Company requests information and files from Contractor in order to allow Company to respond to inquiries from regulatory authorities, Contractor shall immediately provide the requested information and files to Company in the format and manner required by Company. If Contractor fails to provide the requested information and files to Company as required by this Subsection 7.1(d), Company may, at its discretion, impose a $100 per day penalty upon Contractor, determined based upon each day for which Contractor fails to provide the requested information and files to Company after receipt of Company's written or oral request. This penalty shall be in addition to any other rights or remedies available to Company. Company shall be entitled to deduct this penalty from any compensation due to Contractor under this Agreement.

(e)    **Filing of Agreement.**  Contractor shall file a copy of this Agreement with any State insurance departments or divisions or other regulatory bodies as required by law.

(f)    **Policy Issued to a Trustee.**  Where a Policy is issued to a trustee or trustees, a copy of the trust agreement and any amendments thereto shall be furnished to Company by Contractor.

7.2    **Ownership of Files.**  It is understood and agreed by and between the parties that Company shall at all times own all files, books and records generated by or obtained by Contractor relating to Company, Policyholders, Policy premiums, Insured persons, and Policies. However, Contractor shall retain the right to continuing access to such files, books and records to permit Contractor to fulfill all of its contractual obligations to Company and, subject to the terms of Section 9 herein, shall have a right to retain copies of such files, books and records notwithstanding termination of this Agreement. In the event of the termination of this Agreement, Contractor shall, but only upon 30 days prior written request from Company, deliver to Company or, upon written instruction of Company, deliver to a succeeding administrator, all such files, books and records. Company or any succeeding administrator shall acknowledge, in writing, that Company or any succeeding administrator is responsible for retaining the files, books and records of Contractor for six years from the termination of this Agreement.

## SECTION 8: INDEMNIFICATION

8.1    **Indemnification of Company.**  Contractor shall release Company, indemnify Company, and hold Company harmless against any liability, loss, costs, expenses (including reasonable attorney fees incurred by Company) or damages to which Company may be subject, including punitive and extra-contractual damages, resulting from or in connection with any act or omission by Contractor in the performance of any duties or services under this Agreement including, without limitation, Contractor's failure to comply with the material terms or obligations of this Agreement. Contractor shall also reimburse Company for any and all expenses reasonably incurred by Company in connection with investigation or defense of any such liability, loss, costs, expenses or damages.

8.2    **Indemnification of Contractor.**  Company shall release Contractor, indemnify Contractor, and hold Contractor harmless against any liability, loss, costs, expenses (including reasonable attorney fees incurred by Contractor) or damages, to which Contractor may be subject, including punitive and extra-contractual damages resulting from or in connection with the bad faith, gross negligence or willful misconduct of Company or Company's failure to comply with the material terms or obligations of this Agreement. Company shall also reimburse Contractor for any and all expenses reasonably incurred by Contractor in connection with investigation or defense of any such liability, loss, costs, expenses or damages.

8.3    **Procedure.**  Pursuant to this Section 8, when the indemnified party receives notice of a claim or suit with respect to claims resulting from the assertion of liability by a third party for which indemnification is provided by this Section 8, the indemnified party will promptly notify the indemnitor and provide a copy of the claim notice, summons and complaint, or other relevant documents. The indemnified party shall cooperate fully with the defense of any such claim. The indemnifying party shall consult with the indemnified party concerning counsel retained. Should the parties fail to reach agreement on selection of counsel, the opinion of the indemnifying party shall govern the selection. The indemnifying party shall

8

UNITED-0043

control the conduct of the litigation of other proceedings. Counsel will keep both parties apprised of the status of the proceedings by promptly reporting all significant developments and, in addition, by providing general status reports on a timely basis. The parties will mutually agree as to the acceptance of any settlement offer(s) with regard to any claim for which indemnification is sought hereunder, or alternatively, the indemnifying party shall decide whatever action is to be taken regarding any settlement offer(s), provided that the indemnifying party in such case shall obtain the complete and written release of the indemnified party with respect to any third party claims thereto.

8.4     Definitions. As used in this Section 8, the terms "Contractor" and "Company" shall include, respectively, the directors, officers, attorneys, employees, agents and other representatives of Contractor or Company.

8.5     Attorneys' Fees. If either party resorts to litigation to enforce its rights pursuant to this Agreement, the prevailing party in such litigation will be entitled, in addition to any other award or relief, to an award for reasonable attorneys' fees and disbursements and court costs, unless prohibited by applicable law.

8.6     Survival. The provisions of this Section 8 shall survive the termination of this Agreement.

### SECTION 9:  CONFIDENTIAL INFORMATION

9.1     Confidential Information. Performance of the duties and obligations required under this Agreement may require Company to disclose to Contractor certain confidential or proprietary information.

(a)     Definitions. For purposes of this Section 9, the following terms have the following meanings. Any singular word shall include any plural of the same word.

(i)     "Confidential Business Information" means all written or electronic nonpublic business or financial information that is designated as confidential by Company, and all copies thereof and all analyses, reports, data or other written or electronic documents prepared by Contractor or its Representatives based on, or which contains, any Confidential Business Information. Such designation by Company shall be in any written form which clearly communicates to Contractor that the nonpublic business or financial information received is confidential. All Confidential Business Information disclosed orally shall not be considered confidential and subject to the provisions of this Section, unless, within ten (10) days of the disclosure, Company summarizes the oral disclosure in writing, sends the summary to Contractor and identifies such summary to be confidential as set forth hereunder. Notwithstanding the foregoing, the term "Confidential Business Information" shall not include any information that (1) first enters the public domain through means other than direct or indirect disclosure by Contractor in violation of the terms of this Agreement, or (2) is in possession of Contractor free of any obligation of confidence to Company.

(ii)     "Confidential Information" means Confidential Business Information and Confidential Personal Information.

(iii)     "Confidential Personal Information" means all individually identifiable personal information relating to any individual insured by Company or covered under self-funded plans for which the Company provides stop loss insurance, including, but not limited to, demographic, medical and financial information such as name, age, sex, address, social security number, past or present physical and mental health condition and treatment, debt status or history, income and other similar individually identifiable personal information.

(iv)     "Representative" means any officer, director, employee, agent, consultant, representative, subcontractor, professional advisor and affiliate of Contractor.

9

UNITED-0044

(b)    **Confidential Business Information.**

    (i)    **Confidentiality Agreement.**  Contractor agrees to retain all Confidential Business Information in confidence, and will not use or disclose Confidential Business Information to others except (1) to its directors, officers and employees who are necessary or appropriate to perform the obligations required of Contractor hereunder, or (2) if not otherwise prohibited under this Agreement, to Contractor's Representatives, for purposes related to its performance of its obligations hereunder, provided the Representative is first informed of the confidential nature of such information and the obligations set forth herein, and agrees to be bound thereby.  Contractor's will be responsible to Company for a breach of confidentiality by its Representatives.

    (ii)    **Return of Confidential Business Information.**  Upon termination of this Agreement, Contractor will promptly return or destroy all Confidential Business Information as directed in writing by Company.  Upon written request of Company the destruction or return of such information shall be confirmed in writing.  If Contractor has post-termination obligations under this Agreement that require continued access to the Confidential Information, Contractor's obligation to destroy or return such information shall be extended until such obligations have ended.

(c)    **Confidential Personal Information.**  All Confidential Personal Information shall be deemed confidential, with or without designation as such by Company, and shall be treated in the same manner as Confidential Business Information, described above in Subsection 9b(i) and (ii).

(d)    **Indemnification.**  Notwithstanding any other provisions of this Agreement, Contractor shall indemnify, defend and hold Company harmless for any liabilities, claims, demands, suits, losses, damages, costs, obligations and expenses, including, without limitation, attorneys' fees, court costs and punitive or similar damages, incurred by Company which result from any breach of this Section 9 by Contractor.

(e)    **Termination for Cause.**  In addition to any other termination provisions contained in this Agreement, Company may terminate this Agreement upon notice to Contractor if Contractor has materially breached a term of this Section 9.

(f)    **Disclosures Required By Law or a Regulatory Authority.**  If Contractor is required to disclose Confidential Information in response to legal process or a regulatory authority, Contractor shall immediately notify Company and, upon request, cooperate with Company in connection with obtaining a protective order.  Contractor shall furnish only that portion of the Confidential Information which it is legally required to disclose and shall use commercially reasonable efforts to ensure that confidential treatment will be accorded such Confidential Information.

(g)    **Compliance with Laws.**  Contractor shall comply with its obligations under this Agreement and under any applicable state or federal law or regulations as may be in effect or as may be enacted, adopted or determined regarding the confidentiality, use and disclosure of Confidential Information.

(h)    **Equitable Relief.**  Contractor acknowledges the Confidential Information it receives is confidential and/or proprietary to Company, that disclosure thereof could be seriously harmful to the business prospects of Company, that Company may not have adequate remedies at law for a breach of the confidentiality obligations hereunder and that money damages may be difficult or impossible to determine.  Accordingly, Contractor agrees, in addition to all other remedies available at law or under this Agreement, that Company is entitled to (1) seek and obtain equitable relief, including injunctive relief, and (2) reimbursement of all attorneys' fees and court costs.

10

UNITED-0045

(i)    **Material Obligation/Survival.** Each obligation contained in this Agreement pertaining to the confidentiality, use or disclosure of Confidential Information is deemed to be a material obligation of Contractor hereunder. The respective rights and obligations of the parties under this Section 9 shall survive the termination of this Agreement.

### SECTION 10:  TERM AND TERMINATION

10.1    **Term.** This Agreement will be effective as of the Effective Date and will continue until the anniversary date hereof, unless terminated earlier pursuant to the provisions set forth below. This Agreement will automatically renew for successive one-year terms, unless this Agreement is terminated pursuant to the provisions set forth below.

10.2    **Termination.**

(a)    **Termination by Company.** This Agreement may be terminated by Company with or without cause and for any reason whatsoever upon 30 days prior written notice.

(b)    **Termination by Contractor.** This Agreement may be terminated by Contractor upon at least 30 days' advance written notice if Company materially breaches any provision of this Agreement. Contractor shall set forth in the notice of termination the facts underlying its claim of breach, cite the relevant sections of this Agreement that are claimed to have been breached and provide Company 30 days from the date of written notification to cure the identified material breach. Remedy of such breach to the satisfaction of Contractor, within 30 days of the receipt of such notice, shall revive this Agreement for the remaining portion of its then-current term, subject to any other rights of termination contained in this Section 10.

(c)    **Withdrawal of Authority to Perform Services.** Notwithstanding anything to the contrary in this Agreement, Company may at any time, with or without cause, withdraw Contractor's right and authority to perform any or all of the services described in this Agreement upon written notice thereof to Contractor.

(d)    **Automatic Termination.** This Agreement shall automatically terminate upon the occurrence of one or more of the following:

(i)    Contractor or Company seeks reorganization or to affect a plan or other arrangement with creditors, makes a general assignment for the benefit of creditors, applies for or consents to the appointment of a receiver or trustee for all or a substantial part of its property or is insolvent;

(ii)    Dissolution of Contractor or Company;

(iii)    Cessation of Contractor's or Company's business; or

(iv)    In the event all Service Addenda are removed or deleted.

(e)    **Fraud, Sale or Misappropriation.** Company may elect to immediately terminate this Agreement by written notice to Contractor upon the occurrence of one or more of the following:

(i)    Fraud or embezzlement of the part of Contractor, its employees or agents, as deemed to have occurred in Company's judgment;

(ii)    Sale of a controlling interest in Contractor;

11

      (iii)    Misappropriation of funds or destruction of property of Company by Contractor, its employees or agents or failure of Contractor to remit funds due Company upon demand; or

      (iv)    If any governmental authority cancels or declines to renew such of Contractor's licenses as are necessary for the orderly conduct of business to be performed hereunder.

    (f)    **Effect of Termination of Agreement.** In the event this Agreement is terminated, Contractor is no longer authorized to collect and/or receive premium on behalf of Company, and Contractor shall immediately cease all such premium collection activities. Furthermore, if this Agreement is terminated, Contractor shall immediately provide written notification to all Policyholders that Contractor is no longer authorized to collect and/or receive premium on Company's behalf, and the Contractor shall immediately discontinue its premium collection arrangement(s) with Policyholder(s).

10.3    **Return of Supplies and Property.** Upon termination of this Agreement, subject to the terms of Section 9.1(b)(ii), Contractor will promptly deliver to Company all supplies and any other property of Company provided by Company or in the possession of Contractor, except to the extent and only for so long as, such property is necessary for Contractor to fulfill its obligations created by this Agreement.

10.4    **Policy Information.** Upon termination of this Agreement, Contractor shall provide in a format specified by Company all information reasonably requested by Company related to any of the Policies.

10.5    **Causes of Action Prior to Termination Date.** Termination of this Agreement shall be without prejudice to any cause of action occurring prior to the date of termination. Termination shall not affect any provision of this Agreement that survives such termination.

SECTION 11: MISCELLANEOUS

11.1    **Notices.** Any notice required or permitted under this Agreement shall be delivered personally or sent by U.S. Mail with all postage prepaid or by express mail or overnight courier addressed as set forth below (or at such other addresses as may be stated in notices similarly given). Notice may be provided by facsimile, with physical copy (i.e., hard copy) be provided subsequently in the manner described herein:

      to Contractor:    Attention:
                    Address:

                    Telephone:
                    Facsimile:

      to Company:    Attention:    Michael A. Wozny
                                    Mutual of Omaha Companies
                                    Mutual of Omaha Plaza S-1
                                    Omaha, NE 68175
                    Telephone:    (402) 351-5969
                    Facsimile:    (402) 351-1914

11.2    **Entire Agreement.** This Agreement, including all Service Addenda and the TPA Guide, constitutes the entire agreement of the parties and supersedes all previous agreements and/or contracts whether oral or written between them with respect to the subject matter hereof.

11.3    **Severability.** If any provision of this Agreement shall contravene or be invalid under the laws of the United States, the state in which enforcement is sought, or the regulations of the division or department of insurance of such state, it is agreed that such provision shall not invalidate the whole Agreement but this Agreement shall be construed as if not containing the particular provision or provisions held to be invalid.

12

UNITED-0047

11.4    **Amendment.** Except with respect to Company's right to: (a) change the TPA Guide, and (b) revise, add, remove or delete Service Addenda, no modification or amendment of this Agreement shall be valid unless approved in writing by Contractor and an Authorized Representative. Notwithstanding the foregoing, this Agreement shall be amended to conform to any new or different requirements that result from State third party administrator or other applicable laws. Each party agrees to cooperate with the other party, in good faith, to effect any such amendment required by State third party administrator or other applicable laws. If the parties cannot agree on form and substance of any such amendment, the parties shall effect such amendments as are specified in the written opinion of Company's legal counsel.

11.5    **Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successor and assigns.

11.6    **Captions and Headings.** The captions and headings are for convenience of reference only and shall not control or affect the meaning or construction of any provision of this Agreement.

11.7    **Governing Law.** This Agreement shall be interpreted and construed in accordance with the laws of the State of Nebraska without giving effect to that it's principles of conflicts of law.

11.8    **Authority.** Each party represents to the other that it is authorized to enter into this Agreement and that its entry into this Agreement does not and will not violate the terms of any judgment, decree or ruling or any contract with any third party. The parties have caused this Agreement to be executed by their respective duly authorized officers.

11.9    **Assignment.** This Agreement or the services required herein may not be assigned by either party unless such assignment has been approved in writing by the other party.

11.10    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument.

11.11    **Waiver.** The waiver by either party of any term, covenant or condition herein shall not be deemed to be a waiver of such term, covenant or condition on any subsequent breach of the same or any other term, covenant or condition herein.

11.12    **Relationship of the Parties.** Neither party shall have any authority to enter into any commitments binding upon the other. This Agreement shall not be construed in any way to create an employment relationship or the relationship of a partnership, joint venture or other business entity.

[CONTRACTOR]

By _Matthew Schafer_
Print Name _MATTHEW M SCHAFER_
Print Title _CEO_
Date _2-18-03_

[MUTUAL OF OMAHA INSURANCE COMPANY]

By _____
Michael A. Wozny
1st Vice President – Operations & Performance

Date:    January 22, 2003

13

UNITED-0048

AMENDMENT
TO
THIRD PARTY ADMINISTRATOR AGREEMENT

This Amendment (this "Amendment") to the Third Party Administrator Agreement, (the "Agreement") by and between Benefit & Risk Management Services ("Contractor") and United of Omaha Insurance Company ("Company") is effective May 1, 2005 (the "Amendment Effective Date").

RECITALS:

A.     Contractor and Company entered into the Agreement effective January 1, 2003.

B.     Contractor and Company desire to amend the Agreement as stated herein.

In consideration of the foregoing promises and the following covenants and agreements, Contractor and Company agree:

1.     The term "Effective Date" in the Agreement means January 1, 2003.

2.     Section 1.7(b) shall be deleted and replaced with the following:

Contractor shall comply with all applicable laws and regulations and act in an ethical and professional manner in connection with this Agreement, including, without limitation, with respect to any compensation disclosure obligations and any other obligations it may have governing its relationships with its clients.   Contractor shall immediately notify Company in the event Contractor or any employee, officer or director of Contractor is convicted of a felony involving dishonesty, breach of trust or violation of 18 U.S.C. 1033 after the Effective Date.

3.     Section 3.3 shall be deleted and replaced with the following:

Upon request from Company, Contractor shall deliver to Policyholders any information that Company provides to Contractor for the purpose of fulfilling Company's obligations to provide such information to Policyholders or for any other purpose, including, without limitation, any policies, certificates, booklets, termination notices or other written communications, or Schedule A to Form 5500 and any other information relating to compensation paid to Contractor by Company. Contractor shall deliver such information to Policyholders promptly after receipt of instructions from Company to deliver such information or within the time period required by ERISA or other applicable law.

UNITED-0049

4.  Section 8.1 shall be deleted and replaced with the following:

Contractor shall release Company, indemnify Company, and hold Company harmless against any liability, loss, costs, expenses (including reasonable attorney fees incurred by Company) or damages to which Company may be subject, including punitive and extra-contractual damages, resulting from or in connection with any breach of this Agreement by Contractor or any act or omission by Contractor in the performance of any duties or services under this Agreement including, without limitation, Contractor's failure to comply with the material terms or obligations of this Agreement. Contractor shall also reimburse Company for any and all expenses reasonably incurred by Company in connection with investigation or defense of any such liability, loss, costs, expenses or damages.

5.  This Amendment shall be read together and construed as one document with the Agreement, but to the extent of any inconsistency or ambiguity, this Amendment shall govern. Except as specifically provided in this Amendment, all of the terms and conditions of the Agreement shall remain in full force and effect, and this Amendment shall be enforceable as of the Amendment Effective Date.

6.  Capitalized terms not otherwise defined herein shall have the meaning given them in the Agreement.

7.  This Amendment may be executed in multiple copies, and each such executed copy shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be signed and executed as of the day(s) and year set forth below.

UNITED OF OMAHA                          BENEFIT & RISK MANAGEMENT
INSURANCE COMPANY                        SERVICES

By: _____           By: _____

Name: _Tom M Gage_____                Name: _MATTHEW A Schafer_

Title: _VP Stop Loss / Special Risk Sales_   Title: _CEO_____

Date: _11/29/05_____                  Date: _12.12.05_____

2

UNITED-0050

## AMENDMENT TO THIRD PARTY ADMINISTRATOR AGREEMENT

This Amendment to the Third Party Administrator Agreement ("Amendment") by and between Benefit & Risk Management Services ("Contractor"), and Mutual of Omaha Insurance Company ("Company") is effective January 1, 2006 (the "Amendment Effective Date").

A.     Company and Contractor have previously entered into a Third Party Administrator Agreement ("Agreement"), effective January 1, 2003, as amended effective May 1, 2005 whereby Contractor has agreed to perform certain administrative services for Company.

B.     Company and Contractor desire to amend the Agreement as stated herein.

In consideration of the mutual promise contained in this Amendment, Company and Contractor agree to amend the Agreement as follows:

1.     All references to "Mutual of Omaha Insurance Company" shall be deleted and replaced with "United of Omaha Life Insurance Company" throughout the Agreement and any previous amendments.

2.     Except as specifically amended hereby, the Agreement shall remain in full force and effect, and this Amendment shall be enforceable as of the Amendment Effective Date.

Company and Contractor have caused this Amendment to be signed and executed as of the dates set forth below.   This Amendment may be executed in one or more counterparts; each counterpart shall be deemed an original.

BENEFIT & RISK MANAGEMENT
SERVICES

By: _____
Name: R. Scott Reid
Title: President
Date: 2/3/06

MUTUAL OF OMAHA INSURANCE
COMPANY

By: _____
Name: Tom Gage
Title: VP Stop Loss & Special Risk Sales
Date: 1/31/06

UNITED OF OMAHA LIFE INSURANCE
COMPANY

By: _____
Name: Tom Gage
Title: VP Stop Loss & Special Risk Sales
Date: 1/31/06

UNITED-0051