Exhibit O

MUTUAL of OMAHA INSURANCE COMPANY
UNITED of OMAHA LIFE INSURANCE COMPANY
Mutual of Omaha Plaza
Omaha, NE 68175
402 342 7600
mutualofomaha.com



August 2, 2006

Ralph Herrera
Benefit & Risk Management Services
10860 Gold Center Drive, S-300
Rancho Cordova, CA 95741

Re: Alta Bates Summit Medical Center
Policy: UP-90X4
Insured: [redacted]
SSN: XXX-XX-1551
Policy Year: 1-1-06 to 1-1-07

Dear Ralph:

I have completed my review of your submission, dated 7-21-06, for the above referenced individual totaling $331,371.80. The following determination has been made.

Please refer to the stop loss policy provision "MISSTATED DATA" that states:

"MISSTATED DATA - We have relied upon the information, including, without limitation, the Select Risk Questionnaire and Your application, provided by You or Your agents, employees or representatives, in the issuance of this Policy. If, before or after, making any reimbursement, We determine that You or Your agent, employee or representative provided inaccurate information or misstated, omitted, concealed or misrepresented any material fact or circumstance concerning this Policy or the Plan, including any Loss or other items that You were required to disclose to Us on Your application or the Select Risk Questionnaire, or there was fraud by You or Your agent, employee or representative relating to this Policy, We may:
(a) deny stop loss reimbursements for Losses related to (or the adjustment of Specific Deductibles for) certain individuals, notwithstanding any other provision of the Policy;
(b) revise the terms or conditions of the Policy, including, without limitation, the premium rates;
(c) rescind the stop loss insurance; or
(d) void the Policy."

The "Select Risk Questionnaire" which is part of the stop loss policy states:

"Complete Attachment A of this Select Risk Questionnaire, with respect to any individuals (employees, COBRA participants, FMLA or other continuees, retirees or dependents) satisfying any of the following criteria and expected to be covered under the Applicant's self insured health care plan on the Proposed Effective Date:
(a) Any individual who has received benefits under the Applicant's medical plan during the last 12 months (including any pending charges not yet paid) exceeding [the lesser of $20,000 or] [50%] of the Proposed Specific Deductible;
(b) Any individual confined in a medical facility or institution during the past 30 days or expected to be so confined at any time during the period commencing on the date this Questionnaire is signed and ending on the 90th day after the Proposed Effective Date;
(c) Any employee absent from work due to illness or injury on the day this Questionnaire is signed;
(d) Any individual physically or mentally unable to perform all of the normal activities of an individual who is in good health on the day this Questionnaire is signed; or
(e) Any individual diagnosed with any serious illness or injury including but not limited to any of the following diagnoses:"



DEPOSITION
EXHIBIT
99

ABSMC 00113

The diagnosis codes include 393-448/ Heart Disease/CHF/Cardiomyopathy and 582-588/ Renal Disease/Failure/Dialysis.

Review of the claim documentation submitted indicates that the claimant incurred services on May 24th 2005 for diagnosis 584.9 and 401.9 (claim # 752627) and July 27th 2005 for diagnosis 586 (claim # 714509). There were also preauthorization's submitted for service on August 24th 2005 for diagnosis 585 (authorization # 178200) and September 1st 2005 for diagnosis 585 (authorization # 178198). Based on this documentation we are applying provision MISSTATED DATA (a) and denying reimbursement for the stop loss claim submitted.

The determinations made for this reimbursement submission are based on the information submitted and information present in the stop loss reimbursement file at this time. If you feel that there is any additional information that may impact these determinations, please submit it. We will be happy to review the file again once the information is received.

Sincerely:

*[signature]*

Mark Brewer
Stop Loss Operation Auditor
Mutual of Omaha
Mutual of Omaha Plaza
Omaha NE 68175
t(402) 351-6540
f(402) 351-1914
Mark.Brewer@Mutualofomaha.com


CC Betty Coyle Roberts
   Mutual/United of Omaha

ABSMC 00114

Exhibit P

CONFIDENTIAL

STOP LOSS DEPARTMENT

# CLAIMS MANUAL





DEPOSITION EXHIBIT 46

UNITED-6079

CONFIDENTIAL

## CLAIMS PROCESSING PROCEDURES AND GUIDELINES

**Mail**

Each week a claim analyst is assigned to handle incoming mail.
a) Date stamp the correspondence with the received date.
b) Distribute the mail to the responsible claim analyst.
c) Each claim analyst will sort according to initial, subs, follow-ups, aggregate, etc.
d) Claim analysts will inventory mail daily – turn inventory in to Kris daily.

**Processing a Claim**

A specific stop loss claim occurs when an individual's eligible losses paid under a self-insured plan exceed the specific deductible within a benefit period. The employer's plan document defines the terms of coverage. The Stop Loss contract defines reimbursements available to the employer for benefits paid according to the plan doc.

Claims should be processed oldest work first – according to time of service standards (see Time of Service Goals section).
a) Make or pull claim file and green policy file. Review stop loss policy and group plan doc.
b) Review and resolve any disclosure issues.

**Disclosure**

To see if an individual's health condition(s) and/or "trigger diagnosis" (for list see below) was disclosed to MoO during the underwriting process, the claim analyst should look in the system for a disclosure notice (Lasered/Disclosed tab in the Claim or Contract module).

If one is not there, then the stop loss RNs should be contacted to see if they knew anything about this individual's condition(s). If proper disclosure was provided, or the nurses determine that disclosure was not necessary, the claim can continue to be considered for reimbursement. A copy of the large claim review should be placed in the claim file.

5

UNITED-6080

CONFIDENTIAL

If there is still a question as to whether an individual's condition(s) was disclosed properly, the claim analyst should check the underwriting file or the green policy file in the stop loss department for the disclosure statement and the cover letter that was sent to the employer. A copy of the disclosure statement should be placed in the claim file.

If there is still a question of whether the claimant was disclosed properly then the claims analyst should contact the MoO underwriter who rated the group to see if this claimant was disclosed. The response may be that MoO knew about this individual's condition(s) and the claim analyst should go ahead and continue to consider the claim for reimbursement. The claim file should be properly documented with the results of all review; case management, underwriting, management, etc.

If MoO did not know about this individual's condition(s) then the claim needs to be pended while the claim analyst gathers all the necessary documentation to review the issue further.

Once all of this information is gathered, the claim analyst will review the information including any necessary input from the underwriter, case management nurse, and management prior to resolving the disclosure issue. The Underwriting department's time service standards allow the underwriter up to two business days to respond. It may be necessary to refer the claim to the claim supervisor for a final decision regarding the handling of a claim that was not disclosed and should have been disclosed.

**When Disclosure is Required:**

Employers must disclose all plan participants that meet the following criteria:

(a) Any individual who has received benefits under the Applicant's medical plan during the last 12 months (including any pending charges not yet paid) exceeding 50% of the Proposed Specific Deductible;
(b) Any individual confined in a medical facility or institution during the past 30 days or expected to be so confined within 90 days after the Proposed Effective Date;
(c) Any employee absent from work due to illness or injury on the day the Select Risk Questionnaire is signed; or
(d) Any individual physically or mentally unable to perform all of the usual and customary duties and normal activities of an individual who is in good health on the day the Select Risk Questionnaire is signed; or
(e) Any individual diagnosed with any serious illness or injury including but not limited to any of the following diagnoses:

**Diagnosis Requiring Disclosure:**

| ICD-9 Code | Diagnosis | ICD-9 Code | Diagnosis | ICD-9 Code | Diagnosis |
|---|---|---|---|---|---|
| 001-139 | Infectious Diseases/AIDS/HIV | 290-299 | Mental & Nervous Disorders/Psycho-neurotic | 582-588 | Renal Disease/Failure/Dialysis |
| 140-239 | Malignancies/Cancer/Leukemia | 320-389 | M.S./Nervous System/Encephalitis | 640-670, V31-V37 | High Risk Pregnancy/Complications |
| 250 | Uncontrolled Diabetes/Complications | 393-448 | Heart Disease/CHF/Cardiomyopathy | 719-730 | Connective Tissue/Back Disorder/Osteomyelitis |
| 272.7 | Gauchers Disease/Malabsorption Syndrome | 430-438 | Cerebrovascular Disease/Stroke | 740-779 | Congenital Anomalies/Newborn Complications |
| 277 | Cystic Fibrosis | 416, | Primary Pulmonary | 880- | Intracranial/Spinal Cord |

6

CONFIDENTIAL

|  |  | 490-496 | Hypertension/Respiratory | 854, 952-953 | Trauma/Paralysis |
|---|---|---|---|---|---|
| 278 & 783 | Hyperalimentation/Feeding Disorders | 555-558, V44 | Severe GI Disorders/Regional Enteritis | 860-959 | Major Trauma/Amputation/Burns |
| 286 | Hemophilia/Blood Disorders | 570-579 | Chronic Liver/Pancreatic Disease/Hepatitis | 996-997, V42 | OrganTransplants |

**Disclosure and Laser Issues With Underwriting**

I have had some discussions with John Lenagh, and it is apparent everyone is doing a good job of identifying possible disclosure or laser problems. However, underwriting is feeling overwhelmed by the volume of requests and sometimes doesn't understand the "tone" of the e-mail. Some of our e-mails are perceived as somewhat accusatory, "why wasn't this person lasered when the nurse projected $200,000 in claims?"..........................just as an example. The underwriters feel we are questioning their abilities and not necessarily looking for clarification. I assured John we are only looking for clarification, because we would not presume to tell the underwriters how to do their job. John has also indicated their new strategy is to avoid lasers as much as possible. Therefore, he and I came up with the following guidelines:

**Person not disclosed on new or renewal business that probably should have been:**

Follow the normal process; check with nurses, review large claim, and check with underwriting based on nurse and large claim review results. Provide as much information as possible for underwriting. The claim information should be thoroughly reviewed and any pertinent information should be included in e-mail to include: LCB, dollars involved, diagnosis, claimant, group, TPA, specific deductible, and any background information to help make a determination on the disclosure issue.

**Person was disclosed and projected claims on large claim review exceed the specific deductible, and the individual was not lasered:**

**New Business** - if the difference between the spec deductible and projected claim dollars is $50,000 or more, check with underwriting for clarification. The e-mail should include the claimant, group, TPA, $ involved, spec ded, and projections made by the nurse. We should not question why the individual was not lasered, the e-mail should state something like:................the nurse projected $200,000 for Joe and the spec deductible is $50,000. We have a claim for $128,000. Before I process this claim, I want to make sure we have the correct information. Is it correct that Joe was not lasered and the spec ded of $50,000 applies? Thanks!

**Renewal Business** - if the difference between the spec deductible and projected claim dollars is $100,000 or more, check with underwriting for clarification. See above for information to provide and question to ask in e-mail.

We are making these changes because our business direction has changed, and Underwriting will not be writing very much business that has lasers attached (unless requested by the group). Therefore, our e-mails need to reflect our understanding of their strategy and be a source of clarification only.

**Lifetime Maximums**

7

CONFIDENTIAL

Lifetime maximums should be verified before any large reimbursements are made. In general, once the claimant reaches 50% of the lifetime maximum, the analyst will request information regarding the actual dollar amount applied to the lifetime maximum. This information will be entered by the analyst into the journal in SLIIC and documented in the file.

**Verify Eligibility**

Initial Self Insured Plan Eligibility Determination:

The claim analyst must verify the individual's (e.g. claimant/employee) eligibility for coverage by checking the enrollment & eligibility information. The claim analyst must verify that the documentation submitted complies with the requirements (provisions) in the plan language for eligibility and coverage, (e.g. the hire date on the enrollment form, along with any required waiting period agrees with the effective date of coverage).

The claim analyst will review and verify that MoO has received the following information (if applicable):

- Hire date
- Signed enrollment form (individuals covered, type of coverage)
- Documentation on any covered dependent (e.g. common law spouse, foster child, grandchild, full time student, incapacitated child)
- Open enrollment documentation
- Original effective date
- Creditable coverage and preexisting condition application
- Special enrollment documentation
- Late enrollment documentation and preexisting condition application
- Active status or hour bank eligibility
- Last day worked
- Return to work date
- FMLA eligibility and election
- Non-COBRA continuation or extension of benefits
- COBRA qualifying event
- Signed & valid COBRA election
- Proof of COBRA payments
- USERRA documentation
- Other insurance investigation

Initial Stop Loss Policy Eligibility Determination:

The claim analyst will verify and review the following information for stop loss coverage, (if applicable):

- Proof that required disclosures were made to MoO
- That the TPAs/Plan's premium was paid
- The stop loss deductible amount
- Provisions in the stop loss policy that apply and are not in the self insured plan, (e.g. PEC, Medical Necessity, U&C)
- That the charges incurred and paid by the self insured plan fall within the stop loss policy provisions (e.g. loss claim basis)
- Policy provisions for covered expenses (e.g. medical, prescriptions, transplants, mental & nervous)

8

UNITED-6083

CONFIDENTIAL

- The special underwriting stop loss provisions (e.g. aggregated specific deductible, laser deductible)
- Plan payment timely adjudication as defined in the stop loss policy
- Accommodation provisions

Maintaining Eligibility:

The claim analyst must verify that the documentation submitted complies with the requirements, (provisions), in the plan language for maintaining eligibility.

The claim analyst will verify that MoO has received the following (if applicable):

- FMLA eligibility and election
- Non-COBRA continuation or extension of benefits
- COBRA qualifying event
- Signed & valid COBRA election
- Proof of COBRA payments

**Verify Premium Paid to Date**

Premium can be checked in Supersession using PMDB. Perform the GJB logon. When you get the "Sign Command Completed" message, press F10. In the name field type in GPEO0110 and press enter. On the GFS - PMDB SYSTEM MENU screen enter C. Policies in the next field are coded as follows:

GUG = 230
GMG = 850
GMSL = 6E0
UP:UP = UP0

Type in the appropriate choice and the last 4 digits of the policy number, (i.e. GUG-45L3 would be entered as 23045L3), and press enter. Advance to page 3 by pressing enter. The paid date is in this field.

**PAID TO DTE: 12-01-01    12-01-01**

TPA claim paid dates should be within premium paid-to-dates for the employer group. Our contracts generally give the insured a 45 day grace period to pay premiums, but any claims paid by the TPA after the premium paid to date must be discussed with management. It may be necessary to get Georgeann Baxter involved to contact the TPA and determine status of premium payments.

**Enter Claim into SLIIC System**

The analyst should enter the claim information into the SLIIC system and determine reimbursement according to the Stop Loss contract and Summary Plan Description (SPD). Please see the **SLIIC** section of the manual for information on claim entry procedures.

**INCURRED DATE**

9

Exhibit Q

CONFIDENTIAL

| | | |
|---|---|---|
| Julie-GBS Moore/MutualOMA<br><br>11/20/2006 09:49 AM | To | Gil Peers/MutualOMA@Mutual of Omaha, John Lenegh/MutualOMA@Mutual of Omaha, Tom Gage/MutualOMA@Mutual of Omaha, Eliane |
| | cc | |
| | bcc | |
| | Subject | BRMS Results |

One of my follow-ups from the meeting last week was to provide you with a summary of the BRMS results by year, by group. The spreadsheet in the attached file shows this.


BRMS Results Summary.xls

Julie Moore
1st Vice President
TPA Stop Loss Operations
Mutual of Omaha
(402) 351-5238
Fax (402) 351-1914
Julie-GBS.Moore@mutualofomaha.com



DEPOSITION
EXHIBIT
110
Gage

UNITED-3920

**Benefit & Risk Management Service**
Financial Results by Group and Calendar Year
Through September 30, 2006

**Alta Bates Summit Medical Center**

| Year | Premium | Gain/(Loss) |
|---|---|---|
| 2002 | | |
| 2003 | 696,174 | 464,865 |
| 2004 | 814,092 | 228,647 |
| 2005 | 1,389,309 | 574,896 |
| 2006 | 1,124,789 | (1,803,987) |
| All Years | 4,024,364 | (535,579) |

BRMS Results Summary

UNITED-3921