Exhibit R

CONFIDENTIAL

REDACTED

## TPA Report

Administrator: Business & Risk Management Services
Address:       10860 Gold Center Drive #100
               Rancho Cordova, CA  95670

Telephone:   888-326-2555                    Email:   deannp@brmsonline.com
TPA Contact: DeAnn Preling                   Position: Manager

Auditor(s): Claudia Wells                    Audit Dates: 3-22-04 to 3-25-04

Service Office: TPA Stop Loss                Service Rep: Georgeann Baxter

| Policyholder | Policy Number | Renewal Month |
|---|---|---|
| Alta Bates Summit Medical Center | GUG-90X4 | 1-1-05 |

Key Office Personnel

|  | Name | Length of Service | Claim Processing Dollar Limit |
|---|---|---|---|
| Manager | DeAnn Preling | 1 yr | unlimited |
| Claims Lead | Paula Simard | 1 yr | $100,000 |
| Claims Auditor | Pamela Gordon | 3 yrs | $50,000 |
| Claim Examiners | 7 | Up to 7 yrs | 0-$5,000 |

## Audit Scope

This was an overview audit of the TPA's claim processes and procedures. DeAnn Preling was interviewed to obtain the majority of the information available in this report. The claim reviews were completed from claims that had been entered into the claim system, and claim entry and processing screens were accessed. Eligibility was reviewed from the data that was available in the TPA's claim payment system. Claims were randomly selected from a MoO claim list that was compiled from 50% specific deductible notices and paid claims.

DEPOSITION
EXHIBIT
57
Wells

PENGAD 800-631-6989

UNITED-3877

CONFIDENTIAL

Supervisory review

All claim payments over the claim examiner's dollar limit are reviewed. The claim auditor reviews audits of $5,000 to $50,000, the lead reviews audits of $50,000 to $100,000, and the manager reviews all claims that exceed $100,000. Reviews are completed on every fifth claim processed.

TPA's Quality Goals

Financial accuracy:   98%
Payment accuracy:    98%
Processing accuracy: 98%

Supervisory review on stop loss reimbursement requests

Stop loss reimbursement claims are reviewed as described above under supervisory reviews. Ralph Herrera, the stop loss coordinator (SLC), reviews and prepares all claims submitted for stop loss reimbursement.

Incoming mail

The incoming mail is picked up daily from the TPA's post office box. The mail is opened daily at the TPA's office; date stamped and sorted by group. The hospital bills are separated from the physician bills. Network pricing is completed on the hospital claims before they are batched. The batched bundles are placed in an inventory drawer and work is delegated daily to the assigned examiners.

Correspondence that receives priority handling

Correspondence is handled in the date order that it is received. Correspondence that receives priority handling is a subpoena, attorney letter, appeal and any escalated issue. The claims manager, lead and auditor handle the correspondence that requires priority handling. Medical records are forwarded to the TPA's utilization review department for handling.

Current inventory

Inventory reports were provided for the groups with MoO stop loss coverage. The pending claim inventory as of 3-19-04 was 5290. The oldest date received was 2-23-04 or 20 working days.

TPA's time service goal

UNITED-3678

CONFIDENTIAL

The TPA's time of service goal is 10 working days. The Turnaround Time Reports for the groups audited were furnished. The average time service for processing claims from 1-1-03 to 3-20-04 was 27.26 working days. The time of service is based on the date received to the date paid. Based on the reports furnished and the MoO audit, the TPA is not meeting the time service goal. Recommendations will be made to the TPA to improve their time of service.

Office filing system

A claim number is assigned to each claim received and claims are filed in numerical order. The claims are stored onsite for a period of seven years. The TPA is currently testing a scanning process. The claims will be scanned as soon as testing is complete.

At the close of the stop loss policy year does the TPA alter the normal claim processing procedure to ensure that claims are paid prior to the end of the stop loss year?

The TPA does not perform any different claim processes at the end of a stop loss year.

Extracontractual payments documentation

Extracontractual payments are documented in the system notes and also identified on the explanation of benefits. Extracontractual payments are separated from the file and are not submitted to the stop loss carrier for reimbursement. Extracontractual claims are only sent to the stop loss carrier with prior approval.

System warning messages

The TPA's system includes, but is not limited to the following messages; prior to the effective date, after termination date, over age dependent, well child services, possible third party recovery and duplicate suspect.

Duplicate suspect checking

The system identifies the date of service, the tax identification number and the amount billed. If two fields match, the system will display the duplicate suspect message and the possible duplicate suspect claim numbers will display. It is the responsibility of the examiner to complete review of the claim.

Claim system reports

UNITED-3679

CONFIDENTIAL

The TPA generates 50% specific deductible, medical case management and precertification reports daily. Potential large case reports, high dollar reports and third party liability reports are generated weekly. The TPA has not been forwarding the potential large case reports or high dollar reports to the stop loss carrier. DeAnn and I discussed the need to develop a process for notifying MoO of trigger diagnosis claims. DeAnn was advised I would send her an e-mail with the MoO case manager's e-mail address and have the MoO case manager contact their office to review this process.

Eligibility process

The TPA's operations department handles the eligibility updates and changes. The information is received electronically from their clients. The operations department sends the letters requesting full-time student and handicapped child verification when the child reaches the limiting age. The student status is updated every six months. The operations department is responsible for sending the COBRA election notices and forms to the employee and entering the eligibility information into the system. Examiners send notification to the operations department of any eligibility issues.

Pre-existing condition administration.

The TPA's system is enhanced with warning messages of potential pre-existing conditions on those plans that include pre-existing provisions. The examiner completes the file development; including the request for medical records and proper authorizations.

Coordination of Benefits

Other insurance coverage is verified on all new enrollees and at the beginning of every new plan year. COBRA continuee's are sent an inquiry at the time of COBRA notification. DeAnn did not know how often COBRA continuee's were sent subsequent inquires. At the time of a claim, if other insurance coverage or another employer is indicated, other insurance coverage inquiries are sent.

Usual & Customary application.

The TPA applies U&C based on what the group elects. The TPA applies 150% of Medicare's allowable amount for groups electing the TPA's U&C. The U&C is system enhanced and is automatically applied. For groups that do not elect the TPA's U&C, the plan doc would include specific U&C language and the examiner handles application of the U&C manually.

Other cost containment functions

UNITED-3680

CONFIDENTIAL

The TPA's system is enhanced with a precertification screen. Precertification is not an automated process; a referral message generates and requires the examiner to review the UR notes and manually price the claim. The TPA does not have a bundling program; the examiner manually prices multiple procedure claims.

<u>Describe the office process for obtaining claim payment reductions</u>

The TPA refers all non-network claims to Q-Med to negotiate a discount. The threshold for sending claims to Q-Med is $1,000 professional fees, $2,000 for outpatient hospital and $4,000 for inpatient hospital expenses.

<u>Hospital audit criteria</u>

Non-network claims are sent to Q-Med. If non-negotiable or excessive charges are identified, an onsite audit is performed. Q-Med obtains prior approval from the TPA before scheduling an audit.

<u>50% notices</u>

The TPA generates the 50% of specific deductible report daily. The stop loss coordinator reviews the reports, and weekly notices are sent to the stop loss carrier.

<u>Trigger diagnosis claim referrals</u>

Trigger diagnosis referrals are not being made on a consistent basis. The TPA generates a Potential Large Claim report and a Potential High Dollar report weekly. The UR nurse reviews the reports. The MoO process was outlined to DeAnn and Ralph Herrara, (SLC). I advised DeAnn that I would have a MoO case manager contact their office to review MoO requirements and answer any questions they might have.

<u>Precertification administration</u>

The TPA's utilization review department completes the precertifications. The utilization review department enters the precertification information on the UR screen. The system prompts the examiner to review the precertification screen. The precertification information is included with a claim submitted for stop loss reimbursement.

<u>Guidelines for requesting itemized hospital bills</u>

The TPA requires an itemized hospital bill on all inpatient confinements. This is due to outliers, case rates and specific department charges that have an impact on the benefit payment that is due.
<u>Case management</u>

UNITED-3681

CONFIDENTIAL

The TPA's Utilization Review Department includes an RN, MD and a technician that handle the case management files. The stop loss coordinator submits the case management information on claims submitted for stop loss reimbursement.

<u>Refunds</u>

Refund checks are processed by the TPA's claim lead, Paula Simard. Paula is responsible for determining the reason for the refund and if reimbursement is due to the stop loss carrier. Refunds due to the stop loss carrier are referred to the stop loss coordinator. The stop loss coordinator completes a form with details of the refund. The form is attached to the refund or adjustment notice sent to the stop loss carrier.

<u>Subrogation</u>

The TPA performs the initial accident and third party liability investigation. The TPA sends subrogation liens to the third party liability carrier and corresponds with the representing attorneys. The TPA was informed MoO utilizes Ingenix, a firm that specializes in recovery of third party liability claims.

<u>Employees working at home</u>

None

<u>Eligibility and Claim Processing Procedures</u>

Total separation of duties for claim processing and eligibility updates. The examiners cannot update eligibility and the Enrollment Department cannot process claims.

<u>Medical necessity reviews</u>

Medical necessity reviews are referred to the TPA's Utilization Review Department.

| <u>Vendors</u> | <u>Reference Material</u> |
|---|---|
| Q-Med – negotiated discounts | ICD9 |
| | CPT4 |
| | Trilogy |
| | UR Dept has library of reference material |

<u>Results of the Claim Audit</u>
2004

UNITED-3682

CONFIDENTIAL

Total Claims Audited:  106

Total Audit Amount:  $1,125,112.10

1. Time Service

| | |
|---|---|
| 0 to 5 days | 25% |
| 6 to 10 days | 16% |
| 11 to 15 days | 23% |
| over 15 days | 36% |

Comments: The time of service is determined from calendar days and is from the date the claim is received to the date the actual payment check was issued. Goals are not being met and TPA needs to improve their time of service.

2. Backlog in days: The inventory report furnished did not provide a breakdown of claims by date. The reports of 3-19-2004 show the oldest date of pending correspondence as 2-23-2004.

Comments: To ensure all claims are processed timely according to plan provisions, and that claims submitted to the stop loss carrier are reimbursed, the TPA needs to implement an action plan to improve time of service.

3. Quality

| | Quantity | Amount |
|---|---|---|
| Ovpay | 6 | $6,583.44 |
| Undpay | 2 | $3,257.96 |
| Process | 3 | -0- |
| Total | 11 | $9,841.40 |

Financial Accuracy:  99.20%

Payment Accuracy:  92.50%

Processing Accuracy:  97.20%

Comments:  The majority of the overpayment errors were due to duplicate payments caused by entering the incorrect provider or incorrect processing of multiple surgeries. The underpayments were due to not applying correct policy benefits and an incorrect disposition on the claim. Processing errors were due to an incorrect EOB message being applied and precertification was not documented prior to processing of the hospital charges.

Summary/Conclusion

UNITED-3683

CONFIDENTIAL

1. The TPA has an unacceptable amount of payment errors. The types of payment errors that had the largest impact were duplicate payments due to selecting the wrong provider and not applying correct multiple surgery guidelines. Mutual of Omaha stop loss reimbursement analysts will need to review TPA submissions closely for duplicate payments and multiple surgery claims being paid correctly.

2. The TPA's claim system does not perform any bundling of claim procedures. The TPA uses a manual process for the bundling of claims. MoO stop loss reimbursement analysts will need to review bills with multiple procedures on the same day to ensure that correct reimbursement was made. It will be recommended that the TPA may want to research available bundling programs to eliminate costly overpayments of hyper-itemized claims.

3. The inventory reports of 3-19-04 show claims have not been processed within the TPA's 10-calendar day time of service goal. The Turnaround Time Reports indicate an average of 27.26 days from when claims are received to being paid. To ensure claims are processed timely according to plan provisions and that claims submitted to the stop loss carrier are reimbursed, the TPA needs to implement an action plan to improve time of service.

4. Trigger diagnosis notices are not consistently being sent to MoO. The TPA needs to develop a process to identify individuals with a trigger diagnosis and send proper notice to MoO. It is important that prompt notification of trigger diagnosis claims be received, and it will be recommended a process be established in a timely manner. E-mail was sent to DeAnn with the MoO case managers contact information. Information was given to the MoO case manager that the TPA needs to be contacted to review MoO requirements and assist the TPA in establishing a process.

5. Third Party Liability claims are being handled and followed by the TPA. Due to the potential length of recovery time and the attorney and third party involvement, the TPA was informed of Ingenix that specializes in third part recovery. The TPA was informed third party liability claims submitted for stop loss reimbursement, are referred by MoO to Ingenix to represent MoO right of recovery.

6. Other insurance coverage verification for COBRA continuee's was not documented during the interview with the TPA. Due to the potential for an individual to secure other employment or a spouse to obtain coverage, MoO recommends other insurance coverage inquiries be made every quarter. The TPA will be informed of MoO recommendation.

UNITED-3684

CONFIDENTIAL



**Mutual of Omaha
Companies**

DEPOSITION
EXHIBIT
60

April 5, 2004

DeAnn Preling
Business & Risk Management Services
10860 Gold Center Drive #100
Rancho Cordova, CA  95670

Re: 2004 Audit

Dear DeAnn,

Thanks to everyone, especially to you, Pamela and Paula, for the courtesy and the time that was extended to me during my recent visit. It was very pleasant and I appreciated working in such a nice environment. Would you also be sure to extend my thanks to Julie and Ralph for their hospitality.

Based on the results of the audit, I have a few processing issues we need to review with you and recommendations I would like to make.

1. Your claim paying system does not recognize hyper-itemization of charges or unbundling of medical procedures. Hyper-itemization and unbundling of medical expenses continues to be very costly for clients and insurance companies. An option is to research available bundling programs that eliminate costly overpayments of hyper-itemized claims. McKesson is the vendor used by Mutual of Omaha. If you would like to obtain additional information you may visit McKesson's website at http://www.mckhboc.com/health_payors.html.

2. In respect to your process of monitoring third party liability claims, currently your office is handling the third party liability claims. In many instances a third party liability claim can take years to resolve and recover the benefits paid. Mutual of Omaha automatically sends claims submitted for stop loss reimbursement with third party liability to Ingenix, a firm that specializes in third party recovery. Ingenix may contact your office for claim information and may ask to represent your recovery interest. You may want to consider Ingenix, or another vendor to protect to your right of recovery. If you would like any additional information concerning Ingenix, please let me know.

3. The inventory report of 3-19-04 showed claims are not being processed within your 10-day time of service goal. The Turnaround Time Reports for the groups audited indicated an average 27.26 days from when claims are received to the date being paid. To ensure claims are processed timely according to plan provisions, we recommend implementation of an action plan to improve time of service.

**Mutual of Omaha Insurance Company** • MUTUAL OF OMAHA PLAZA • OMAHA, NE 68175 • 402-342-7600

JM1003

UNITED-4819

CONFIDENTIAL

4. Trigger diagnosis reports are not being generated. This creates a risk of not identifying claims that could benefit from medical case management. It is extremely important to identify large claims as early as possible to achieve the most effective care, from both an outcomes and cost perspective. Mutual of Omaha requires immediate notification of a catastrophic illness or injury. We recommend you evaluate your current process to ensure all measures are being taken that proper notifications are being sent to the stop loss medical case managers. I have discussed this issue with the Mutual of Omaha case manager and they will be contacting your in the near future to provide any assistance and answer any questions concerning Mutual of Omaha's trigger diagnosis requirements.

5. During my audit other insurance coverage verification for COBRA continuee's was not documented. Individuals or spouses of individuals covered by COBRA have the potential of becoming gainfully employed and securing other insurance coverage. To eliminate the risk of costly claim payment errors, Mutual of Omaha recommends other insurance inquiries be made quarterly.

Attached you will also find a claim review list. The claims identified appear to have been paid or processed in error. Please let us know if you agree or disagree with our findings. If possible we would like to have a response within 30 days.

Thank you again for your time and assistance. Mutual of Omaha hopes to continue a very successful relationship with your company. If you have any questions or concerns, please do no hesitate to call or email us at anytime.


Sincerely,


Claudia Wells
Operations Auditor
Stop Loss Claims & Auditing


Phone/402-351-4386
Fax/402-351-1914
E-Mail/claudia.wells@mutualofomaha.com

CONFIDENTIAL

## Claim Review List

| Insured/Dependent | SS# & Group # | Claim # |
|---|---|---|
| 1. ███████ | ███████ | 78575/78509 |

Identical claim was entered under two different providers. A duplicate claim resulted in an overpayment of $500.

| 2. ███████ | ███████ | 463610 |

Claims entered under incorrect benefit tier, benefits were underpaid.

| 3. ███████ | ███████ | 418872/418316/416286/421876 |

418872-Inpatient hospital confinement, the precertification was not documented.
418316-Multiple surgical procedures, the multiple procedure benefits were not applied.
416286-Identical claim was entered under two different providers. A duplicate to claim 418316, claim overpaid $4516.00.
421871-Multiple surgical procedures, the multiple procedure benefits were not applied.

| 4. ███████ | ███████ | 475881 |

Assistant surgeon's claim was allowed at 20% of the actual surgeon's fee and not 20% of the amount allowed. Claim was overpaid $271.44.

| 5. ███████ | ███████ | 462638 |

Incorrect explanation of benefits message was used.

| 6. ███████ | ███████ | 410446/430336 |

410446-Claim was denied in error, claim underpaid $2782.96.
430336-Inpatient hospital confinement, the precertification was not documented.

| 7. ███████ | ███████ | 465627 |

Duplicate to claim 413117, the provider refunded $680 the actual charges were $860.00, claim overpaid $180.00.

CONFIDENTIAL                                      REDACTED

## TPA Report

Administrator:  Benefit & Risk Management Services
Address:       10860 Gold Center Drive #300
               Rancho Cordova, CA  95670


Telephone:   888-326-2555                    Email: deannp@brmsonline.com
TPA Contact:  DeAnn Prefling                 Position: Claims Manager


Auditor(s):    Claudia Wells – Stop Loss Operations Auditor
               Peggy McColley RN – Stop Loss Medical Case Manager
               Ed Haas – Internal Audit

Audit Dates:   6-27-05 to 6-30-05


Service Office: TPA Stop Loss              Service Rep: Georgeann Baxter


| Policyholder | Policy Number | Renewal Month |
|---|---|---|
| Alta Bates Summit Medical Center | 90X4 | 1-1-06 |


Key Office Personnel

| | Name | Length of Service | Claim Processing Dollar Limit |
|---|---|---|---|
| Manager | DeAnn Prefling | 2 yr | unlimited |
| Team Leads | 5 | 2-3 yrs | $50,000 |
| Claim Examiners | 20 | Up to 8 yrs | 0-$5,000 |
| Medical Case Manager | Mark Lucas RN | 1.5 yr. | -0- |
| SR Account Executive | Julie Mendonca | | -0- |

Audit Scope



UNITED-3901

CONFIDENTIAL

This is the second audit of the TPA's claim processes and procedures. The prior audit was performed 3-22-04. The focus of this audit was to review claims involving medical case management and the TPA's procedure for submitting notice to MoO on claims involving a 50% specific deductible and/or a trigger diagnosis. DeAnn Prefling and Mark Lucas were interviewed to obtain the majority of the information available in this report. For the audit we were given read only authorization to review claim entry, processing screens, eligibility and imaged claims. About 50% of the claims reviewed were not imaged, and a paper copy was obtained upon request. Claims were randomly selected from a MoO claim list that was compiled from 50% specific deductible notices and paid claims. Ed Haas of Internal Audit was also present reconciling premium payments and eligibility. For the most part there have not been many procedure changes since the prior 2004 audit report. Updates, changes or new questions added since the last audit will be identified in **bold print.**

Supervisory review

All claim payments over the claim examiner's dollar limit are reviewed. The claim auditors review audits of $5,000 to $50,000, a lead reviews audits of $50,000 to $100,000, and the claim manager reviews all claims that exceed $100,000. Random reviews are completed on every fifth claim processed.

TPA's Quality Goals

Financial accuracy:    98%
Payment accuracy:     98%
Processing accuracy:  98%

Supervisory review on stop loss reimbursement requests

Stop loss reimbursement claims are reviewed as described above under supervisory reviews. Ralph Herrera, the stop loss coordinator (SLC), reviews and prepares all claims submitted for stop loss reimbursement.

Incoming mail

The incoming mail is picked up daily from the TPA's post office box. The mail is opened daily at the TPA's office; date stamped and sorted by group. **Claims are now scanned, converted to a data file and queued to the assigned claim examiner. Network pricing is completed on the claims before they are scanned.**

Correspondence that receives priority handling

UNITED-3902

CONFIDENTIAL                                                              REDACTED

Correspondence is handled in the date order that it is received. Correspondence that receives priority handling is a subpoena, attorney letter, appeal and any escalated issue. The claims manager, leads and auditors handle the correspondence that requires priority handling. Medical records are forwarded to the TPA's utilization review department for handling.


Current inventory

Inventory reports were provided for the groups with MoO stop loss coverage. The pending claim inventory as of 3-19-04 was 5290. The oldest date received was 2-23-04 or 20 working days. **A copy of the inventory report for the week prior to the audit was requested, but has not been furnished. The TPA's current inventory and pending claim status is unknown.**


TPA's time service goal

The TPA's time of service goal is 10 working days. The Turnaround Time Reports for the groups audited were furnished. The average time service for processing claims from 1-1-03 to 3-20-04 was 27.26 working days. The time of service is based on the date received to the date paid. Based on the reports furnished and the MoO audit, the TPA is not meeting the time service goal. Recommendations will be made to the TPA to improve their time of service.

**The TPA's time service goal is 7-10 working days. The TPA measures their time of service in working days from the date the claim is received to the date processed. The TPA's time of service from the date received to the date the payment is issued is impacted due to the fact** 

funds the 15th and 30th of each month and                    , Alta Bates and

fund once a week. **A lag report was not provided, and based on the audit results only 27% of the claims are processed within 15 working days.**


Office filing system

A claim number is assigned to each claim received, and claims are filed in numerical order. The claims are stored onsite for a period of seven years. The TPA is currently testing a scanning process. The claims will be scanned as soon as testing is completed. **Claims are now scanned, and paper copies are retained for a period of 30 days.**


At the close of the stop loss policy year does the TPA alter the normal claim processing procedure to ensure that claims are paid prior to the end of the stop loss year?

The TPA does not perform any different claim processes at the end of a stop loss year.



Extracontractual payments documentation

UNITED-3903

CONFIDENTIAL

Extracontractual payments are documented in the system notes and also identified on the explanation of benefits. Extracontractual payments are separated from the file and are not submitted to the stop loss carrier for reimbursement. Extracontractual claims are only sent to the stop loss carrier with prior approval.

### System warning messages

The TPA's system includes, but is not limited to the following messages; prior to the effective date, after termination date, over age dependent, well child services, possible third party recovery and duplicate suspect.

### Duplicate suspect checking

The system identifies the date of service, the tax identification number and the amount billed. If two fields match, the system will display the duplicate suspect message and the possible duplicate suspect claim numbers will display. It is the responsibility of the examiner to complete review of the claim. **No duplicate payments were identified during the audit.**

### Claim system reports

The TPA generates 50% specific deductible, medical case management and precertification reports daily. Potential large case reports, high dollar reports and third party liability reports are generated weekly. The TPA has not been forwarding the potential large case reports or high dollar reports to the stop loss carrier. DeAnn and I discussed the need to develop a process for notifying MoO of trigger diagnosis claims. DeAnn was advised I would send her the MoO case manager's e-mail address and have the MoO case manager contact their office to review this process. **Joyce Mumm was notified after last years audit to contact the TPA. Joyce contacted the TPA, and on 3-29-04 Joyce sent the TPA an email with her contact information.**

### Eligibility process

The TPA's Operations Department handles the eligibility updates and changes. The information is received electronically from their clients. The Operations Department sends the letters requesting full-time student and handicapped child verification when the child reaches the limiting age. The student status is updated every six months. The Operations Department is responsible for sending the COBRA election notices and forms to the employee and entering the eligibility information into the system. Examiners send notification to the Operations Department of any eligibility issues.

### Coordination of Benefits

UNITED-3904

CONFIDENTIAL

Other insurance coverage is verified on all new enrollees and at the beginning of every new plan year. COBRA continuee's are sent an inquiry at the time of COBRA notification. DeAnn did not know how often COBRA continuee's were sent subsequent inquires. At the time of a claim, if other insurance coverage or another employer is indicated, other insurance coverage inquiries are sent.  **Other insurance coverage is verified annually for COBRA continuee's. During the audit interview DeAnn was advised that for stop loss claim submissions MoO requires verification for COBRA continues quarterly. In addition three processing errors were identified where the annual verification of other insurance coverage was not documented. Refer to the claim list for specific details.**

Usual & Customary application.

The TPA applies U&C based on what the group elects. The TPA applies 150% of Medicare's allowable amount for groups electing the TPA's U&C. The U&C is system enhanced and is automatically applied. For groups that do not elect the TPA's U&C, the plan doc would include specific U&C language and the examiner handles application of the U&C manually.

Other cost containment functions

The TPA's system is enhanced with a precertification screen. Precertification is not an automated process; a referral message generates and requires the examiner to review the UR notes and manually price the claim. The TPA does not have a bundling program; the examiner manually prices multiple procedure claims. **The TPA is currently going through a conversion that includes installation of a bundling program.**

Describe the office process for obtaining claim payment reductions

The TPA refers all non-network claims to Q-Med to negotiate a discount. The threshold for sending claims to Q-Med is $1,000 professional fees, $2,000 for outpatient hospital and $4,000 for inpatient hospital expenses. **The TPA has discontinued referrals to Q-Med and now the TPA referrals are now sent to Fed Med to negotiate a discount.**

Hospital audit criteria

Non-network claims are sent to Q-Med. If non-negotiable or excessive charges are identified, an onsite audit is performed. Q-Med obtains prior approval from the TPA before scheduling an audit. **The TPA has discontinued referrals to Q-Med, and the referrals are now sent to Fed Med and SHPPS. During the interview Peggy recommended the TPA consider utilizing Care Assist to review neonate hospital bills. Peggy offered to forward Care Assist's contract information, and the TPA stated they are familiar with the vendor and they would obtain the information. The TPA had already been furnished the contract information for URN for transplants.**

50% notices

UNITED-3905

CONFIDENTIAL

The TPA generates the 50% of specific deductible report daily. The stop loss coordinator reviews the reports, and weekly notices are sent to the stop loss carrier.

Trigger diagnosis claim referrals

Trigger diagnosis referrals are not being made on a consistent basis. The TPA generates a Potential Large Claim report and a Potential High Dollar report weekly. The UR nurse reviews the reports. The MoO process was outlined to DeAnn and Ralph Herrara, (SLC). I advised DeAnn that I would have a MoO case manager contact their office to review MoO requirements and answer any questions they might have. **Trigger diagnosis notices are still not being submitted to MoO on a consistent basis. Peggy's discussions with Mark Lucas were very extensive concerning this issue and that MoO requires the trigger diagnosis notices be submitted timely.**

Precertification administration

The TPA's utilization review department completes the precertifications. The utilization review department enters the precertification information on the UR screen. The system prompts the examiner to review the precertification screen. The precertification information is included with a claim submitted for stop loss reimbursement.

Guidelines for requesting itemized hospital bills

The TPA requires an itemized hospital bill on all inpatient confinements. This is due to outliers, case rates and specific department charges that have an impact on the benefit payments due.

Case management

The TPA's Utilization Review Department includes an onsite RN and a contracted physician. The stop loss coordinator submits the case management information on claims submitted for stop loss reimbursement. **As of January 2005 the TPA has two medical case management RN's. During the audit Peggy reviewed medical case management files and obtained case management notes for the 50% specific or trigger diagnosis claim notices submitted to MoO. Peggy and Mark Lucas discussed in detail case managing claims and MoO expectations.**

Refunds

CONFIDENTIAL                                                                 REDACTED

Refund checks are processed by the TPA's claim lead, Paula Simard. Paula is responsible for determining the reason for the refund and if reimbursement is due to the stop loss carrier. Refunds due to the stop loss carrier are referred to the stop loss coordinator. The stop loss coordinator completes a form with details of the refund. The form is attached to the refund or adjustment notice sent to the stop loss carrier. **Paula is no longer processing the refund checks. The checks are now sent directly to accounting, copied and forward to the examiner to review. Claim examiners adjust the claim and process the refunds due to the stop loss carrier. In reviewing                                     check register I noted a refund of $8,380.15 on a claim that MoO paid stop loss benefits, and MoO was not issued a refund. The error was reported to the TPA during the audit, and a request for the refund will be included in the letter to the TPA.**

Subrogation

The TPA performs the initial accident and third party liability investigation. The TPA sends subrogation liens to the third party liability carrier and corresponds with the representing attorneys. The TPA was informed MoO utilizes Ingenix, a firm that specializes in recovery of third party liability claims.

Employees working at home

None

Eligibility and Claim Processing Procedures

Total separation of duties for claim processing and eligibility updates. The examiners cannot update eligibility and the Enrollment Department cannot process claims.

Medical necessity reviews

Medical necessity reviews are referred to the TPA's Utilization Review Department.

SAS 70 Audits

The TPA provided a copy of their 12-31-2002 SAS 70 audit report. The external auditors concluded that the TPA has favorable controls over their processes.

Internal Audit

Internal audit did not note any issues that needed to be addressed during the audit. However Internal Audit's review is not concluded, and if any issues are identified, this report will be amended and the TPA informed.

Vendors                                   Reference Material



CONFIDENTIAL

**Fed Med – negotiated discounts**
       **hospital audits**

**SHPPS – hospital audits**

Trilogy
UR Dept has library of reference material
ICD9
CPT4

Results of the Claim Audit

UNITED-3908

CONFIDENTIAL

Total Claims Audited:   85

Total Audit Amount:   $1,143,766.91

1. Time Service

| | |
|---|---|
| 0 to 5 days | 2% |
| 6 to 10 days | 11% |
| 11 to 15 days | 14% |
| over 15 days | 73% |

**Comments: Claims reviewed during the audit determined the above time of service results. The time service is from the date the claim is received to the date the actual payment was issued. The TPA is not meeting their goals, and the results compared to the last audit have not improved. The TPA needs to improve their time of service.**

2. Backlog in days

**Comments: I requested the TPA provide a copy of the inventory report for the week prior to the audit. The TPA has not provided the information, therefore, I am unable to comment on their backlog.**

3. Quality

| | Quantity | Amount |
|---|---|---|
| Ovpay | 1 | $157.30 |
| Undpay | 2 | $8460.15 |
| Process | 4 | -0- |
| Total | 7 | $8617.45 |

Financial Accuracy:   99.24%

Payment Accuracy:   96.48%

Processing Accuracy:  95.30%

<u>Comments:</u>  **The attached claim list will itemize the errors found during the audit. Three of the processing errors were verification of other insurance coverage that was not documented. The refund due MoO of $8380.15 is included in the underpayment amount shown above. The TPA was provided the claim list at the time of audit and given the opportunity to dispute the errors. The TPA at this time has not disputed any of the errors. The quality results listed above reflect the errors. In the event the TPA provides additional, information the results would be adjusted accordingly.**

<u>2004 Recommendations and Updates</u>

UNITED-3909

CONFIDENTIAL

1. The TPA's claim paying system does not recognize hyper-itemization of charges or unbundling of medical procedures. Hyper-itemization and unbundling of medical expenses continues to be very costly for clients and insurance companies. An option is to research available bundling programs that eliminate costly overpayments of hyper-itemized claims. McKesson is the vendor used by Mutual of Omaha. If you would like to obtain additional information you may visit McKesson's website at http://www.mckhboc.com/health_payors.html.

**Up to the time of this audit, the TPA's system was not enhanced to recognize unbundling of medical procedures. The TPA is upgrading with a system conversion that includes the installation of a bundling program.**

2. The inventory report of 3-19-04 showed claims are not being processed within your 10-day time of service goal. The Turnaround Time Reports for the groups audited indicated an average 27.26 days from when claims are received to the date paid. To ensure claims are processed timely according to plan provisions, we recommend implementation of an action plan to improve time of service.

**The TPA has not provided an inventory report for the 2005 audit. Based on the audit and the time of service results, the TPA seems to continue to struggle with meeting time of service goals. It will again be recommended to the TPA they evaluate their time of service and develop a plan to meet their time of service goals on a consistent basis.**

3. Trigger diagnosis reports are not being generated. This creates a risk of not identifying claims that could benefit from medical case management. It is extremely important to identify large claims as early as possible to achieve the most effective care, from both an outcomes and cost perspective. Mutual of Omaha requires immediate notification of a catastrophic illness or injury. We recommend you evaluate your current process to ensure all measures are taken that proper notifications are sent to the stop loss medical case managers. I have discussed this issue with the Mutual of Omaha case manager, and they will be contacting your in the near future to provide assistance and answer any questions concerning Mutual of Omaha's trigger diagnosis requirements.

**The TPA still does not appear to have a trigger diagnosis report that generates trigger diagnosis notices to MoO. This audit was mainly focused on medical case management issues. Peggy McColley worked directly with Mark Lucas to outline the importance of submitting notifications, especially on neonates and transplants.**

4. Third Party Liability claims are being handled and followed by the TPA. Due to potential length of recovery time and the attorney and third party involvement, the TPA was informed of Ingenix, a vendor that specializes in third party recovery. The TPA was informed third party liability claims submitted for stop loss reimbursement are referred by MoO to Ingenix to represent MoO right of recovery.

**The TPA's process remains the same.**

5. Other insurance coverage verification for COBRA continuee's was not documented during the interview with the TPA. Due to the potential for an individual to secure other employment or a spouse to obtain coverage, MoO recommends other insurance coverage inquiries be made every quarter. The TPA will be informed of MoO recommendation.

UNITED-3910

CONFIDENTIAL

The TPA verifies other insurance coverage on an annual basis. The TPA was informed that MoO stop loss claims would require other insurance coverage be verified for COBRA continuees on a quarterly basis. On three claims reviewed during the audit the annual verification of other insurance coverage was not documented. The TPA has been informed of these findings.

2005 Summary and Conclusions

UNITED-3911

CONFIDENTIAL

**REDACTED**

1. The TPA has did not provide a current inventory or pending claim report. The TPA will be informed the requested inventory report is needed to update our file.

2. The TPA's time of service goal is 7-10 days. From the claims audited only 27% of the claims were processed within 15 working days. Based on the audit and in absence of a lag report and a current inventory report, it appears the time service goal is not being met. It will be recommended the TPA evaluate their current time of service and what measures need to be considered to meet their goal.

3. The TPA verifies other insurance coverage on an annual basis and that includes verification for COBRA continues. The TPA will be advised MoO requires quarterly verification for COBRA continues. In addition, three processing errors were identified where the annual verification of other insurance coverage was not documented. The claim list provided to the TPA identifies the claims involved. It will be recommended the TPA ascertain if the verification was obtained and why the information was not updated to the claim paying system.

4. The TPA refers hospital claims for review to FedMed or SHPPS. During the exit interview Peggy recommended the TPA consider utilizing CareAssist to review neonate hospital bills. CareAssist specializes in the field of neonate medical care.

5. Trigger diagnosis notices are not consistently being sent to MoO. It will again be recommended the TPA develop a process to identify individuals with a trigger diagnosis and send proper notice to MoO. It is important that prompt notification of trigger diagnosis claims be received, and it will be recommended a process be established in a timely manner.

6. _____ received a refund of $8380.15 on a claim that MoO paid stop loss benefits. MoO has no record of receiving a refund. The letter to the TPA will include a request for reimbursement.

7. Internal Audit did not note any issues at the time of the audit. However Internal Audit's final review has not been concluded, and the TPA will be informed this may result in additional issues that need to be addressed.

8. Regarding the case management files reviewed by Peggy, it was determined the TPA had received the case management notes and medical documentation, but the information had not been forwarded or communicated to MoO. The MoO case manager had requested updates on several occasions with no response. At the time of the audit the TPA had two case management nurses and it was difficult for the case managers to adequately maintain case management communication. This concern was discussed with Mark Lucas and he understands MoO's case managements expectations of timely notifications and updates for trigger and 50% notices. Mark also provided the telephone number for the other nurse who can be contacted in his absence, this information was given to Joyce Mumm, RN,BSN at MoO.



**Mutual of Omaha Companies**

July 25, 2005

DeAnn Prefling
Benefit & Risk Management Services
10860 Gold Center Drive 3rd Fl
Rancho Cordova, CA  95670                    Re: 2005 Audit

Dear DeAnn,

It was nice to see everyone again and Peggy, Ed and myself thank everyone for the courtesy and the time that was extended to us during our visit. Please tell Mark we really appreciate him being there, and our thoughts are with him.

The following are the overall audit results:

Financial Accuracy:  99.24%
Payment Accuracy:   96.48%
Processing Accuracy: 95.30%

Based on the results of the audit, I have a few processing issues we need to review with you and recommendations I would like to make.

1. A copy of the inventory report for the week prior to our audit was not received. We are unable to report your current pending claims and to update our file please forward this information to me as soon as possible.

2. A Turnaround Time Report was not furnished and from the claims reviewed during the audit only 27% of the claims were processed within 15 working days. To ensure claims are processed timely according to plan provisions, we recommend implementation of an action plan to improve time of service.

3. Trigger diagnosis and 50% notifications have not been reported timely to Mutual of Omaha. For the case management files reviewed it was determined the case management notes and medical documentation had been received but not forwarded or communicated to Mutual of Omaha. This creates a risk of not identifying claims that could benefit from medical case management. It is extremely important to identify large claims, especially transplants and premature babies, as early as possible to ensure the best medical and financial outcome for the claimant and group. Mutual of Omaha requires immediate notification of a catastrophic illness or

**Mutual of Omaha Insurance Company** • MUTUAL OF OMAHA PLAZA • OMAHA, NE 68175 • 402-342-7600

JM1003



ABSMC  00110

injury. Peggy and Mark discussed this concern and he understands Mutual of Omaha's case managements expectations of timely notifications and updates for trigger and 50% notices. We recommend you continue to evaluate your current procedures related to reinsurance notification and medical case management reporting.

4. Other insurance coverage verification for COBRA continuee's is verified annually. Individuals or spouses of individuals covered by COBRA have the potential of becoming gainfully employed and securing other insurance coverage. To eliminate the risk of costly claim payment errors on claims submitted for stop loss reimbursement, Mutual of Omaha requires other insurance inquiries be made quarterly.

5. Three claims were identified during the audit where the annual verification of other insurance coverage was not documented. Mutual of Omaha would recommend it be ascertained if the verification was obtained and the reason the information was not updated to your claim notes. The attached claim list identifies the claims involved.

6. During the interview Peggy McColley discussed with Mark Lucas the recommendation to have CareAssist review large neonate hospital bills for appropriate charges according to the claimant's diagnosis and treatment. It is essential that the referrals be made timely and prior to claim payment. CareAssist specializes in neonatal care management and billing audits. CareAssist Care Management fees are reimbursed under the stop-loss policy when the specific deductible is met. You may contact CareAssist at 877-631-9080 or visit their website at www.CareAssist.org.

7. For Sutter North Medical Foundation I reviewed a claim that had been submitted for stop-loss reimbursement for a Terry Biladeau. In reconciling the claim with the Mutual of Omaha file I found a stop-loss benefit of $249,866.98 was paid for a claim from UCD Medical Center for the inpatient confinement of 5-9-04 to 5-21-04. Your records indicate the hospital adjusted the claim and the amount due has been reduced to $241,486.83. This resulted in an overpayment of $8380.15. Mutual of Omaha has no record of receiving a refund of the overpayment. Please furnish a copy of documentation that Mutual of Omaha was reimbursed or remit the refund due of $8380.15.

8. Internal Audit did not note any issues or concerns at the time of the audit, however their review is not concluded at this time. Once the review is complete you will be notified if there are any additional issues or concerns.

Attached is the claim review list that identifies claims that appeared to have been paid or processed in error. Please let us know if you agree or disagree with our findings. If possible we would like to have a response within 30 days.

Hopefully the discussions between Peggy McColley and Mark Lucas will result in positive case management results.

Thank you again for your time and assistance. Mutual of Omaha hopes to continue a very successful relationship with your company. If you have any questions or concerns, please do no hesitate to call or email us at anytime.

ABSMC 00111

Sincerely,

Claudia Wells
Operations Auditor
Stop Loss Claims & Auditing

Phone/402-351-4386
Fax/402-351-1914
E-Mail/claudia.wells@mutualofomaha.com

ABSMC 00112

CONFIDENTIAL

# INTERNAL AUDIT DEPARTMENT

## REVIEW OF
## UNITED OF OMAHA LIFE INSURANCE COMPANY

### BENEFIT AND RISK MANAGEMENT SERVICES
### STOP LOSS THIRD PARTY ADMINISTRATOR
### OPERATIONS

### OCTOBER 2005

## REPORT NO. 2005-42

DEPOSITION
EXHIBIT

65

UNITED-4066

CONFIDENTIAL                                              REDACTED

# REVIEW OF
# UNITED OF OMAHA LIFE INSURANCE COMPANY

## BENEFIT AND RISK MANAGEMENT SERVICES
## STOP LOSS THIRD PARTY ADMINISTRATOR
## OPERATIONS

## SCOPE

We performed an on-site review, in conjunction with Stop Loss Product Performance and Stop Loss Medical Management personnel, of the third party administrator (TPA) operations of Benefit and Risk Management Services (BRMS), in Sacramento, California from June 27 through June 29, 2005. BRMS is administering premiums and eligibility, and paying claims for five self-funded plans that had stop loss coverage through United of Omaha Life Insurance Company (United) as of April 30, 2005. BRMS collected stop loss premiums totaling $1,850,719 and paid claims totaling $1,041,209 from May 1, 2004 through April 30, 2005 for these five plans. (                    plan was effective August 15, 2004 and the          plan was effective January 1, 2005. Therefore, amounts shown below for these two plans were not for a full year.) Collected premium and paid claim amounts for the groups administered by BRMS were obtained from Stop Loss Product Performance personnel and they are shown below:

4.1

| Plan Name | Premiums | Claims |
|---|---|---|
| Alta Bates Summit Medical Center | $1,018,409 | $63,901 |

The purpose of our visit was to perform a limited review of the internal controls related to premium and eligibility administration. Stop Loss Product Performance and Stop Loss Medical Management personnel focused their review on claims administration controls, which included reauditing a sample of claims for the groups tested. The results of their review were separately reported to Stop Loss management and to the TPA.

## OBJECTIVES AND RESULTS

The primary objectives (denoted in bold type) and the related results of our review are described in detail on the following pages:

CONFIDENTIAL                                        **REDACTED**

- **The administrator was in compliance with certain key provisions of the administration agreement.**

  During our review, we noted that a third party administrator agreement, effective January 1, 2003, was signed by both parties to the contract. However, the agreement is with Mutual of Omaha Insurance Company (Mutual) rather then United. Since the stop loss insurance policies are issued by United, Law Operation personnel have indicated that the agreement should be amended. This issue is addressed in recommendation number one of this report. Review of this agreement and an evaluation of procedures performed by the TPA disclosed that BRMS was substantially in compliance with key terms of this agreement to include meeting licensing requirements, remitting premiums timely and accurately, and maintaining member eligibility. However, the TPA has not provided current evidence that errors and omissions insurance and a fidelity bond acceptable to the Company are being maintained. This issue is addressed in recommendation number two of this report. In addition, the TPA was not in compliance with the requirement to maintain a separate trust bank account for the deposit of United premiums. We understand that the TPA deposits premiums and fees from all employers into one trust account and that the TPA's system is designed to accommodate one bank account. Our review of the controls over premium processing by the TPA revealed that it has adequate segregation of duties and proper system controls to help ensure that the TPA remits the premiums to United in a timely manner. Further, we understand that the TPA has consistently remitted premiums to United on a timely basis. Therefore, we believe that this TPA has adequate mitigating controls in place for remitting premiums without the required use of a separate trust account. Based on discussions with Stop Loss management, they do not believe that this requirement should be enforced for this TPA.

- **Premium statements were completed accurately and timely, and included correct premium rates.**

  Our testing of selected premium statements disclosed that they contained the correct premium rates and were accurately prepared, except that incorrect commission rates were used when calculating the amount of commission to be retained by BRMS on the premium statements for                    in 2004 and 2005. We were informed that the resulting commission overpayment was $6,055, and recovery of this overpayment is currently being pursued. This issue is addressed in recommendation number three of this report. Review of the premium statements also disclosed that the commission rates shown on the Home Office Administration System, Insyneh, were not always in agreement with the rates shown on the premium statements submitted by the TPA. This issue was communicated to Policyowner Services management in a separate memorandum. We also determined that premium statements and premium payments for February through April 2005 were processed timely and accurately for plans we tested. In addition, we verified that the total number of members by class on the premium statements agreed with the related employer billings for the respective test months.

2

CONFIDENTIAL

- **Eligibility information was maintained accurately, enrollment forms were obtained and stop loss reimbursement requests were submitted only for eligible members.**

  We selected a random sample of active employees from the TPA's detailed eligibility reports, reviewed the related enrollment forms and verified eligibility for the employees tested. We also selected a sample of employees with retroactive adjustments and reviewed the related supporting documentation to determine whether any claims were paid during the retroactive periods. This review did not disclose any stop loss claim overpayments. We understand that TPA Stop Loss Product Performance personnel separately verified eligibility for all claims they reaudited, and that they did not identify any eligibility concerns. We did note that enrollment forms were not available for Alta Bates Summit Medical Center retirees. BRMS assumed responsibility for Alta Bates from another TPA effective January 1, 2003, and the previous TPA did not provide enrollment forms for retirees. However, data files provided by the TPA did provide the needed enrollment information.

- **Claims were accurately processed and were processed timely.**

  TPA Stop Loss Product Performance personnel reaudited 85 claims totaling $1,143,767 processed by the TPA. The results of this testing are as follows:

  |  | Company Standards | Reaudit Results |
  |---|---|---|
  | Payment Accuracy | 98% | 96.48% |
  | Financial Accuracy | 99% | 99.24% |
  | Processing Accuracy | 96% | 95.30% |

  In general, the TPA did a good job processing claims as indicated by the fact that the TPA was close to United's standards in all three categories. Three payment accuracy errors, totaling $8,617, were noted and they consisted of two underpayments totaling $8,460 and one overpayment of $157. A majority of the dollar amount of the accuracy errors consisted of an $8,380 refund due United for a claim that had been received by the TPA on a specific claim that had been reimbursed. Stop Loss Product Performance personnel recommended in their report that the Company be reimbursed for this claim refund. Subsequent to this on-site visit, the refund was received by United.

  A report of the pending claim inventory and a Turnaround Time Report were not provided by the TPA. Therefore, the volume of pending claims could not be determined nor could current time service be evaluated. However, the reaudits disclosed that only 27% of the claims reviewed were handled within 15 workdays. The TPA's goal is to handle all claims within 10 workdays. This issue is addressed in recommendation number four of this report.

  The TPA Guide, developed by the Company, specifies that the TPA must notify United whenever benefits paid or pending for a covered individual exceed or are expected to exceed 50% of the specific deductible. In addition, the TPA must immediately notify United of catastrophic illnesses, injuries or certain diagnoses. For

3

CONFIDENTIAL

the case management files reviewed, it was determined that medical documentation on selected claims had not been communicated to United in a timely manner. This issue is addressed in recommendation number five of this report.

- Internal controls over the premium, eligibility, and claim processing functions were adequate and were operating effectively.

  Our tests revealed that key internal controls related to the premium and eligibility administration processes were operating effectively at the time of our review. We also jointly performed limited testing with TPA Stop Loss Performance personnel of various claim processing controls and, in general, they were operating effectively with the exception of the issues identified in the prior objective.

# RECOMMENDATIONS

As a result of our review, we noted some control weaknesses that are further discussed in the Detailed Recommendations section of this report. Recommendations to correct these weaknesses are listed in summary form below and, when adopted, we believe will enable management to better control their processes. Recommendations are categorized as either High Priority Recommendations or as Other Recommendations Requiring Timely Attention to assist with establishing the direction of implementation efforts and the use of resources. Recommendations classified as high priority represent those with control concerns we consider most significant and those that should be implemented as soon as possible.

**High Priority Recommendations:**

None

**Other Recommendations Requiring Timely Attention:**

1.    The third party administrator agreement should be amended to indicate that it is effective with United of Omaha Life Insurance Company.

2.    The third party administrator should provide evidence that errors and omissions insurance and a fidelity bond acceptable to the Company are being currently maintained.

3.    Policyowner Services personnel should implement procedures to verify that the commissions retained by third party administrators are correct.

4.    Time service for paying claims should be improved.

5.    Case Management personnel should be notified in a timely manner of potentially large claims.

4

CONFIDENTIAL

## INTERNAL AUDIT DEPARTMENT

Ed Haas
Audit Supervisor

Distribution:    D. Martin             K. McCoy
                     M. Rucker          J. Moore
                     T. Thompson    D. Cloyd
                     G. Peers            B. Coyle Roberts
                     R. Bruning       D&T
                     T. Gage             File (2)
                     J. Lenagh

5

UNITED-4071

CONFIDENTIAL

REDACTED

# DETAILED RECOMMENDATIONS

## OTHER RECOMMENDATIONS REQUIRING TIMELY ATTENTION:

1.   **The third party administrator agreement should be amended to indicate that it is effective with United of Omaha Life Insurance Company.**

Our review disclosed that the TPA agreement is between BRMS and Mutual. However, the insurance policies are underwritten by United. The risk is that if Mutual is included as the party to a TPA agreement when United stop loss products are involved, Mutual could unnecessarily be exposed to a liability. Therefore, we recommend that the TPA agreement be amended to indicate that the TPA agreement is between United and BRMS. Although we identified this issue for BRMS, we recommend that Group Stop Loss and Marketing personnel review all TPA agreements to verify that they reflect the correct Company.

2.   **The third party administrator should provide evidence that errors and omissions insurance and a fidelity bond acceptable to the Company are being currently maintained.**

The TPA agreement requires the TPA to maintain, at its own expense, errors and omissions insurance and a fidelity bond acceptable to the Company. In addition, the TPA is required to provide annual evidence that said coverages are in effect. The most recent copies of this supporting documentation maintained by Group Stop Loss Sales and Marketing personnel show that the errors and omissions insurance and fidelity bond have expired. Therefore, we recommend that current evidence of errors and omissions insurance and fidelity bond coverage be provided to the Company by this TPA. In addition, we recommend that procedures be developed to help ensure that evidence of current in force required insurance coverages is regularly obtained from all TPAs.

3.   **Policyowner Services personnel should implement procedures to verify that commissions retained by third party administrators are correct.**

Our review of selected premium statements submitted by the TPA disclosed that the commission rates used by BRMS for two of the five plans administered by the TPA did not agree with the commission rates shown on Insynch, a Home Office database used for identifying all basic information related to each policy. That is, Insynch listed a rate of 12% for                        , whereas the TPA was retaining commissions of 10%. In the second instance, a commission rate of 10% was shown on Insynch for the                        plan, but the TPA was retaining commissions of 11%.

It was determined that the TPA was using the correct commission rate for                        and, accordingly, Home Office records were corrected by Policyowner Services personnel. However, incorrect commission rates were being used by BRMS for the                        plan based on an apparent misunderstanding by them. Stop Loss Issue and Compliance Department personnel have determined that the total

6

UNITED-4072

CONFIDENTIAL

overpayment is $6,055, consisting of $4,855 from 2004 and $1,200 for 2005, and they are in the process of recovering this commission overpayment from BRMS.

These variances between commission rates on Insynch and the commission rates used by BRMS indicate that the commission rates and corresponding commission amounts being retained by TPAs are not being verified in the Home Office. Therefore, we recommend that procedures be implemented to verify that the commission rates used by the various TPAs are correct and are in agreement with the rates shown on Insynch. The secondary issue of data integrity for commission rates recorded on Insynch represents a Home Office processing concern that has been addressed in a separate memorandum to the Stop Loss Issue and Compliance team.

4.    **Time service for paying claims should be improved.**

Time service is calculated as the time elapsed between the date the claim is received and the date the claim payment check is issued or additional information is requested. The TPA's standard is to perform these functions within 10 workdays for all claims. The reaudit of 85 claims by TPA Stop Loss Product Performance personnel disclosed that only 13% of the claims were handled within 10 workdays and 27% were handled within 15 workdays. We were informed that part of this delay could be attributed to the fact that 1,000 members were added to the Alta Bates Summit Medical Center group effective January 1, 2005. TPA Stop Loss personnel included a recommendation in their July report to BRMS to develop an action plan to help ensure that claims are processed timely according to plan provisions.

5.    **Case Management personnel should be notified in a timely manner of potentially large claims.**

Case Management personnel are not being notified in a timely manner when benefits exceed or are expected to exceed 50% of the Specific deductible. In addition, the TPA is not immediately notifying United when it becomes aware of catastrophic illnesses, injuries or diagnoses, such as premature birth, spinal cord injury, major head trauma, etc. This creates a risk that claims which could benefit from medical case management review to help control claim costs may not be reported in time for effective case management activities. It is important to identify large claims, especially premature babies and transplant cases, as early as possible, to help ensure the best medical and financial outcome for the claimant and the group. The TPA Guide, which is part of the third party administrator agreement, requires that the TPA notify the Company whenever benefits are expected to exceed 50% of the Specific deductible and to immediately notify the Company of any catastrophic illness, injury or diagnoses. It was determined, prior to the site review, that Stop Loss Medical Case management personnel were often not notified of potentially large claims until the TPA requested reimbursement. TPA Stop Loss personnel included a recommendation in their July report to BRMS to develop an action plan to help ensure that the TPA complies with the terms of the TPA Guide and notifies the Company in a more timely manner of claims that potentially could become large.

7

UNITED-4073

CONFIDENTIAL

## AUDIT RECOMMENDATIONS - STATUS REPORT

RESPONSE DUE BY:     November 10, 2005

AUDIT:     Benefit and Risk Management Services S/L TPA

AUDIT REPORT NUMBER:    2005-42

DATE OF ISSUE:     October 10, 2005

| AUDIT RECOMMENDATIONS REQUIRING FOLLOW-UP | DESCRIPTION OF ACTION TAKEN OR PLANNED TO BE TAKEN | DATE IMPLEMENTED OR ESTIMATED DATE TO BE IMPLEMENTED |
|---|---|---|
| 1. The third party administrator agreement should be amended to indicate that it is effective with United of Omaha Life Insurance Company. | Has been amended to "United" Referred in legal Report # 2005-1092 on 9-29-05. | 30 days or 10-29-05 |
| 2. The Third party administrator should provide evidence that errors and omissions insurance and a fidelity bond acceptable to the Company are being currently maintained. | Evidence has been submitted. Faxed to Ed thas 10-11-05 | Done |

_Tom Gage_
Tom Gage

_10-11-05_
Date

_Tom W. Gage_
Signature

Approved:    Bruce Thrasher - Sr Vice President Internal Audit

_____
Date

UNITED-4074