Exhibit S

92870b.txt

```
     1  THIS IS A ROUGH DRAFT TRANSCRIPT.  IT IS NOT CERTIFIED
     2  BY THE CERTIFIED SHORTHAND REPORTER AND CANNOT BE
     3  OFFERED AS THE OFFICIAL CERTIFIED TRANSCRIPT OF THESE
     4  PROCEEDINGS.  IT CANNOT BE CITED FROM OR USED IN ANY
     5  WAY TO REBUT OR CONTRADICT THE OFFICIAL CERTIFIED
     6  TRANSCRIPT OF THE PROCEEDINGS AS PROVIDED BY THE
     7  CERTIFIED SHORTHAND REPORTER.  IT IS PROVIDED FOR
     8  INTERNAL OFFICE USE OF THE CLIENT TO WHICH IT IS
     9  PROVIDED.
09:59   10
10:01   11
10:01   12  BY MR. WALL:
10:01   13      Q   Could you please state your name for the
10:01   14  record and spell your last name.
10:01   15      A   DeAnn Prefling, P, as in Paul, R-E-F, as in
10:01   16  Frank, L-I-N-G.
10:01   17      Q   Have you ever been deposed before?
10:01   18      A   No.
10:01   19      Q   So just let me briefly talk about how it's
10:01   20  going to work so we can go as smoothly as possible.
10:01   21  You see the reporter is taking down your testimony and
10:02   22  she's doing it stenographically, so we have to try not
10:02   23  to speak over each other so it makes it easier for her
10:02   24  to take down the testimony.
10:02   25      A   Okay.
```

                                                            1
                *** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

```
10:02    1      Q   And when you give your answers, please answer
10:02    2  audibly.  Please try not to shake your head or nod or
10:02    3  say uh-huh, things like that, because that's hard to
```
Page 1

92870b.txt

```
10:25  1       A    Worked with Claudia to address all of her key
10:25  2   points listed in the letter.
10:25  3       Q    Did you start working with her immediately
10:25  4   about the key points addressed in this letter?
10:25  5       A    I don't believe so.  I believe that the first
10:26  6   time I actually received the letter was sometime in
10:26  7   August, late August.  And between her and my schedule,
10:26  8   I don't believe that we actively started working on
10:26  9   these action items until the fall.
10:26 10       MR. DAVIS:  Of 2005?
10:26 11       THE WITNESS:  Of 2005.
10:26 12   BY MR. WALL:
10:26 13       Q    On the first page there's paragraph number 3;
10:26 14   do you see that?
10:26 15       A    Yes, I do.
10:26 16       Q    There's a discussion about trigger diagnoses.
10:26 17   Did you ever have any discussions with Claudia Wells
10:26 18   about trigger diagnoses that you can recall?
10:26 19       A    Not until this time.
10:26 20       Q    And what is the first discussion that can you
10:26 21   recall with Claudia talking about trigger diagnoses?
10:26 22       A    Talking about trigger diagnoses was following
10:26 23   this letter, when we started working on gathering some
10:26 24   reporting information for her.
10:26 25       Q    So sometime in the fall?
```

                                                              17
            *** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

```
10:26  1       A    Sometime in the fall of 2005.
10:27  2       Q    During the audit did anybody at Mutual of
10:27  3   Omaha tell you what type of trigger notifications
10:27  4   Mutual of Omaha was expecting?
```

92870b.txt

| | | |
|---|---|---|
| 10:27 | 5 | A    Other than -- not specific, not specifically, |
| 10:27 | 6 | no. |
| 10:27 | 7 | Q    What sort of changes did you start to |
| 10:27 | 8 | implement in September of 2005 in order to improve |
| 10:27 | 9 | BRMS's trigger reporting? |
| 10:27 | 10 | A    Actually, what we began in 2005 and started |
| 10:27 | 11 | to work towards was gathering reporting from our |
| 10:27 | 12 | utilization review system and not just our claims |
| 10:28 | 13 | system.  Typically we would run reports.  The large |
| 10:28 | 14 | claims reports that they received, which was their |
| 10:28 | 15 | requirement, was generated out of our claims system |
| 10:28 | 16 | based on claims paid dollars.  What we tried to do in |
| 10:28 | 17 | order to gain earlier notification on any potential |
| 10:28 | 18 | diagnosis was to run it out of our utilization review |
| 10:28 | 19 | system, which was a new feat for us. |
| 10:28 | 20 | Q    In 2004 and 2005, what type of searches was |
| 10:28 | 21 | BRMS able to do of its utilization review database? |
| 10:28 | 22 | A    Can you explain what you mean by "searches"? |
| 10:28 | 23 | Q    What type of information could be extracted |
| 10:29 | 24 | from the database? |
| 10:29 | 25 | A    We could extract from the database by group, |

                                                                18
*** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

| | | |
|---|---|---|
| 10:29 | 1 | which is by clients.  We could extract the activity by |
| 10:29 | 2 | service, which means that we could run a report and |
| 10:29 | 3 | say we had this many outpatient surgeries versus this |
| 10:29 | 4 | many inpatient stays, very general information. |
| 10:29 | 5 | Q    Could you extract information regarding |
| 10:29 | 6 | diagnoses? |
| 10:29 | 7 | A    No, we could not. |
| 10:29 | 8 | Q    By "extract," you mean electronically extract |

Page 16

```
                      92870b.txt
10:29   9  information?
10:29  10      A    Generate and run a report on, no, we could
10:29  11  not.
10:29  12      Q    Is there any way somebody could go in the
10:30  13  database and search for ICD-9 codes, for example?
10:30  14      A    The only way that an individual could do that
10:30  15  is to actually go in authorization by authorization
10:30  16  and look at all the key elements contained within that
10:30  17  information.  We didn't have the ability to report on
10:30  18  it.  We couldn't report on procedures that were done
10:30  19  or anything.
10:30  20      Q    Do you know what a 50 percent notice is?
10:30  21      A    Yes, I do.
10:30  22      Q    What is your understanding of a 50 percent
10:30  23  notice?
10:30  24      A    A 50 percent notice is a notification that is
10:30  25  given to a carrier once a claimant reaches 50 percent
                                                              19
             *** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

10:30   1  of their specific deductible in paid claims.
10:30   2      Q    And what is your understanding of a trigger
10:30   3  notice?
10:30   4      A    A trigger notice -- my understanding of a
10:31   5  trigger notice in Mutual's world, that we deal with
10:31   6  with carriers, is the same thing as a 50 percent
10:31   7  notification.  It's a notification that they're
10:31   8  approaching their specific deductible.
10:31   9      Q    You don't have an understanding that a
10:31  10  trigger notice is just a carrier wanting to be
10:31  11  notified when anybody has been diagnosed with a
10:31  12  catastrophic illness?
```

92870b.txt

```
10:31  13           MR. DAVIS:  My only objection is in terms of time
10:31  14   frame.
10:31  15           THE WITNESS:  Yeah.
10:31  16           MR. DAVIS:  It was involving concept, but you can
10:31  17   answer the question if you understand it.
10:31  18           THE WITNESS:  Today, yes, that's the way I
10:31  19   understand it, is they're looking for diagnoses of
10:31  20   catastrophic illnesses.  Typically how we used to
10:31  21   handle it in the past was anytime they reached a
10:31  22   certain threshold of their paid claims or if they were
10:31  23   in an active, current treatment plan for something
10:31  24   that we knew would become large.
10:32  25   BY MR. WALL:
                                                                    20
              *** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

10:32   1       Q   Now, do you personally fill out any of these
10:32   2   50 percent notices for United of Omaha?
10:32   3       A   No, I do not.
10:32   4       Q   Have you ever seen those forms before?
10:32   5       A   Yes, I have.
10:32   6       Q   Have you ever read any of the insurance
10:32   7   policies that United of Omaha issued to Alta Bates?
10:32   8       A   The actual policy that United of Omaha?
10:32   9       Q   Yes, stop loss policy.
10:32  10       A   I am sure that I have.
10:32  11       Q   Is that something that you review in your
10:32  12   work?
10:32  13       A   Yes, it would be something that I would
10:32  14   review.
10:32  15       Q   When do you review that type of -- those type
10:32  16   of documents?
```

Page 18

Exhibit T

MATT.txt

```
         1  THIS IS A ROUGH DRAFT TRANSCRIPT.  IT IS NOT CERTIFIED
         2  BY THE CERTIFIED SHORTHAND REPORTER AND CANNOT BE
         3  OFFERED AS THE OFFICIAL CERTIFIED TRANSCRIPT OF THESE
         4  PROCEEDINGS.  IT CANNOT BE CITED FROM OR USED IN ANY
         5  WAY TO REBUT OR CONTRADICT THE OFFICIAL CERTIFIED
         6  TRANSCRIPT OF THE PROCEEDINGS AS PROVIDED BY THE
         7  CERTIFIED SHORTHAND REPORTER.  IT IS PROVIDED FOR
         8  INTERNAL OFFICE USE OF THE CLIENT TO WHICH IT IS
         9  PROVIDED.
16:06   10
16:12   11
16:13   12
16:13   13  BY MR. WALL:
16:13   14      Q   Could you please state your name for the
16:13   15  record and spell your last name?
16:13   16      A   Matthew Schafer, S-C-H-A-F-E-R.
16:13   17      Q   Have you ever been deposed before?
16:13   18      A   Yes.
16:13   19      Q   How many times?
16:13   20      A   Three, roughly, my best recollection.
16:13   21      Q   So you know a little bit about the process
16:13   22  and you have been sitting through the deposition
16:13   23  today.
16:13   24      A   Yes.
16:13   25      Q   So we'll try not to speak over each other and
```
                                                                    1
                 *** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

```
16:13    1  you understand that you have to answer audibly.  Is
16:13    2  there any reason you can't give your best testimony
16:13    3  today?
```
                                Page 1

MATT.txt

14:55 10   standards.  I think it's discussed in No. 4 of how the
14:55 11   whole TPA industry and TPAs in general can adopt new
14:55 12   technology to identify claims and do early
14:55 13   intervention and this is a subject that continues
14:56 14   today by all TPAs.
14:56 15       Q    What do you recall anyone from Mutual of
14:56 16   Omaha telling you about the notification of trigger
14:56 17   reporting and how they felt BRMS was handling that?
14:56 18       A    They were very aware that we did not have
14:56 19   reports that automatically identified trigger
14:56 20   diagnosis.  We discussed what set of trigger -- over
14:56 21   and again not in necessarily the context of the 2004
14:56 22   or 2005, but over the period of relationship with
14:56 23   Mutual we had conversations about what constitutes a
14:56 24   trigger diagnosis, whether we're going to use any @IC
14:56 25   standards, whether we're going to have their own

106
*** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

14:56  1   particular standards.  I think from time to time I may
14:56  2   have been asked what other carriers we're looking at.
14:56  3   We discussed our strategies and how we were going to
14:56  4   build the capabilities and we also discussed pitfalls
14:57  5   of this because there is a downside to trigger
14:57  6   diagnosis.  We discussed in general how we're going to
14:57  7   get there.
14:57  8            Somewhere in the '04, '05, time frame we
14:57  9   adopted a process to try to give them notes on people
14:57 10   they identified and modify our current reports until
14:57 11   we got the blessing on some type of trigger diagnosis
14:57 12   report that they liked.
14:57 13       Q    Tried to get the notes on people they

Page 93

MATT.txt

14:59 18   and we discussed our ability to report, how we were
14:59 19   doing it, and how we've done it for previous years
14:59 20   past.  Tom and I have worked together with other
14:59 21   companies.  We also, as I just mentioned, put together
14:59 22   process and procedures to try to identify when
14:59 23   physically and human possible when you process 50 to
14:59 24   80,000 a claims a year for somebody, when do you
14:59 25   report them.  When do you know, what is the definition

108
*** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

14:59  1   of when you're reasonably be aware.  So we kind of
14:59  2   came to some standards that we work together on until
14:59  3   we developed a trigger diagnosis report.
14:59  4        Q   Did BRMS make any changes to its procedures
14:59  5   in response to this paragraph number four in the 2004
14:59  6   audit?
14:59  7        MR. DAVIS:  The objection is it assumes fact is
15:00  8   not in evidence that paragraph four was actually a
15:00  9   policy and procedure as of the day of that letter or
15:00 10   at any time.  Aside from what the letter says, he's
15:00 11   asking you whether policies and procedures changed,
15:00 12   which means they had to change from something.  You
15:00 13   can answer the question.
15:00 14        THE WITNESS:  Throughout our relationship with
15:00 15   Mutual of Omaha we were always working with them and
15:00 16   in constant conversation with them about changes,
15:00 17   improvements.  I'm privy to changes and improvements
15:00 18   that they made within their own internal organization
15:00 19   and Tom and I had this type of relationship.  So I
15:00 20   believe we were working with them on procedure changes
15:00 21   and actually implemented procedure changes that they

Page 95

```
                                    MATT.txt
15:00  22   were comfortable with and that they accepted on an
15:00  23   ongoing basis over the couple of years until we
15:00  24   developed the technology to do what they wanted for
15:01  25   trigger diagnosis reporting.
                                                              109
             *** ROUGH REALTIME TRANSCRIPT - NOT CERTIFIED ***

15:01   1   BY MR. WALL:
15:01   2       Q   Can you think of my specific changes that
15:01   3   were made in 2004 and 2005?
15:01   4       A   In the periods of 2004, 2005, we put them in
15:01   5   direct contact with our nurse case manager and we
15:01   6   would take a standard paid claims report and we would
15:01   7   put notes.  Typically that report is a report that is
15:01   8   not dynamic.  It's a report that comes out of system
15:01   9   and reports paid claims.  We would work with them on
15:01  10   people they wanted to know.  If we knew somebody was
15:01  11   in active case management we would also give them
15:01  12   information on that and that was a dialogue that took
15:01  13   place between our medical department and us in 2004,
15:01  14   2005 time frame.
15:02  15           (Recess.)
15:22  16   BY MR. WALL:
15:22  17       Q   I would like to talk about Exhibit 203.  It's
15:22  18   the 2005 audit letter.
15:22  19   BY MR. DAVIS:
15:22  20       Q   Go ahead as long as he has it.  I'm good.
15:22  21   BY MR. WALL:
15:22  22       Q   You testified earlier that you remember
15:22  23   seeing at least these accuracy numbers in this audit?
15:23  24       A   Yes.
15:23  25       Q   Did you have any meetings with anyone at BRMS
                                Page 96
```

Exhibit U

```
         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF CALIFORNIA


ALTA BATES SUMMIT MEDICAL  )
CENTER,                    )
                           )
     Plaintiff,            )
                           )
             -vs-          ) Case#C07-4224 JSW
                           )
UNITED OF OMAHA LIFE       )
INSURANCE COMPANY, et al., )
                           )          DEPOSITION
     Defendants.           )
                           )


             *** CONFIDENTIAL ***


           DEPOSITION OF CLAUDIA WELLS


          Deposition of CLAUDIA WELLS, taken
on behalf of the Plaintiff, at Erickson &
Sederstrom, 10330 Regency Parkway Drive,
Suite 100, Omaha, Nebraska, beginning at
9:04 a.m., Wednesday, June 25, 2008, before
Bobbi M. Randall, RPR, CSR, a General Notary
Public within and for the State of Nebraska,
pursuant to Notice.

            BOBBI M. RANDALL, RPR, CSR
         MATHESON-TAULBORG-DENNEY-SCHLEIFE
            7602 Pacific Street, LL101
                 Omaha, NE  68114
                  (402) 397-9669
```

ORIGINAL

```
 1                        APPEARANCES

 2       For the Plaintiff:

 3       MARCIA L. AUGSBURGER
         LESLIE C. MURPHY
 4       Attorneys at Law
         Ninth Floor
 5       555 Capitol Mall
         Sacramento, CA  95814
 6
         For the Defendants:
 7
         TRAVIS WALL
 8       Attorney at Law
         Ninth Floor
 9       650 California Street
         San Francisco, CA  94108
10
         DAVID A. BARRON
11       Attorney at Law
         Mutual of Omaha Plaza
12       Omaha, NE  68175

13                          INDEX

14
         CLAUDIA WELLS                                Page
15
         Direct Examination by Ms. Augsburger           4
16
         Certificate                                  191
17

18       EXHIBITS:                                  Marked

19       38 - Company Practices for Group Stop-
              Loss Coverage                            14
20
         39 - Select Risk Questionnaire, 2003          28
21
         40 - Select Risk Questionnaire, 2004          28
22
         41 - Third Party Administrator Agreement     33
23
         42 - Third Party Administrator Guide         35
24
         43 - PPO Network Contact List                42
25
```

```
 1  still uses the services of those -- the other
 2  TPAs?
 3      A    Okay, Mutual of Omaha what?
 4      Q    Do you know whether they still use the
 5  services of the other two TPAs where internal
 6  audit went to audit them?
 7      A    I don't know what you mean by services,
 8  Mutual of Omaha uses services.
 9      Q    Do they still have relationships with
10  those TPAs?
11      A    Yes, they do.
12      Q    What was your understanding of what
13  internal audit was going to be looking for when
14  they went along on the BRMS audit?
15      A    Premium.
16      Q    What do you mean?
17      A    Premium audits.
18      Q    Can you be a little more --
19      A    They would look at the -- how the
20  premium is collected and distributed.  I'm not
21  real sure exactly what's all in their audit,
22  what's included in their audit.
23      Q    Okay.  By premiums, what premiums are
24  you talking about?
25      A    The premiums that are collected.
```

```
 1        STATE OF NEBRASKA          )
                                     )  ss
 2        COUNTY OF DOUGLAS          )

 3              I, Bobbi M. Randall, RPR, CSR a General
 4        Notary Public in and for the State of Nebraska, do
 5        hereby certify:
 6              That prior to being examined, the
 7        witness named in the foregoing deposition, CLAUDIA
 8        WELLS, was by me duly sworn to testify the truth,
 9        the whole truth, and nothing but the truth;
10              That said deposition was taken before me
11        at the time and place set forth and was taken down
12        by me in shorthand and thereafter reduced to
13        computerized transcription under my direction and
14        supervision, and I hereby certify the foregoing
15        deposition is a full, true, and correct transcript
16        of my shorthand notes so taken.
17              I further certify that I am neither
18        counsel for nor related to any party to said
19        action nor in any way interested in the outcome
20        thereof.
21              IN WITNESS WHEREOF, I have hereunto
22        subscribed my name this July 14th, 2008.
23
24                         [signature]
25                         Bobbi M. Randall, RPR, CSR
                           General Notary Public
```

[GENERAL NOTARY - State of Nebraska
BOBBI M. RANDALL
My Comm. Exp. April 12, 2012]

Exhibit V

                                CONFIDENTIAL



**Ed Haas/MutualOMA**
07/18/2005 06:55 AM

To  Claudia Wells/MutualOMA@Mutual of Omaha
cc  Hugh Spellman/MutualOMA@Mutual of Omaha
bcc
Subject  Fw: BRMS

Claudia, I was not in the office last week. Hence, my delay in responding.

I haven't looked at BRMS yet and probably won't for a couple weeks. I didn't note any issues that will need addressing by the TPA but suggest you leave room for a comment if something develops as I wrap up my work.

Please send me a copy of your report when it is released so I can incorporate your findings in my report.

Thanks,

----- Forwarded by Ed Haas/MutualOMA on 07/18/2005 06:49 AM -----



**Claudia Wells/MutualOMA**
07/14/2005 11:42 AM

To  Ed Haas/MutualOMA@Mutual of Omaha
cc
Subject  Fw: BRMS

Correction will be completing my BRMS report in the next couple of day.
Too many similar acronyms.

----- Forwarded by Claudia Wells/MutualOMA on 07/14/2005 11:40 AM -----



**Claudia Wells/MutualOMA**
07/14/2005 11:39 AM

To  Ed Haas/MutualOMA@Mutual of Omaha
cc
Subject  BRMS

Hi Ed, I just returned from MT and need to focus the next couple of days of completing my ~~EBMS~~ BRMS report. Please let me know if you noted any problems or concerns during your audit and feel should be included in my report or provide me a "brief" report on your findings.

Thanks



<pre>                                                        UNITED-3832</pre>

CONFIDENTIAL



Claudia Wells/MutualOMA
07/08/2005 10:46 AM

To  Georgeann Baxter/MutualOMA@Mutual of Omaha
cc  Mark Brewer/MutualOMA@Mutual of Omaha
bcc
Subject  BRMS

DeAnn Prefling at BRMS provided the following e-mail address for sending contracts and commission schedules:

Julie Mendonca-Senior Account Executive///juliem@brmsonline.com

UNITED-3833