# Exhibit A

```
                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA


ALTA BATES SUMMIT MEDICAL    )
CENTER,                      )
                             )
     Plaintiff,              )
                             )
              -vs-           )Case#C07-4224 JSW
                             )
UNITED OF OMAHA LIFE         )
INSURANCE COMPANY, et al.,   )
                             )         DEPOSITION
     Defendants.             )
                             )
```

*** CONFIDENTIAL ***


DEPOSITION OF CAROL TARKOWSKI


Deposition of CAROL TARKOWSKI, taken on behalf of the Plaintiff, at Erickson & Sederstrom, 10330 Regency Parkway Drive, Suite 100, Omaha, Nebraska, beginning at 8:30 a.m., Friday, June 27, 2008, before Bobbi M. Randall, RPR, CSR, a General Notary Public within and for the State of Nebraska, pursuant to Notice.

```
         BOBBI M. RANDALL, RPR, CSR
    MATHESON-TAULBORG-DENNEY-SCHLEIFE
         7602 Pacific Street, LL101
              Omaha, NE  68114
                (402) 397-9669
```

ORIGINAL

```
 1                    APPEARANCES

 2   For the Plaintiff:

 3   MARCIA L. AUGSBURGER
     LESLIE C. MURPHY
 4   Attorneys at Law
     Ninth Floor
 5   555 Capitol Mall
     Sacramento, CA  95814
 6
     For the Defendants:
 7
     TRAVIS WALL
 8   Attorney at Law
     Ninth Floor
 9   650 California Street
     San Francisco, CA  94108
10
     DAVID A. BARRON
11   Attorney at Law
     Mutual of Omaha Plaza
12   Omaha, NE  68175

13                      INDEX

14
     CAROL TARKOWSKI                              Page
15
     Direct Examination by Ms. Murphy                3
16
     Certificate                                   144
17

18   EXHIBITS:                                  Marked

19   116- 1500 Form                                123

20   117- Stop Loss Contract & Plan Document
             Information                           123
21
     118- Appeals                                  123
22

23

24

25
```

```
 1   will be in your pile in front of you.
 2        A    (Witness obliged.)
 3        Q    Exhibit 46 is titled Stoploss Department
 4   Claims Manual.  Is this the manual that you were
 5   referencing earlier?
 6        A    Yes.
 7        Q    Is this the training manual?
 8        A    Yes.
 9        Q    And if you turn the page there, you see
10   that it starts at page 5.  Do you typically use
11   pages 1 through 4 in the normal course of
12   business?
13        A    Yes.
14        Q    Do you know who wrote this?
15        A    When you say 1 through 4, I think it
16   might be mostly table of contents, but I don't
17   know.
18        Q    Okay.
19        A    But I put this together.
20        Q    Okay.  When did you do that, if you
21   recall?
22        A    It was, I believe, in the end of 2005,
23   end of 2006.
24        Q    Why did you prepare the manual?
25        A    Upper management -- my boss had
```

1   indicated we all needed to make sure that we
2   documented our processes, so we all -- each area
3   decided that we needed to put together a manual.
4       Q   And who is your boss?
5       A   At that time?
6       Q   Yes.
7       A   Julie Moore.
8       Q   And currently?
9       A   Joseph Conley.
10      Q   Prior to you creating this Stoploss
11  Department Claims Manual, was this a similar type
12  manual or is this the first of its kind?
13      A   This was the first manual.
14      Q   Okay.  I can see it says, Claims
15  Processing Procedures and Guidelines, and it lists
16  out mail, processing a claim, and I'm just going
17  to focus on the disclosure.  It says, To see if an
18  individual's health conditions and/or trigger
19  diagnosis, for list see below, was disclosed to
20  MoO during the underwriting process, the claim
21  analyst should look in the system for the
22  disclosure notice, lasered/disclosed tab in the
23  contracts module.  Do you see that part?
24      A   Yes.
25      Q   Is that information stored in a computer

```
 1   system?
 2        A    Yes.
 3        Q    Is that the SLIIC system?
 4        A    Yes.
 5        Q    The select risk questionnaire that we
 6   looked at earlier in the policy, is that loaded
 7   onto the SLIIC system?
 8        A    The specific -- that form, no, but the
 9   contents, they will put those individuals into the
10   system.
11        Q    Okay.  So they basically summarize it
12   and put it in the computer so you can --
13        A    Yes.
14        Q    Are they all listed, for example, in a
15   stoploss spreadsheet -- I'm sorry, in an Excel
16   spreadsheet?
17        A    I think at one time there were Excel
18   spreadsheets.
19        Q    Are the patients with high dollar claims
20   separated from the patients with trigger
21   diagnoses?
22        A    I don't know how the TPA -- the TPA
23   sends the information in.  They may send in
24   information that is specific to, here is the high
25   dollar claims.  They may send in a report that,
```

1  here are those trigger diagnosis claims.  It would
2  depend on the TPA and how they send it in.  Then
3  the nurses review that information, so I don't
4  know how that information would be sent in.
5      Q   Right.  But in the SLIIC system where
6  it's summarized, where it says that the individual
7  health conditions and/or trigger diagnoses, are
8  those in any particular order?
9      A   I don't believe so.
10     Q   Okay.  The next paragraph says, If one
11 is not there, then the stoploss RNs should be
12 contacted to see if they knew anything about the
13 individual's conditions.  If proper disclosure was
14 provided, or the nurses determine that disclosure
15 was not necessary, the claim can continue to be
16 considered for reimbursement.  A copy of the large
17 claim review should be placed in the claim file.
18         Is this accurate, how your claims
19 analysts handle stoploss reimbursement claims in
20 2005?
21     A   Yes.
22     Q   Would they always go to a stoploss
23 nurse?
24     A   Yes.
25     Q   And for BRMS would that nurse be

if there is any disclosure information in one or the other. We usually go to the contract folder first.

Q   Is that the green policy file?

A   Yes.

Q   And what are the claims analysts checking for?

A   They're looking to see if that individual was listed on any of the information we received.

Q   Anything else they would look for?

A   As far as disclosure? They will look at the disclosure statement, see if there is disclosure in there, and then they will look at any of the information attached with that disclosure.

Q   So their first step would be to go to case management nurses to find out if they knew anything about the patient, and then -- and if they said they did not know about the patient, then you would go and check the underwriting file and the contract file, the green policy file?

A   Yes.

Q   The next paragraph says, If there is still a question as to whether the claimant was

1  everything up. So you have done your due
2  diligence, you've looked at disclosure, you find
3  there might be an issue, you don't think this
4  person was disclosed, now you need to put together
5  information so that we can begin the process of
6  discussing this.
7      Q   At this point would you expect your
8  claims analysts to notify you?
9      A   Usually, yes.
10     Q   Are you notified about all of the claims
11 that have disclosure issues?
12     A   Normally. I don't know that I was
13 notified of all.
14     Q   Can you give me a general sense, for
15 example, in 2005, how many claims had disclosure
16 issues?
17     A   I don't recall.
18     Q   Do you think it was over a thousand?
19     A   No. It would be a small number.
20     Q   Over 50?
21     A   No.
22     Q   Less than ten?
23     A   Yes.
24     Q   Okay. The next paragraph says, Once all
25 of this information is gathered, the claims

1  analysts will review the information, including
2  any necessary input from the underwriter, case
3  management nurse, and management prior to
4  resolving the disclosure issue.
5         Can you explain what this sentence is
6  describing?
7       A    So the claim analyst had discussed the
8  information with everyone and received all the
9  necessary input from everyone involved, and now
10 there's going to be -- they're going to talk to
11 management about the disclosure issue.
12      Q    It says, The underwriting department's
13 time service standards allow underwriter up to two
14 business days to respond.  It may be necessary to
15 refer the claim to claims supervisor for final
16 decision regarding the handling of a claim that
17 was not disclosed and should have been disclosed.
18 Now, the claims supervisor, is that you?
19      A    Yes.
20      Q    So if all of this happened, the
21 consulting with the case manager and the
22 underwriter, would you expect your claims analyst
23 to come to you before denying that claim?
24      A    I would expect that I would be included
25 in any further discussions.

1  information from the TPA. Usually that is a part
2  of it as well, that they're going to explain why
3  this was not disclosed.
4      Q    In the couple of instances that you
5  generally recall, do you recall why -- what
6  information that you had received that resulted in
7  an exception being made?
8      A    I can't recall their specifics of it, to
9  tell you the truth.
10     Q    Okay. Do you recall generally what time
11 frame that was?
12     A    What do you mean?
13     Q    The claims that there was an exception
14 made, was that something that happened this year?
15 Last year?
16     A    I know there were a couple in 2005 and
17 2006. There was one this year.
18     Q    Aside from the process that we just
19 walked through on these two pages there, is this
20 the general guideline that you expect your claims
21 analysts to follow when reviewing a stoploss
22 claim?
23     A    Yes.
24     Q    Okay. On the next page it says,
25 Disclosure and Laser Issues with Underwriting.

1   And it says, I have had some discussions with John
2   Lenagh, and it is apparent everyone is doing a
3   good job of identifying possible disclosure or
4   laser problems.  What's the difference between a
5   disclosure and a laser problem?
6       A   A laser problem would be that we know
7   this individual was disclosed, and the nurse may
8   have even projected and they project higher than
9   the specific deductible.  So in a claims person's
10  mind, maybe this person should have been lasered
11  and they weren't.  So we will go back to the
12  underwriting department just to make sure our
13  contract is correct, this person wasn't to be
14  lasered, and then we can go ahead and apply the
15  specific deductible.
16      Q   Right.  And this next couple of
17  sentences here, you're pretty much describing that
18  situation where sometimes your analysts go back to
19  underwriting and say, Hey, why didn't you laser
20  this person?
21      A   Yes.
22      Q   And you're just telling them to give
23  them a break and --
24      A   Yes.
25      Q   It says, The underwriters feel we are

```
 1   So they have certain requirements on that select
 2   risk questionnaire of individuals that they have
 3   to let us know about.  That's disclosure, so
 4   whether it's someone who is off work, someone who
 5   has 50 percent of spec already, someone who has a
 6   trigger diagnosis, someone who is in the hospital,
 7   all of these -- whatever the requirements are, I
 8   haven't read them all, or offhand -- but they are
 9   required to disclose those individuals on the
10   select risk questionnaire prior to issuing the
11   policy.
12       Q    So when you deny a claim for -- let me
13   rephrase that.  Is it the practice of Mutual of
14   Omaha when they are reviewing a stoploss claim
15   with a disclosure issue that the only thing -- or
16   the first thing that you look at is the select
17   risk questionnaire?
18       A    Can you repeat that?
19       Q    Sure.  I can.  It wasn't a very good
20   question.  Let me try it again.  When you receive
21   a stoploss claim and you believe there's a
22   disclosure issue and you go back to the files, do
23   you believe it's typical that the first thing that
24   you look at is a select risk questionnaire?
25       A    Yes.
```

1   Q   If the person is not listed on the
2 select risk questionnaire, what happens next?
3   A   Then we go to the nurse. Often they
4 receive data that's very expansive, and it's
5 attached to the select risk questionnaire. And
6 whether or not that data is in our file, we'll
7 look in the file, the contract file, see what data
8 is in there and what information the nurses
9 received during the renewal or selling process.
10   Q   And if the person is not listed on the
11 select risk questionnaire, would you also speak
12 with the underwriter?
13   A   Yes.
14   Q   And have you had occasion where the
15 underwriter had information that was not in the
16 file that you had, that you initially reviewed?
17   A   I don't recall that happening.
18   Q   What if they did?
19   A   We would review that information with
20 them.
21   Q   Okay. Can I have you next look at
22 Exhibit 114?
23   A   (Witness obliged.)
24   Q   This is similar to the email that we
25 looked at previously, but it has some bolding

```
 1      STATE OF NEBRASKA          )
                                   ) ss
 2      COUNTY OF DOUGLAS          )

 3           I, Bobbi M. Randall, RPR, CSR a General
 4      Notary Public in and for the State of Nebraska, do
 5      hereby certify:
 6           That prior to being examined, the
 7      witness named in the foregoing deposition, CAROL
 8      TARKOWSKI, was by me duly sworn to testify the
 9      truth, the whole truth, and nothing but the truth;
10           That said deposition was taken before me
11      at the time and place set forth and was taken down
12      by me in shorthand and thereafter reduced to
13      computerized transcription under my direction and
14      supervision, and I hereby certify the foregoing
15      deposition is a full, true, and correct transcript
16      of my shorthand notes so taken.
17           I further certify that I am neither
18      counsel for nor related to any party to said
19      action nor in any way interested in the outcome
20      thereof.
21           IN WITNESS WHEREOF, I have hereunto
22      subscribed my name this July 14th, 2008.
23
24                    _____
25                    Bobbi M. Randall, RPR, CSR
                      General Notary Public
```

[SEAL: GENERAL NOTARY-State of Nebraska, BOBBI M. RANDALL, My Comm. Exp. April 12, 2012]

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
 2
    ALTA BATES SUMMIT MEDICAL      )
 3  CENTER,                        )
                                   )
 4         Plaintiff,              )
                                   )
 5              -vs-               ) Case#C07-4224 JSW
                                   )
 6  UNITED OF OMAHA LIFE           )
    INSURANCE COMPANY, et al.,     )
 7                                 )        CERTIFICATE
           Defendants.             )
 8  _____)

 9

10  CERTIFICATE OF DEPOSITION OF CAROL TARKOWSKI

11

12                         Taken in behalf of
                           the Plaintiff.
13
    Date:  June 27, 2008
14
    The Original Deposition is
15  in the possession of:

16
    MARCIA L. AUGSBURGER
17  Attorney at Law
    Ninth Floor
18  555 Capitol Mall
    Sacramento, CA  95814
19
    Costs:  $1,026.00
20
                       [signature]
21              _____
                BOBBI M. RANDALL, RPR, CSR
22              GENERAL NOTARY PUBLIC

23              DATE:  July 14, 2008

24              [NOTARY STAMP: GENERAL NOTARY-State of Nebraska
                BOBBI M. RANDALL
25              My Comm. Exp. April 12, 2012]
```